109332

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN RE: COUNTRYWIDE FINANCIAL CORP. CUSTOMER DATA SECURITY BREACH LITIGATION | Case No. 3:08-MD-01998-TBR<br><br>MDL No. 1998<br><br>HONORABLE THOMAS B. RUSSELL |

**MEMORANDUM OF PLAINTIFFS, MATTHEW AND DANIELLE HOLMES, IN OPPOSITION TO THE MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT**

## I.     INTRODUCTION

Plaintiffs, Matthew and Danielle Holmes, by their undersigned counsel ("Holmes"), hereby oppose the Motion for Preliminary Approval of Proposed Class Action Settlement and Publishing of Notice, and Setting of a Final Fairness Hearing ("Motion for Preliminary Approval").  The proposed nationwide class action settlement appears from the facts of record – which admittedly are sparse due to the complete lack of discovery at this preliminary stage of the proceedings – to present a classic example of a "reverse auction"[1] which Federal Courts routinely have frowned upon.  Here, the Countrywide Defendants successfully sought out a group of Plaintiffs' counsel who were willing to compromise the rights of a vast, consumer settlement Class (which greatly exceeds the scope of the litigation Class sought to be represented in this MDL proceeding), in exchange for little more than what Countrywide had offered the victims of

---

[1]     The phenomena of "reverse auction" settlements in class action cases, and the District Court's responsibilities in evaluating the same, was most notably addressed in the seminal case of *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002).  As the authorities cited in *Reynolds* and its progeny and thereafter point out, this Court must be wary of the staged presentation being made by the proponents of the settlement, the Countrywide Defendants and the plaintiff Barnow Group, as part of their joint request for preliminary approval.  This wariness is driven by the fact that these former adversaries are now aligned in support of a settlement that will extinguish the rights of millions of consumers.

1

the data breach last September in its letter to affected consumers.  Of course, there also is a promise to pay an indeterminate amount of attorneys' fees and costs, which immediately should cause appropriate "red flags" to go up, as the fees in this case may eclipse the overall recovery by the Class.

Because this proposed settlement comes so early on in the case – even before this Court's first scheduled "status conference" now slated for February 17, 2009 – this Court has precious little evidence to draw upon in making its requisite determinations of "fairness, reasonableness and adequacy" for purposes of preliminary approval.  The Holmes, and the other absent Class member clients of the undersigned firms[2], have the same problem in evaluating the settlement for their own purposes.  But, we submit that this Court can and should look outside this case in evaluating the proposed settlement.   There are at least 3 other known cases involving data security breaches that might inform this Court in deciding whether the proposed settlement of this case is fair, reasonable and adequate – two of which involve the same lawyers who have brokered the deal before this Court:

1.   *In re: Department of Veterans Affairs Data Theft Litigation*, No. 06-0506, MDL 1796 (D.D.C.) (Robertson, J.) ("*VA case*")[*See* documents at Exhibit "A" hereto];

2.   *In re: Lending Tree, LLC, Customer Data Security Breach Litigation,*  No. 3:08-cv-00229, MDL 1976 (W.D.N.C.) (Whitney, J.) (involving the same defense counsel from Reed Smith, as here)("*Lending Tree*")[*See* documents at Exhibit "B" hereto]; and

3.   *In re: TJX Companies Retail Securities Breach Litigation*, No. 07-10162, MDL 1838 (D.Mass.)(Young, J.)("*TJ Maxx*")[*See* documents at Exhibit "C" hereto].

---

[2]     The undersigned represent nearly a dozen consumer Class members who were affected by Countrywide's data security breach.

In the VA and TJ Maxx cases, litigation milestones and/or settlement benefits far greater than those proposed in this case were achieved for the Classes.[3]  All of these cases had proceeded through at least some discovery, allowing the Court to be better informed as to the merits of the claims being settled.

In the *VA case*, on January 27, 2009, settlement papers were filed with the U.S. District Court for the District of Columbia presenting a proposed settlement of class action claims by victims of a data breach caused by the theft of a Veterans Affairs Department laptop computer which contained the names, birth dates, insurance information and Social Security numbers of millions of veterans and active duty troops.  The settlement provides a fund of $20 million to be paid out of the federal treasury (*ie.* taxpayer dollars) to compensate the victims.  While the lawsuit had sought $1,000 in damages  for each Class member, the settlement provides a minimum of $75 for each claimant up to a maximum $1,500 for "actual harm" suffered as a result of the breach.[4]

Remarkably, in the *VA case*, the stolen laptop was recovered by the FBI and the thieves were apprehended, ending the threat of future identity theft.[5]  Perhaps even more remarkable is the fact that "forensic investigators determined that the criminals had not accessed sensitive

---

[3]      The Lending Tree case is currently in litigation.

[4]      Unlike here, "actual harm" is broadly defined to include physical symptoms of emotional distress or out-of-pocket expenses incurred by reason of the breach.

[5]      Such a threat remains significant in this case.  As discussed more fully below, unlike any other case known to the undersigned, here the cause of the data breach is known (it was stolen by a Countrywide employee, Rebollo), the intended use of the confidential data of the Class is known (it was sold for future commercial use by customers of Rebollo's accomplice, Siddiqi), the threat of identity theft is real (the Holmes believe their identity may have been stolen by virtue of an unauthorized attempted purchase of an automobile in their names), and the continuing threat of identity theft remains (because Countrywide has done nothing to try to retrieve the stolen data, even though the recipients are both known and knowable).

data", meaning that no "information involved in this incident was used to harm a single veteran." *See* Settlement Agreement and articles attached collectively at Exhibit "A".

In *Lending Tree*, as here, employees of Lending Tree perpetrated a theft of personal data using computer access the company had failed to terminate after the employees left the company. While the case has yet to settle, what is perhaps most noteworthy about the lawsuit is that the same defense counsel as here have pursued claims against the third party recipients of the stolen data in an effort to recover the same and prevent future identity theft of the consumer victims. *See* articles attached as Exhibit "B". Here, not only has Reed Smith *not* pursued such a course against known and knowable recipients of the personal data sold by Rebollo and Siddiqi, they have actively opposed the efforts of the Holmes to do so, by opposing the Holmes' Subpoena to the FedEx Kinko's where Rebollo copied and distributed the stolen confidential data. *See* Motion for Leave. In light of the importance to consumers like the Holmes that reasonable assurances be provided through this lawsuit that they will not suffer identity theft in the future due to Countrywide's negligence, Reed Smith's opposition in this regard should cause concern for both the Court and the Class. *See* January 26, 2009 Letter, attached as Exhibit "D".

Lastly, in *TJ Maxx*, the same Plaintiff attorneys that have proposed this Settlement, reached a Settlement after TJ Maxx announced that there had been unauthorized intrusions into portions of their computer systems containing Personal Confidential Information. In that Settlement Agreement, TJ Maxx agreed to provide *inter alia,* three (3) years of credit monitoring as well as the retention of an independent expert who was to "submit a written report to plaintiffs' designated independent expert, setting forth any actions taken or planned to be taken by TJX, subsequent to TJX's discovery of the intrusion, to enhance the security of TJX's computer system." Settlement Agreement at 19, attached as Exhibit C. Upon receiving the

4

report and meeting with TJX's expert, Plaintiffs' independent expert in that case was to provide "a responsive letter to plaintiffs stating whether the Enhancement Actions are, in the judgment of plaintiff's independent expert, a prudent and good faith attempt by TJX to minimize the likelihood of intrusions in the future."   *Id.*   Here, not only has there not been any formal discovery into the causes of the underlying breach and vulnerabilities of the Countrywide security system, but the Proposed Settlement provides only for confirmatory discovery  of corrective actions taken by Countrywide to be conducted by the very attorneys who have entered into the Settlement, who are not qualified to make such an assessment.  The lack of adequate discovery into the steps taken by Countrywide to fix their security system's weaknesses by qualified experts or personnel should cause concern for both the Court and the Class.

On its face, the proposed settlement here seeks to trade valuable rights against the Countrywide Defendants for the same credit monitoring that Countrywide already has offered and already paid for back in September 2006.  While it offers two minimal cash funds to reimburse certain expenses, $1.5 million and $5 million respectively, it imposes stringent eligibility requirements and caps on individual claim values.  Because the claims are paid on a first-come, first-served basis, future claimants likely will find their rights completely released for no value when they ultimately suffer identity theft in a year, 2 years or even 7 years from now due to the unabated data theft.[6]

---

[6]     According to Countrywide, "[o]ne of the menacing problems of identity theft is that it can happen more than once. Once the initial incident is resolved, the thief may begin using the victim's identity again after waiting 6 months to a year and the cycle begins all over again." *See* Privacy and Security in the Countrywide Family, attached to Complaint at Exhibit "A".

Only this Court – as the ultimate fiduciary for the members of the Class and the final arbiter of who is best suited to represent their interests[7] – can prevent a miscarriage of justice by an ill-timed and uninformed settlement.

As set forth more fully herein, the Holmes respectfully submit that the relief requested by the Motion for Preliminary Approval should be denied for the following reasons:[8]

1.    The proposed nationwide settlement does not fall within any reasonable "range of possible approval".

2.    There has been no formal discovery taken of any Defendant in the action, including Defendants named only by the Holmes in their Complaint,[9] and it is therefore virtually impossible for the Court to accurately make an appraisal of the settlement.

---

[7]    This Court owes the Class the highest level of protection the law affords – that of a fiduciary – to protect their interests and to ensure that they are represented adequately. *See Reynolds*. 288 F.3d at 279-80. Moreover, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the Court must undertake a distinct inquiry into what counsel is "best able to represent the interests of the class" for purposes of its class counsel appointment. Fed.R.Civ.Proc. 23(g)(1)(C)(ii).

[8]    The Barnow Group seeks all of the following by their Motion for Preliminary Approval: (1) preliminary approval of the proposed nationwide settlement, (2) certification of the proposed nationwide class, and (3) appointment of the named class representatives and their counsel as the adequate representatives of the proposed nationwide Class.

[9]    The Holmes' alone have sued Rebollo and Siddiqi, as principal actors in the data security breach and theft. They also alone have sued as "Doe Defendants" all the individuals and businesses who purchased the confidential data stolen by Rebollo and Siddiqi. Consequently, regardless of the outcome of this Court's determination of the fairness of the proposed settlement with Countrywide, the Holmes' class action lawsuit will continue against these other parties for declaratory and injunctive relief and damages. It is respectfully submitted that, because these Defendants may have claims against Countrywide for contribution and indemnity, among others, and vice-versa, prudence dictates that they should be identified, served with process, and permitted to enter their appearances through counsel before any final release is granted to Countrywide. Furthermore, because the proposed settlement defines "Released Claims" as including "Unknown Claims", the Holmes and Class should be entitled discovery of facts pertaining to such "Unknown Claims" before releasing them. *See* Settlement Agreement [Docket No.7-2] at 1.23, 1.27; *see also*, discussion below.

3.      The figure espoused as the value of the proposed settlement is grossly inflated, rising potentially to a level of misrepresentation, such that closer scrutiny is warranted into the negotiations that have taken place.  If the settlement is truly in the best interests of the Class, then complete transparency should be provided into how it came about.

4.      Neither the named class representatives nor their counsel are adequate alone to represent the sweeping settlement Class proposed, a Class which far exceeds the scope of any litigation Class sought in this MDL.

5.      The proposed release is far more expansive than that which could be considered reasonable for resolution of the claims pursued by this litigation.

6.      The proposed settlement completely abandons the critical declaratory and injunctive relief sought by the Holmes, offering in its place certain vague "confirmatory discovery" to be conducted exclusively by the lawyers who have chosen to *not* litigate this case any further.

By their willful blindness to the realities of this meritorious case – as exemplified by their rushing to settle for nominal value without a shred of discovery into the merits –  the Barnow Group has aligned itself with Countrywide, and thereby has surrendered the right to ably represent the interests of the litigation Class going forward.  During the pendency of this Court's determination of the fairness of the settlement, and while the litigation proceeds, as it must against the non-settling Defendants, the undersigned counsel for the Holmes and other absent Class members trust that the Court will continue to look for and receive favorably the input of unconflicted counsel.

II.     **ARGUMENT**

A.      **THE PROPOSED NATIONWIDE SETTLEMENT SHOULD NOT BE APPROVED PRELIMINARILY AS IT IS NOT FAIR, REASONABLE OR ADEQUATE**

The district court owes a fiduciary duty to class members in approving a class action settlement.  "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *Reynolds*, 288 F.3d at 279-80.  The fiduciary responsibility of the district court

7

includes the obligation of ensuring that "the class members' interests were represented adequately." *Int'l Un. of Electronic, Electrical, Salaried, Machine & Furn Workers, AFL-CIO v. Unisys Corp.*, 858 F. Supp. 1243,1264 (E.D.N.Y. 1994).[10] This duty does not allow the district court to acquiesce in the class representative's inadequate representation of class members. *Watson v. Ray*, 90 F.R.D. 143, 146 (S.D. Iowa 1981).

This fiduciary duty extends to the Court's review of the terms of a proposed settlement and the conduct of counsel in achieving the settlement. *See generally, Reynolds*, 288 F.3d 277 (7th Cir. 2002).

1.     **The Court Cannot Find That the Settlement Is Reasonable Without Some Consideration of the Range of Possible Outcomes**

"'Basic to [the process of deciding whether a proposed compromise is fair and equitable] in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.'  In so doing, a court must 'apprise [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated'" *Acosta v. Trans Union, LLC,* 243 F.R.D. 377, 389 (C.D.Cal.,2007) (internal citations omitted).  The proponents of the nationwide settlement here agree that, "[p]reliminary approval is the first step of this process, and the court must simply determine whether the proposed settlement falls with the range of possible approval...."  Pltfs' Memo at 20 (citing cases).  However, while paying lip service to the standard, the proponents fail to provide even a preliminary evaluation of the reasonableness of the settlement.  The extent of their discussion

---

[10]     Though the instant Argument is broken into two (2) distinct sections – with the first dealing with preliminary approval of the proposed settlement and the second with class certification – of necessity, there is substantial overlap in the facts and issues discussed in these sections warranting repeated cross-references.  To be complete in its analysis of the class issues, however, this Court should review the facts and issues raised in the discussion of the settlement with respect to the class issues of at least adequacy and notice.

regarding the reasonableness of the settlement is one paragraph listing the "terms" of the settlement and touting the "groundbreaking" and "innovative" nature of the settlement, and a second paragraph comparing the settlement with the "possibility of no relief should the claims of Representative Plaintiffs be denied." Motion at 23.  In fact, there is nothing "groundbreaking" or "innovative" about the instant settlement as it is dominated by relief that was previously offered to the Class at no cost

In reviewing the Motion for Preliminary Approval, the Holmes could find no mention of the range and likelihood of possible recoveries considered in arriving at the conclusion that proposed terms of the settlement represent a reasonable settlement, *i.e.*, one "within the range of possible approval."  Motion at 20.  In absence of any proffer of a range of possible recoveries, it would be impossible for this Court to exercise the discretion necessary to preliminarily approve the settlement.  Neither the Holmes nor the Court can determine from the moving papers on the record therewith whether the proponents of the settlement think the Class has recovered one, five or fifty percent of possible damages recoverable in the lawsuit.  Respectfully, without that knowledge, this Court cannot conclude that the settlement appears reasonable at this point in time.  *See, e.g., Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 285 (7th Cir. 2002) (reversing settlement approval because "the judge made no effort to translate his intuitions about the strength of the plaintiffs' case, the range of possible damages, and the likely duration of the litigation if it was not settled now into numbers that would permit a reasonable evaluation of the reasonableness of the settlement.")

Just a quick analysis of the numbers available to the Holmes suggest the severe devaluation of the case by the settling parties.  The proponents of the settlement here maintain that approximately 2.4 million people had their Personal Confidential Information downloaded

and sold to third parties by Defendant Rebollo.  Therefore, Plaintiffs' damage claims under the

FCRA alone range between a minimum of $240 million up to $2.4 billion in statutory damages.[11]

And, such a valuation of the case excludes  punitive damages, costs and attorneys fees that could

be awarded.   In order to properly analyze the reasonableness of the proposed settlement, the

Court should estimate the range of possible outcomes and ascribe a probability to each point on

the range.   In the absence of any formal discovery in this case at this juncture, it would be

impossible for the Court to do so - a flaw that is fatal to the proposed settlement.  *See Reynolds v.*

*Beneficial Nat'l Bank,* 288 F.3d 277, 285 (7th Cir. 2002).

        Nothing has been provided to this Court to establish the factual basis for finding that the

settlement appears to fall within the range of reasonableness.  The suggestion that the proffered

settlement amount is greater than zero and therefore within the range avoids the question

altogether as every Class action settlement is by definition greater than zero.  Such reasoning

would lead to the absurd result that every proposed Class action settlement would be reasonable

simply because it offers a value greater than zero.  The failure of the proponents of the settlement

to provide this Court with  the necessary information they considered in arriving at what they

deemed a fair final settlement amount is fatal to their application for preliminary approval.

        **2.     Even Without the Benefit of Discovery to Determine the Range of
                Possible Outcomes and Probability of Success, an Analysis of the
                Proposed Consideration for the Release of all Claims Against the
                Countrywide Defendants Demonstrates the Inadequacy of the
                Proposed Settlement.**

        An analysis of each of the terms of the Proposed Settlement demonstrates the inadequacy

of the Proposed Settlement.

---

[11]     The FCRA provides for statutory damages of "not less than $100 and not more than
$1,000" as well as "such amount of punitive damages as the court may allow" and "the costs of
the action together with reasonable attorney's fees as determined by the court." 15 U.S.C.
§1681n.

### A.        Credit Monitoring Protection Package

The most substantial element of the proposed settlement is the "Credit Monitoring Protection Package". The Barnow Group touts the value of the available benefits derived from the proposed settlement at "over $660 million." Motion at 23. That figure represents the purported cost of the credit monitoring service that the Barnow Group negotiated for in exchange for the release of all claims. *See* Motion at 12, fn 7 (valuing the portion of the settlement related to Experian's "Triple Advantage" product being offered to Class members at $663,780,000). The valuation is flawed for a number of reasons. First, the credit monitoring service should not be considered "bargained for" consideration in the settlement. Countrywide previously offered the same exact Experian "Triple Advantage" credit monitoring service to all victims of the data security breach in a notification letter sent last fall (hereafter "Notification Letter"). *See* Exhibit "E" to Holmes' Complaint.

Specifically, the  Notification Letter apprised all the known victims of the data breach that "a Countrywide employee may have sold unauthorized personal information about [the victims] to a third party ... includ[ing] your name, address, Social Security number, mortgage loan number, and various other loan and application information." *Id.* The Notification Letter also conveyed regret by Countrywide for the incident and an apology for the inconvenience, while it sought to assure the victims of the data security breach that Countrywide "take[s] [their] responsibility to safeguard [the victim's] information very seriously and will not tolerate any actions that compromise the privacy or security of our customer's information." *Id.* The Notification Letter stated further:

> As an additional measure of protection, Countrywide has arranged for complimentary credit monitoring services provided by a Countrywide vendor at no cost to you over the next two years. We have engaged ConsumerInfo.com, Inc. an Experian® Company, to provide to you at your option, a two-year membership in Triple Advantage Credit Monitoring. **You will not be billed for this service.** Triple Advantage includes daily

11

monitoring of your credit reports from the three national credit reporting companies (Experian, Equifax® and TransUnion®) and email monitoring alerts of key changes to your credit reports.

*Id.* (emphasis in original).

The proponents of the proposed settlement acknowledge that 1.85 million victims of the security breach "did not accept Countrywide's prior offer of two (2) years of credit monitoring" upon receiving the Notification Letter.  Motion at 11.  This is despite the fact that the service was then offered as complimentary - as opposed to through a class action settlement which requires a full release of claims against the Countrywide Defendants.  There is nothing of record to suggest that these 1.85 million victims who chose to not enroll in the credit monitoring service last fall when it was  offered for free would now accept the same on the condition of a full release of their claims against Countrywide.

The proponents of the proposed settlement also attempt to mislead this Court and the Class into thinking that the $25,000 identity theft insurance is an additional term of this settlement by stating that the credit monitoring is "along with $25,000 in identity theft insurance provided by a designated third-party insurer."  Motion at 11.  However, a review of the terms of the Triple Advantage credit monitoring package that was originally offered free of charge to all Class members reveals that it *included* this same $25,000 identity theft insurance.  *See* www.consumerinfo.com/countrywide.[12]  Consequently, such insurance should not now be listed as additional consideration for the settlement since it was part of the original package, and the separate listing as such by the proponents is misleading at best.

---

[12]     In the Notification Letter, Countrywide directs the victims of the security breach to www.consumerinfo.com/countrywide in order to "learn more about and enroll in Triple Advantage", their, the website indicates that the Triple Advantage package includes "$25,000 identity theft insurance provided by Virginia Surety Company Inc."  Notification letter, attached to Complaint at Exhibit "E".

Further, the "Experian Guarantee" that is touted as an additional settlement benefit - the sole benefit of the credit monitoring package to those roughly 550,000 victims who previously enrolled in the complimentary credit monitoring offered in the Notification Letter is illusory at best.  First, the proponents of the settlement concede that the "Experian Guarantee" is a product that is "not separately available to consumers", Motion at 12, and the moving papers are devoid of any valuation of the benefit of this guarantee.  Second, since the Experian Guarantee  is only applicable to those victims who enroll in the initial credit monitoring package, it comes into play only after the initial $25,000 identity theft insurance provided by Virginia Casualty Company is exhausted.  Countrywide's own literature, as further discussed below, states that "[s]tudies have shown that victims spend an average of $808 and 205 hours resolving identity theft." *See* "privacy and security in the Countrywide family", attached to Holmes' Complaint at Exhibit "A" (hereafter "Countrywide Privacy Policy").  Time spent by individual victims in resolving potential identity theft issues is not a reimbursable expense under either the Triple Advantage Package or the Experian Guarantee.  Since Countrywide's own literature suggests that victims spend an average of $808 resolving identity theft, the $25,000 insurance provided by Triple Advantage renders the "Experian Guarantee" illusory as no one is likely to exhaust the Triple Advantage insurance with covered expenses.

Beyond the severe restrictions upon what expenses are covered, the Triple Advantage insurance and Experian Guarantee are not available to residents of New York or Puerto Rico. Settlement Agreement at 1.5.  Therefore, those packages are of no value to those Class Members residing in New York or Puerto Rico, leaving those residents of New York and Puerto Rico who signed up for the complimentary credit monitoring service last fall pursuant to the Notification

Letter without any benefit from the credit monitoring package being offered.  This problem of differential benefits under the proposed settlement heightens the need for scrutiny and separate representation of  the disparate interests of the Class members.

A close reading of the fine print of the Experian Guarantee shows just how illusory the "Guarantee" really is.   Paragraph 6 of Exhibit 2 to the Motion for Preliminary Approval describes the "Right to Terminate $1 Million Triple Advantage Premium Guarantee" as follows:

> We expressly reserve the right to terminate and discontinue offering the $1 Million Triple Advantage Premium Guarantee <u>at any time in our sole and complete discretion</u>.  If we terminate the $1 Million Triple Advantage Premium Guarantee. You will be notified in writing.  We will continue to honor the $1 Million Triple Advantage Premium Guarantee for an Identity Theft that occurred during the Guarantee Period while you were using Triple Advantage Premium as described above.

Motion at Exhibit 2, p. 36. (emphasis added).  Unilateral rights of rescission of settlement terms by one party renders the benefit of such terms to the other party illusory.

Accordingly, the credit monitoring package amounts to nothing more than exactly what was offered to the victims of the security breach as complimentary in the Notification Letter - which 1.85 million people elected not to enroll in - plus an additional insurance package with little chance of ever being utilized and nonetheless one that can be terminated and discontinued "at any time in our sole and complete discretion."  *Id.*

Finally, assuming *arguendo* that those victims of the security breach who refused credit monitoring when it was free suddenly choose to enroll in the package as part of the proffered settlement, the proponents of the settlement grossly inflate the value of the credit monitoring package to these members of the Class.  While the Barnow Group touts the value of the Credit

Monitoring Package as exceeding $660 million.[13]  Motion at 12, fn 7, the true value of the credit monitoring package to individual class Members is far less.  Courts widely recognize that "compensation in kind is worth less than the cash value of the same nominal value"  *In re Mexico Money Transfer Litig.,* 267 F.3d 743, 748 (7th Cir.2001); *see also, e.g., In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 321 (N.D.Ga.1993) ("the economic value of the certificates to the class is [not] the same as the face value of the certificates").  Further, any valuation of the Credit Monitoring package should take into account the claims-made process. *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 292 F.Supp.2d 184, 187 (D.Me.2003) ( "The total value of the voucher program will be equal to the value of the voucher multiplied by the number of vouchers actually used.").   In this case, since the 1.85 million people that are being offered credit monitoring as part of the proposed settlement previously refused it when it was free, it is reasonable to assume that only a small fraction of that large group will agree to accept it now, conditioned on a release of claims.

The value of the credit monitoring package should be analyzed in terms of its cost to the Countrywide Defendants who are receiving the release in exchange.  *See Acosta v. Trans Union, LLC,* 243 F.R.D. 377, 390 (C.D.Cal.,2007) (noting that the cost to the Defendant of the free credit report offered in the settlement is negligible).  Here, it has not been proffered of record what Countrywide actually paid to enroll the 550,000 Class members who accepted credit monitoring last fall.  That figure, once revealed by Countywide, will provide a more accurate proxy for value than the existing valuation.  Further, there appears to be some relationship

---

[13]     "The cost of Experian's 'Triple Advantage$^{SM}$' product to members of the general public is $14.95 per month.   Thus, the total available benefits provided under this portion of the Settlement Agreement amounts to $663,780,000 ($14.95 X 24 months = $353.80; 1.85 million X 353.80 = $663,780,00)."  Motion at 12.

between Countrywide and ConsumerInfo.com (the company offering the credit monitoring package) which needs to be fully discovered before a settlement is approved in order to ensure that real money is changing hands between Countrywide and Experian.

Since it can logically be assumed that the victims of the data security breach who were most interested in the Triple Advantage credit monitoring package already enrolled when it was previously offered for free last fall, the credit monitoring package, touted as a $660 million benefit to the Class, is of marginal value to the Class. *See Acosta v. Trans Union, LLC,* 243 F.R.D. 377, 390 (C.D.Cal.,2007). Certainly, such a settlement term is neither "groundbreaking" nor "innovative" since the only "groundbreaking" component of this aspect of the settlement is that it now requires a complete release where once it was free.

**B.     Cash Reimbursement of Identity Theft Losses**

The first glimpse of any cash value of the proposed settlement appears in the offer of "Cash Reimbursement of Identity Theft Losses". Motion at 12. Upon closer scrutiny, however, the real value of the Cash Reimbursement of Identity Theft Losses provision of the Proposed Settlement amounts to pennies on the dollar of potential out of pocket losses. For instance, at first blush it appears that Countrywide is offering cash reimbursement up to a total of $50,000 for each incident of Identity Theft caused by the data security breach. However, in order to be eligible for the cash reimbursement, Class members are required to exhaust the $25,000 identity theft insurance from Virginia Casualty Company (as part of the Triple Advantage Credit Monitoring package), as well as the $1 million dollar Experian Guarantee above the $25,000. Therefore, the Cash Reimbursement of Identity Theft Losses provision of the settlement is useless to the 500,000 people who already enrolled in the credit monitoring service offered with

the Notification Letter as they are insured for Identity Theft losses up to $1,025,000. Likewise, this provision is useless to any other Class member who chooses to enroll in the credit monitoring package now for the same reasons.

Consequently, this provision only realistically[14] applies to those Class members who choose not to enroll in the credit monitoring package, and those Class members residing in New York or Puerto Rico. Assuming, for purposes of analyzing this provision, there are no new enrollees in the credit monitoring package, then there is a cap of $5 million to be divided by roughly 1.85 million Class members.[16] Therefore, the provision of the proposed settlement providing for Cash Reimbursement of Identity Theft Losses amounts to approximately $3 per Class Member for those who are not insured.

What is more remarkable is the lack of any indication as to the actual claims process for this supposed $5 million cash fund. No claim form is provided in the settlement papers. As an example of the lack of direction is the provision that provides for reimbursement of up to $50,000 for each incident of Identity Theft. The Motion states that "Countrywide shall pay such claims on a first valid claim received basis - *i.e.* when Countrywide receives all required documentation." Motion at 12. Therefore, the instant that a Class member receives any reimbursement greater than $3, the entire fund is diminished proportionally with respect to each remaining Class member who has not yet made a claim for reimbursement, but nonetheless remains equally vulnerable to Identity Theft. The Motion does not state whether the

---

[14]    While it may be possible for an individual to have losses due to identity theft in excess of $1,025,000, for purposes of analyzing the proposed settlement, Plaintiffs maintain that there is no realistic expectation that any of the Class members would suffer such astronomical losses.

[15]    Motion at 11 (noting that approximately 1.85 million recipients of the Notification Letter did not enroll in the complimentary credit monitoring package).

reimbursement will be allocated on a pro rata basis, assuming the $5 million fund is exhausted, and thus whether Countrywide will delay all reimbursements until the claim period ends on July 31, 2012, so that the respective pro rata shares of the $5 million can be calculated.

If as the language of the provision reads, claims for reimbursement up to $50,000 will be paid on a "first valid claim received basis", then divergent interests arise between present and future claimants such that subclasses and separate representation may be warranted.[17]   The provision on its face states that "Settlement Class Members will be eligible to make a claim for all such out-of-pocket losses that already occurred, or in the future do occur, during the period beginning January 1, 2006, through and including July 31, 2012."   However, those Class Members that suffered present losses and wish to be reimbursed now for those losses out of the $5 million fund  have disparate and adverse interests with those Class Members who have not yet suffered losses from identity theft.

### C.    Cash Reimbursement of Expenses

The final cash portion of the proposed settlement concerns Countrywide's offer of "Cash Reimbursement of Expenses".  Motion at 13.  This component of the settlement falls woefully below even Countrywide's own range of reasonableness, and is insufficient to reimburse the losses suffered by Class Members.   Countrywide has allocated a total of $1.5 million to reimburse approximately 2.4 million victims of the data security breach.  As discussed above, Countrywide's Privacy Policy provides "[s]tudies have shown that victims spend an average of $808 and 205 hours resolving identity theft." *See* Countrywide Privacy Policy attached to Complaint at Exhibit "A".  Therefore, calculating the value of the lost time at $10 per hour,

---

[16]    *See* discussion below regarding the Supreme Court's decision in *Amchem Products, Inc. V. Windsor*, 521 U.S. 591 (1997).

Motion at 13, Countrywide's own Privacy Policy states that on average victims of identity theft spend $2,858 resolving the theft.  However, the provision of the proposed settlement providing for "Cash Reimbursement of Expenses" would reimburse Class members a maximum of $350[18], with a marginal additional reimbursement equal to the cost to replace a driver's license.[19]

Significantly, although there is the potential for claimants to receive up to $350, plus the cost of replacing their driver's licenses, the reality is that the total amount allocated by Countrywide for these losses does not provide for anything close to that.  Per the Settlement Agreement, Cash Reimbursement of Expenses  is capped at $1.5 million and "[i]n the event that the total valid claims made by persons exceed $1.5 million, then payment of said claims shall be made on a prorated basis."  Motion at 13.  Therefore, in the event that each Class member submits a claim for reimbursement of expenses, Countrywide has allocated a maximum of 62.5 cents to reimburse each and every Class Member,[20] despite Countrywide's own representation that it costs the average victim of identity theft approximately $2,858 to resolve identity theft. *See* Countrywide Privacy Policy attached to Complaint at Exhibit "A", as discussed above.  A closer look at the actual terms of the reimbursement provisions reveal how unjust they really are. For example, as discussed above, Countrywide represents that the average victim of identity theft spends 205 hours resolving the theft.  Here, however, the Settlement Agreement provides that

---

[17]     The Cash Reimbursement provision provides that claimants may be reimbursed up to (i) up to $90 for the cost of opening a new checking account and acquiring new checks; (ii) up to a maximum of $200 for credit monitoring and identity theft already purchased; (iii) up to $60 for phone calls, postage, time and other defined miscellaneous expenses; and (iv) an undisclosed amount to reimburse the cost of replacing a driver's license, *See* fn 19 below.

[18]     In Kentucky, for example, it costs $12 to replace a driver's license, if you are not within 6 months of its expiration date, otherwise it costs $20.   *See*  http://www.dmv.org/ky-kentucky/replace-license.php.

[19]     (2,400,000 million people / $1,500,000 cap on Cash Reimbursement of Expenses).

Countrywide will only reimburse Class members for a maximum of 6 hours of lost time.[21] Assuming no other claims for reimbursement of expenses that fall under this provision of the Settlement Agreement, other than the lost time resolving identity theft, the proposed Settlement Agreement with a cap of $1.5million for Cash Reimbursement of Expenses provides for approximately 6 minutes of reimbursement of lost time to each of the victims of the data security breach. [22]

This Court, acting as a fiduciary for the Class, should not approve of a settlement that is reached prior to any formal discovery and therefore without any idea of the extent of Countrywide's culpability and the actual harm to the Class.  A settlement that allocates less than $1 for each of the 2.4 million victims of a serious data security breach when Countrywide acknowledges to the world on its website that identity theft victims spend on average $2,858, is patently unfair, unreasonable and inadequate.

### D.    Enhanced Security Measures

Countrywide represents "that it has made changes in its policies as a supplementation to its security in response to theft of the Private Information."  Motion at 14.  Because neither Class Plaintiffs nor the Court has the benefit of any discovery to assess the vulnerabilities and weaknesses in Countrywide's data security, and since the proposed settlement vests exclusive discretion to assess the effectiveness of changes in Countrywide's policies in the Plaintiffs' counsel who have chosen to <u>not</u> litigate any further, this component of the settlement does not

---

[20]    The Settlement Agreement at IV(C)(iii), page 13, provides for cash reimbursement of lost time calculated at $10.00 per hour up to $60 per person.

[21]    (2,400,000 million people / $1,500,000 cap on Cash Reimbursement of Expenses)= 62.5 cents per claimant.  Since claimants are being reimbursed for lost time at a rate of $10/hour, 62.5 cents per claimant represents a total reimbursement for 6 minutes and 15 seconds lost resolving the identity theft.

give the Class any peace of mind or confidence that Countrywide is going to protect the Personal

Confidential Information of Class members going forward.  *See* Exhibits A,B and F, attached to

Complaint.

Respectfully, the attorneys who began negotiating this settlement within days of filing

suit and without the benefit of any discovery are hard-pressed to adequately assess the measures

supposedly being taken by Countrywide to cure the obvious vulnerabilities inherent in its

systems.  The fact that no changes are mandated by the settlement speaks volumes about the

level of concern these lawyers place on such issue.  It is unlikely that anyone can effectively

assess the appropriateness of measures being taken by Countrywide without first learning about

the computer system(s) that were in place during the time that Defendant Rebollo was accessing,

downloading and transferring the Confidential Information of Plaintiffs and the Class.  Learning

about Countrywide's obvious vulnerabilities is essential to finding the right fix.

In the *TJ Maxx* case discussed above (and involving the same plaintiffs counsel who

negotiated the proposed settlement here), it was agreed that both settling parties would retain

independent experts that would work together to assess the steps taken by TJ Maxx to fix the

vulnerability of that company's security.  The Settlement Agreement in that case states:

> By 30 days after the date of this Settlement Agreement (i.e., the Amended Settlement
> Agreement), an independent expert retained by TJX shall submit a written report to
> plaintiffs' designated independent expert, setting forth any actions taken or planned to be
> taken by TJX, subsequent to TJX's discovery of the Intrusion, to enhance the security of
> TJX's computer system (the "Enhancement Actions").  The independent expert retained
> by TJX shall, within 30 days of submitting such report, meet with plaintiffs' independent
> expert (together with counsel for TJX and plaintiffs) to discuss the report.  Plaintiff's
> independent expert shall within 30 days thereafter provide a responsive letter to plaintiffs
> stating whether the Enhancement Actions are, in the judgment of plaintiff's independent
> expert, a prudent and good faith attempt by TJX to minimize the likelihood of intrusions
> in the future.

TJX Settlement Agreement at 2.5 (at Exhibit "C" hereto).

In this case, Countrywide has agreed to allow only the Barnow Group to conduct "reasonable confirmatory discovery" for a period of 90 days.  The Agreement does not provide for the retention of any independent experts.  Rather, it assumes that the Barrow Group, with an obvious stake in the outcome of the settlement and without any known expertise in the field, will adequately investigate the steps Countrywide has taken to minimize future data security breaches.

As discussed in the Holmes Complaint and in no other Complaint to the undersigned's knowledge, this is the second time that Countrywide's data security has been breached. Complaint at ¶¶ 89-92.  It is simply not sufficient to allow the same lawyers who have brokered a questionable early settlement[23], to exclusively determine the appropriateness of measures taken to fix the data security problems at a major company like Countrywide.  Countrywide, who already has two prior strikes on its record.

### E.    Dispute Resolution

Aside from the lack of any description as to how Countrywide will evaluate the claims made by the victims of the data security breach that may warrant dispute resolution, this component of the Settlement Agreement is unremarkable.  Better understanding about and limits on Countrywide's exercise of discretion should be provided, at a minimum.

### F.    Other Benefits

The Holmes eagerly awaited the Barnow Group's petition for fees and object to this Court granting  them "sole discretion" to allocate the fees, which was to have been filed last week but was not.  Given that the undersigned Counsel were not informed of the settlement

---

[22]    The Holmes can not stress enough the alarming lack of any formal discovery in this case as to the underlying breach itself and the security that was in place at Countrywide.

negotiations until after a settlement had been agreed to by the Barnow Group and Countrywide Defendants the Holmes' counsel are predictably concerned, especially about the lack of transparency among plaintiffs' counsel.  The various counsel in this case appear have taken separate paths to resolve the matter of Countrywide's data security breach.[24]  The work done by all counsel in this case should be reflected in any award of fees and not left to the sole discretion of the attorneys who rushed to this Proposed Settlement Agreement.

3.    **The Lack of Discovery by the Parties Should Make this Court Both Skeptical and in Reviewing the Proposed Settlement.**

"Federal courts are inherently skeptical of pre-certification settlements, precisely because such settlements tend to be reached quickly before the plaintiffs' counsel has had the benefit of the discovery necessary to make an informed evaluation of the case and, accordingly, to strike a fair and adequate settlement." *Acosta v. Trans Union*, LLC, 243 F.R.D. 377, 397 (C.D.Cal. 2007).   Perhaps the most surprising aspect of the Motion for Preliminary Approval is the proponents' belief that "[the status of the proceedings and the amount of discovery completed] favors preliminary approval of the Settlement Agreement."  That is not the case.  In fact, because the lack of any formal discovery is directly intertwined with every other aspect of the Motion for Preliminary Approval, it should prove fatal to preliminary approval by this Court.

The status of the proceedings is as follows:

---

[23]    The undersigned have actively pursued declaratory injunctive relief, discovery and preservation of critical evidence, electronic and otherwise, necessary to (1) gain a full understanding of the crime at issue and the exposure to the Class; (2) gain an understanding of the prior vulnerability of Countrywide's security measures that led to the underlying breach; (3) learn the best course to properly safeguard the Personal Confidential Information of the Class in the future; and (4) determine how to assure that Countrywide's security measures are adequately enhanced to prevent a recurrence.  Others have sought to settle this case without discovery and without a proper classwide assessment of the extent of the harm, the causes of the harm and/or remedies for the harm so as to restore the confidence of Countrywide's current and former customers.

- **Docket Entry No. 1:** On December 2, 2008, by Order from the Judicial Panel on Multidistrict Litigation, all known pending actions were transferred to this District and MDL 1998 was formed;

- **Docket Entry No. 2:** On December 29, 2008, a conditional Transfer Order from the Judicial Panel on Multidistrict Litigation (CTO-1) transferred certain remaining actions to this District;

- **Docket Entry No. 3:** On December 30, 2008, the Conditional Transfer Order was vacated as it pertains to the Holmes' New Jersey action;

- **Docket Entry No. 4:** On January 6, 2009, a Notice of Appearance was filed by Mark L. Knutson;

- **Docket Entry No. 5:** On January 6, 2009, a Motion for Appointment as Interim Class Counsel was filed by the Martin Group;

- **Docket Entry No. 6:** On January 9, 2009, this Court entered an Order consolidating the Holmes' case with MDL 1998;

- **Docket Entry No. 7:** On January 21, 2009, the Barnow Group and Countrywide filed the instant Motion for Preliminary Approval of Settlement.

As evidenced above, aside from jurisdictional issues surrounding the MDL proceedings and the creation of MDL 1998, there was only one substantive docket entry in this entire MDL proceeding prior to the filing of the Settlement Agreement.  Interestingly, that lone substantive docket entry, the Motion for Appointment as Interim Class Counsel filed by the Martin Group on January 9, 2009, at Docket Entry No. 5, forebodingly seeks appointment as Interim Class Counsel in order to "help protect the class from at least two potential problems: efforts to moot

24

the class action by either (1) settling another class action that would release the claims asserted in this case, or (2) contacting the putative class members and making improper precertification 'settlement offers.'" Martin Group Memorandum of Law in Support of Motion for Appointment of Interim Class Counsel Pursuant to Fed.R.Civ.P. 23(g) at 3.   Therefore, the status of the proceedings can hardly favor preliminary approval of the settlement.

The most fatal flaw to the Motion for Preliminary Approval, and in fact any proposed settlement this early in the proceedings, is that there has been no formal discovery taken in this case by which Plaintiffs or this Court could adequately assess the settlement.  The Motion for Preliminary Approval touts the benefits of informal discovery and attempts to sum up the informal discovery that has been conducted into one line: "Valuable informal discovery occurred during the negotiation of the Settlement Agreement, and it was appropriately targeted at information relevant to the settlement."  Motion at 25.

To be clear, this case is being brought on behalf of a class of 2.4 million people who have had their Personal Confidential Information accessed, downloaded, and sold to various individuals and entities not yet known without their knowledge or consent.  The sale of the Personal Confidential Information of Plaintiffs and the Class was conducted illegally and the only two known co-conspirators, Messers. Rebollo and Siddiqi, have been arrested by the Federal Bureau of Investigation and are facing federal felonious charges.  Though it is known that several other co-conspirators acted similarly to Mr. Siddiqi and purchased this information from Mr. Rebollo, it is not known how many other people purchased the Personal Confidential Information of Plaintiffs and the Class from Mr. Rebollo.  More importantly, it is not known why

these "Doe Defendants" (named only by the Holmes in their Complaint) purchased the Personal Confidential Information and what they intend to do with the information.

Further, without proper discovery it is impossible to determine whether Countrywide appropriately notified each of the victims of the underlying data breach and therefore whether they are entitled to certain benefits from the proposed settlement. For example, in the case of the Holmes', a Notification Letter was addressed and sent to Mr. Matthew Holmes. The Notification Letter was not addressed to his wife Mrs. Danielle Holmes, nor did Mrs. Holmes receive a separate Notification Letter, though she is equally vulnerable to becoming a victim of identity theft because of the underlying data security breach. Without discovery plaintiffs are left to once again take Countrywide at their word that all of the victims of the underlying breach were notified. Significantly, the proposed settlement only offers credit monitoring to those individuals that received a Notification Letter, and therefore, even in the current proposed class settlement, certain individuals, like Mrs. Holmes, who may have had their Personal Confidential Information accessed, downloaded and sold without their authorization may not be entitled to the credit monitoring offered to the Class, as well as certain other benefits made available to the victims of the underlying data breach.

There is simply no bases for this Court or Class members or anyone to assess the value of the proposed settlement without the benefit of discovery and without knowing the circumstances surrounding the underlying conduct. As outlined in *Acosta v. Trans Union*, LLC, 243 F.R.D. 377, (C.D.Cal. 2007), "for a court to approve a proposed settlement, the parties must have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement. In considering a proposed settlement, a court therefore bears an

obligation to evaluate the scope and effectiveness of the investigation plaintiffs' counsel conducted prior to reaching an agreement ... An early settlement [such as the instant proposed settlement] will find the court and class counsel less informed than if substantial discovery had occurred. As a result, the court will find it more difficult to access the strengths and weaknesses of the parties' claims and defenses, determine the appropriate membership of the class, and consider how class members will benefit from settlement." *Id.* at 397 (citing Polar Int'l Brokerage Corp., 187 F.R.D. 108, 113 (S.D.N.Y. 1999) (quoting Manual for Complex Litigation 2d § 30.45 (3d Ed. 1995)).

In this case, the Barnow Group apparently is hoping that the Court will take them at their word that they have conducted an effective investigation and have sought the adequate informal discovery necessary to negotiate a proper and fair settlement. Nonetheless, it is impossible for the Court to properly determine the adequacy of the Settlement without the minimum discovery. Indeed, the lack of any formal discovery calls into question the conduct of the Barnow Group, for not only is the Court unable to determine the adequacy of the Settlement, it is unknown how the members of the Barnow Group that "negotiated" the Settlement was able to arrive at any acceptable level of consideration for the unknown.

### d.      The Likelihood of Success on the Merits

Without formal discovery on the merits of this case it is virtually impossibly for this Court to assess the likelihood of Plaintiffs' success on the merits. That said, it is obviously uncontested that the breach took place and was due to certain vulnerabilities and weaknesses in Countrywide's security system that allowed Defendant Rebollo to access and download the Personal Confidential Information of Plaintiffs' and the Class. At this time, lacking discovery,

The Holmes are not able to detail the specific weaknesses and vulnerabilities in Countrywide's security system warranting their liability.

### e.    The Opinions of Class Counsel and Class Representatives

Significantly, because this Settlement was entered into prior to Class Certification there is no Court appointed Class Counsel, nor is there Court appointed Class Representatives, and therefore this factor does not apply as intended in this case.[30]    However, the opinions of the other Plaintiffs and Counsel in this MDL should be informative to this Court.    Aside from the undersigned[31], as discussed above, the Martin Group previously sought appointment as Interim Class Counsel in order to protect the class from efforts to moot the class action by the settlement of another class action that would release the claims asserted against Countrywide and has evidenced their objection to the Proposed Settlement Agreement in their Reply in Support of Motion For Appointment of Interim Class Counsel Pursuant to Fed.R.Civ.P. 23(g).

Therefore, at a minimum, the undersigned and the Martin Group, along with the Holmes' and the individual plaintiffs represented by the Martin Group object to the proposed Settlement as fundamentally unfair.[32]

---

[24]    Aside from the Preliminary Approval of the Proposed Settlement Agreement, the Barnow Group has necessarily sought the certification of a Settlement Class to effectuate the Settlement. In so doing, the Barnow Group seeks appointment as Co-Lead Settlement Class Counsel and also seeks the appointment of their individual clients as Class Representatives.    As will be discussed below, the instant Proposed Settlement Agreement and the conduct of the Barnow Group in entering into it should be sufficient to disarm the Barnow Group and their purported representative plaintiffs from serving as a fiduciary to the Class in the future, let alone with respect to the instant Motions.

[25]    Contemporaneously with this filing, the undersigned is filing their Response to the Martin Group's Motion seeking Appointment as Interim Class Counsel.

[26]    The Holmes' in no way intend to speak on behalf of the Martin Group, rather, it is simply apparent from pleadings already filed and the Motion for an Extension of Time to file a

**B.      The Proposed Settlement Class Fails To Provide Adequate Representation And Notice to Class Members as Required By The Constitution And Rule 23.**

The proposed settlement class is defined as, "All persons in the United States who either: (1) provided their Personal Information to Countrywide prior to July 1, 2008; or (2) whose mortgage was serviced by Countrywide prior to July 1, 2008.  Countrywide, for this purpose, does not include Bank of America."  Settlement Memo. at 7.  None of the numerous complaints filed in connection with this matter allege such a sweeping class.  Nor do any of the complaints allege injury to such a broad category of persons.

Against this vast backdrop of "class members," the settlement proposes to pay different categories of consumers different benefits from a finite settlement fund.  There is no indication, however, that these different categories of consumers were separately and adequately represented in the settlement process.  Indeed, it appears that persons with the most tangible claims—those who have actually suffered identify theft as a result of the theft of their personal information— were not represented at all.  Even worse, the settlement proposes to release consumer claims for identity theft that have not yet accrued.  Under well-known Supreme Court precedent that the Barnow Group does not even mention to this Court, the lack of adequate representation and impossibility of providing notice for future claims are fatal to certification of the proposed settlement class.

1.      This Court has a heightened obligation to ensure that the proposed settlement class meets the requirements of Rule 23.

In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the United States Supreme Court held that the discretion a district court has in certifying a class for settlement purposes does

---

Response to the instant Motion for Preliminary Approval filed by the Martin Group that their clients object to the Proposed Settlement Agreement.

not permit a district court to ease the demands of Rule 23 of the Federal Rules of Civil Procedure.  To the contrary, the Court held that a district court must apply "undiluted, even heightened attention" to the requirements of Rule 23 in the settlement context." *Amchem*, 521 U.S. at 621.  *See also Walker v. Liggett Group, Inc.*, 175 F.R.D. 226, 230 (S.D.W.V. 1997) ("*Amchem* decimated the notion of some circuits that Rule 23 requisites were relaxed in the settlement context").

Especially heightened scrutiny should be applied to a proposed settlement that has been negotiated at the outset of the case, before class certification or any significant discovery between the parties.  As the Supreme Court has held, "Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the precertification stage, quite independently of the required determination at postcertification fairness review under subdivision (e) that any settlement is fair in an overriding sense."   *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 858 (1999).  *See also Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) ("In the context of a case in which the parties reach a settlement agreement before class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement"); *D'Amato v. Deutsche Bank*, 236 F. 3d 78, 85 (2d Cir. 2001) (noting that where a settlement has been negotiated prior to class certification, "it is subject to a higher degree of scrutiny in assessing its fairness").

2.   The proposed settlement includes different groups of claimants without separate and adequate representation of those groups of claimants.

Before a settlement class may be certified, Rule 23(a)(4) requires that the district court find that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To be deemed adequate, "a class representative must be part of the

class and possess the same interest and suffer the same injury as the class members." *Amchem*, 521 U.S. at 625-26, 117 S.Ct. at 2250-51.  Similarly, the class representative's personal claim must not be inconsistent with the claims of other members of the class.  *Id*.  While the "adequacy-of-representation" requirement tends to merge with the commonality and typicality requirements, it "also factors in competency and conflicts of class counsel." *Amchem*, 521 U.S. at 626 n.20.

The adequacy of representation requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. Conflicts of interest among class members ("intra-class" conflicts) render members of a single unitary class of common interests inadequate to represent all members of the proposed class:

> [W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups.

*Amchem*, 521 U.S. at 627 (adding, "the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent *solely* the members of their respective subgroups") (emphasis added) (citing *In re Joint Eastern and Southern Dist. Asbestos Litigation,* 982 F.2d 721, 742-43 (2d Cir.1992), *modified on reh'g sub nom. In re Findley,* 993 F.2d 7 (2d Cir.1993)).

The requirement that class members be adequately represented is a constitutional mandate in class actions.  "[A]dequate representation is the foundation of all representative actions ...." *In re G.M. Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1121 (7th Cir. 1979) (citing *Hansberry v. Lee*, 311 U.S. 32 (1940)). *See also Susman v. Lincoln American Corp.*, 561

F.2d 86, 89-90 (7th Cir. 1977) ("due process requires that absent class members be adequately represented in order to be bound by a court's judgment"); *Nat'l. Assoc. of Regional Medical Programs. v. Mathews*, 551 F.2d 340, 346 (D.C. Cir. 1977) ("adequacy of class representation has a constitutional dimension"); *Walker v. Liggett Group*, 175 F.R.D. 226, 231 (S.D.W.Va. 1997) ("[t]he bedrock consideration for the court in any certification decision is 'whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives'").  Conflicts of interest between members of the proposed class and the person or persons seeking to represent them defeat the aims of due process:

> Such a selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those whom they are deemed to represent, does not afford that protection to absent parties which due process requires.

*Hansberry v. Lee*, 311 U.S. 32, 45 (1940).

It is apparent from the proposed settlement itself that the theft of personal information from Countrywide affected distinct groups of persons differently, as evidenced by terms offering different benefits to consumers based on whether their personal information was misappropriated, whether they received a letter from Countrywide, whether their identity was actually stolen, etc.  These benefits are finite—some benefits are offered on a "prorated" basis, and some are even offered on a "first come, first served" basis—which necessarily pits different groups of claimants against each other as they seek to maximize their respective shares of settlement proceeds before the settlement funds are exhausted.  As such, these interests are in conflict with each other.  But, while the Barnow Group seeks to sweep these numerous categories of persons with conflicting interests into the proposed settlement, there is no evidence that each category was separately and adequately represented in the settlement process.

Perhaps the most extreme and obvious error in the proposed settlement is that it purports to bind persons who may experience future identity theft, as well as those who have already suffered identity theft.   As the Supreme Court made clear in both *Amchem* and *Ortiz*, a class that includes persons with only future injuries along with presently-injured plaintiffs is riven by inherently conflicting interests.   Persons with present injuries necessarily seek to maximize payment of settlement benefits now, while those who may suffer injury later seek to minimize the present payment of benefits to preserve settlement funds for future claimants.   These conflicting interests make it impossible for presently-injured class representatives and their counsel to provide adequate representation to the members of a "future-injured" class.   *See Amchem*, 521 U.S. at 625-28; *Ortiz*, 527 U.S. at 853.

There is no indication that the Barnow Group even considered, much less resolved, conflicts among the various groups to be included in the proposed settlement. Indeed, it appears that potential claimants with the most substantial interests in this litigation (those who have actually suffered identity theft) were not separately represented at all.   Therefore, the proposed settlement class should not be certified, regardless of whether the Court believes the substantive terms of the settlement are sufficient for preliminary approval.

3.      The inclusion of persons who may experience identity theft in the future makes it virtually impossible to provide adequate notice of the proposed settlement.

As the Barnow Group acknowledges, Rule 23(e)(1)(B) requires that this Court direct reasonable notice to all class members who will be bound by the proposed settlement.   *See* Settlement Brief at 15.  Like adequate representation, adequate notice is required to afford class members due process. *Id*.  The Barnow Group states that it intends to "submit a proposed Notice

Plan to the Court by, at the latest, February 10, 2009" but, as explained below, no notice plan can adequately apprise class members of claims for identity theft that have not even accrued.[2]

In *Phillips Petroleum Company v. Shutts*, 472 U.S. 797 (1985), the Supreme Court set forth the minimum procedural due process requirements necessary if res judicata is to bind an absent class action plaintiff:

> If the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection.  The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, ...  The notice must be the best practicable, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." The notice should describe the action and the plaintiffs' rights in it.  Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.

*Shutts*, 472 U.S. at 811-12 (citations omitted).

As the Supreme Court has acknowledged, "when notice is a person's due, process which is a mere gesture is not due process."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).  Commentators largely agree that it is difficult if not impossible to provide constitutionally-mandated notice to absent class members who may suffer future injury.[3]  In

---

[27]    Just as it is impossible for class members to evaluate a proposed settlement of a future claim, it is impossible for the Holmes to evaluate a future notice plan.  Accordingly, the Holmes reserve the right to submit further comment regarding the Notice Plan to be submitted by the Barnow Group in connection with the proposed settlement.

[28]    As Judge Frank wrote with respect to rigid statutes of limitations or statutes of "repose," under which a person's cause of action in tort can become time-barred even before any harm may occur or became manifest:  "Except in topsy-turvy land, you can't die before you are conceived, or be divorced before ever you marry, or harvest a crop never planted ...".  *Dincher v. Marlin Firearms Co.*, 198 F.2d 821, 823 (2d Cir. 1952).

Professor Coffee's view, "a future claims class action trivializes the right to opt out." John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1446 (1995). Although he may be notified of a potential claim, one who has not manifested any present injury lacks the basic information needed to make an intelligent decision about whether to remain in the class or to pursue a tort action that has not accrued, and might not ever accrue. *See* Brian Wolfman and Alan B. Morrison, *Representing The Unrepresented In Class Actions Seeking Monetary Relief*, 71 N.Y.U. L. Rev. 439, 451-55 (1996). *See also* 1 Herbert B. Newberg, Class Actions § 1.23 at 1-55 (1992) ("For class members who cannot currently identify themselves for purposes of protecting their interests with respect to a class action purportedly commenced on their behalf, an opt-out right within a court-designated period of time . . . is of no beneficial use").

In the *Amchem* settlement litigation, which purported to settle the claims of all persons exposed to asbestos regardless of whether they had existing or future manifestations of injury, the Fifth Circuit found that the obstacles to providing adequate notice to future victims were "insurmountable." *See Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 633 (5th Cir. 1996). And, while the Supreme Court was not required to rule definitively on the notice issue in *Amchem*, Justice Ginsberg recognized "the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could *ever* be given to legions so unselfconscious and amorphous." *Amchem*, 521 U.S. at 628 (emphasis added). *See also In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425, 1435 (2d Cir. 1993) (acknowledging that providing an opt-out right to a person "unaware of an injury would probably do no good").

35

The proposed settlement class releases the claims of millions of persons across the nation who provided personal information to Countrywide at any time before July 1, 2008. *See* Settlement Memo. at 7.  Settlement benefits, however, are reserved for only a portion of these class members: persons who have already received a letter from Countrywide notifying them of the theft of their personal information, persons whose identity was stolen as a result of the theft of their personal information, and persons whose identity will be stolen in the future as a result of the theft of their personal information.  Although the last category of persons has yet to experience any injury from identity theft, they are required to assess now whether to accept the settlement and release their future claims against Countrywide.  Even the most carefully-crafted notice cannot adequately apprise class members of information necessary to evaluate a proposed settlement of a claim that has not yet accrued.  The proposed settlement class is thus infirm, as it does not (and cannot) meet the requirement of adequate notice under Rule 23(e)(1)(B).

III.   **CONCLUSION**

For the foregoing reasons, the undersigned counsel for The Holmes, Matthew and Danielle Holmes, respectfully submit that the Motion for Preliminary Approval of Class Action Settlement should be denied.

                                        Respectfully Submitted,

Dated: February 9, 2009                 __s/Stacey A. Blankenship_____
                                        Stacey A. Blankenship, Esquire
                                        Doug Moore, Esquire
                                        DENTON & KEULER
                                        555 Jefferson Street, Suite 301
                                        Paducah, KY 42001
                                        270-443-8253 telephone

36

Donald E. Haviland, Jr., Esquire
Michael J. Lorusso, Esquire
THE HAVILAND LAW FIRM, LLC
111 South Independence Mall East,
Suite 1000
Philadelphia, PA 19106
(215) 609-4661 telephone

Barry Eichen, Esquire
EICHEN LEVINSON CRUTHLOW, LLP
40 Ethel Road
Edison, NJ 08817
(732) 777-0100 telephone

Kent M. Williams, Esquire
WILLIAMS LAW FIRM
1632 Homestead Trail
Long Lake, MN 55356
(763) 473-1383 telephone

ATTORNEYS FOR PLAINTIFFS, MATTHEW AND
DANIELLE HOLMES, AND THE CLASS