IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN RE: COUNTRYWIDE FINANCIAL CORP. CUSTOMER DATA SECURITY BREACH LITIGATION | Case No. 3:08-MD-01998-TBR<br><br>MDL No. 1998<br><br>HONORABLE THOMAS B. RUSSELL |

## THE HOLMES GROUP'S RESPONSE TO MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT

## I.  INTRODUCTION

Plaintiffs, the Holmes Group,[1] by their undersigned counsel, hereby submit this Revised Memorandum in Opposition to the Motion for Preliminary Approval of Proposed Class Action Settlement.  Consistent with the parties' agreement and this Court's Order,[2] the Holmes Group reviewed the Notice Plan submitted by Settling Plaintiffs last Wednesday, February 25, 2009, and sent a letter to the principals of the Barnow Group[3] raising lingering concerns about the proposed settlement. *See* Letter dated February 27, 2009 at Exhibit "A" hereto.  Despite their best efforts, the parties have been unable to agree on certain material issues relevant to this Court's preliminary approval of the proposed settlement and certification of the proposed Settlement Class.  The Holmes Group has three main concerns with the proposed settlement that

---

[1]      The Holmes Group consists of individual plaintiffs, Matthew and Danielle Holmes, Geoffrey and Melissa Hammons, Daniel and Rhonda Ruark, Paul J. and Marla Vido, James and Brenda Wright, Fred and Sheila McCoy, Mark and Lynisa Getzinger, Todd Loeb, Michael and Barbara Davenport, John and Terra Stiers, Jerry and Lydia Albert, Renee Seal and Christopher and Robin Lierman (collectively "the Holmes Group").

[2]      *See* Order dated February 18, 2009 at Docket No. 18.

[3]      The member firms of the Barnow Group represent the following Plaintiffs as "Settling Plaintiffs": Cody M. Dragon, Laila Elkhettab, Hay B. Gaumer, Scott Gregg, Matthew B. Martin, Harold L. Mooney, Edmund Moses, Thomas A. Munz, Michael J. Rich, and Kim Wickman.

are relevant to this Court's preliminary inquiry at this juncture: (1) the size of the proposed Settlement Class, (2) the plan to notify such Class, and (3) the involvement of future claimants. While the Holmes Group has additional concerns about the proposed settlement, s*ee* letter at Exhibit "A", since no discovery has been provided to date,[4] we are willing to concede that these concerns may be addressed after preliminary approval, if the Court grants preliminary approval after due consideration of the instant objections.   However, since we respectfully submit that preliminary approval cannot be granted without winnowing down the Class size, trimming the Notice Plan and resolving the problem of future claims, we put forth our lingering concerns about the settlement so that perhaps all outstanding issues may be resolved through this Court's timely intervention.  Ultimately, the Holmes Group believes a settlement is achievable.

## II.   ARGUMENT

### A.   STANDARDS FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENTS

The district court owes a fiduciary duty to class members in approving a class action settlement.  "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) ("We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries.").   The fiduciary responsibility of the district court includes the obligation of ensuring that "the class members' interests were represented adequately." *Int'l Un. of Electronic,*

---

[4]      On February 20, 2009, the Holmes Group sent a letter to the Barnow Group seeking copies of all existing confirmatory discovery as well as additional topics of confirmatory discovery of Countrywide.  *See* Letter dated at Exhibit "B" hereto.  To date, we have received no response from the Barnow Group and no documents.

*Electrical, Salaried, Machine & Furn Workers, AFL-CIO v. Unisys Corp*., 858 F. Supp. 1243,1264 (E.D.N.Y. 1994).  This duty does not allow the district court to acquiesce in the class representative's inadequate representation of class members.  *Watson v. Ray*, 90 F.R.D. 143, 146 (S.D. Iowa 1981).

This fiduciary duty extends to the Court's review of the terms of a proposed settlement and the conduct of counsel in achieving the settlement.  *See generally, Reynolds v. Beneficial Nat. Bank,* 288 F.3d 277 (7th Cir. 2002).  Only this Court – as the ultimate fiduciary for the members of the Class and the final arbiter of who is best suited to represent their interests[5] – can prevent a miscarriage of justice by an ill-timed, uninformed and overbroad settlement that attempts to bind millions of unaffected people into a broad sweeping release.

Federal Rule of Civil Procedure 23(e) concerning class action settlements, provides:

The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

Fed.R.Civ.P. 23(e).

Approving a class action settlement is a two-step process.  In the first step – preliminary approval – the court reviews the proposed settlement for obvious deficiencies, schedules a formal

---

[5]     Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the Court must undertake a distinct inquiry into what counsel is "best able to represent the interests of the class" for purposes of its class counsel appointment.  Fed.R.Civ.Proc. 23(g)(2).

fairness hearing and determines the propriety and scope of the class to which to provide notice of the proposed settlement and hearing.  In the second step, the court considers final approval of the proposed settlement at the previously scheduled fairness hearing, where arguments and evidence may be presented in support of and in opposition to the settlement.  This two-step approach is widely used by federal and state courts throughout the country.  *See generally, Newberg on Class Actions,* Second Ed. at § 11.25.

Because Rule 23(e) requires the dissemination of class notice, the contours of the Class must be known and reasonably defined so that the court can determine the appropriate notice which "shall be given to all members of the Class in such a manner as the Court directs."  As Newberg has observed,

> "[t]he *Manual for Complex Litigation* recommends that the Judge use this conference to learn the circumstances surrounding the negotiations and to hear not only from parties and counsel who participated in them, in the case of multi district consolidated actions, from those, if any, who were left out of the negotiations.   Where a class-wide settlement is negotiated before class determination in consolidated suits, the defendants may have dealt with one set of counsel to the exclusion of all other counsel for litigating plaintiffs in the action and in related action.  The *Manual for Complex Litigation*…suggests that the following pertinent inquiries be pursued at the hearing.

> 1.    At what stage in the proceedings was the proposed settlement achieved?
> 2.    Has there been any development of facts through discovery or otherwise on which estimates of the probability of liability in the range of possible damages can be made?
> 3.    Can the proponents of the settlement submit data to establish, at least preliminarily, the reasonableness of the proposed settlement?
> 4.    Who are the negotiating parties, to what extent were they authorized to proceed with the settlement of their classes claims and the possibly those of other classes?
> 5.    Did all counsel for all parties participate in the negotiations and, if not, what are the views of the non-participating parties in counsel?
> 6.    If the proposed settlement relates to only one of a number of classes, what effect will it have on the claims of other classes?
> 7.    How and by whom are fees of class counsel to be paid – from the settlement fund or otherwise?

8.    In either event, what are the estimated fees and expenses, so that class members can calculate the cost of their prospected participation in the settlement?

*Newberg on Class Actions*, Second Ed. at §11.25 (citing *Manual for Complex Litigation* §

1.46)(5th ed. 1982).

The *Manual for Complex Litigation* further advises:

"such a preliminary hearing is not, of course, a definitive proceeding on the fairness of the proposed settlement, and the judge must be careful to make clear that the determination permitting notice to members of the Class is not a finding that the settlement is fair, reasonable and adequate. In appraising the possibilities and probabilities of recovery and the possible range of damages for the purposes for submitting or approving the settlement proposal, the judge should carefully avoid expression of any opinion that constitutes a pre-judgment of the outcome of the litigation or final judgment on the merits. On the contrary, he should make clear that it is simply a determination that there is, in effect, probable cause to submit the proposal to members of the class and to hold a full-scale hearing on its fairness, at which all interested parties will have an opportunity to be heard and after which a formal finding of the fairness of the proposal will be made."

*Manual for Complex Litigation* § 146 (5th ed. 1982). Newberg further advises that "[n]othing

prevents the court from receiving successive settlement proposals or from submitting successive

settlement proposals to the Class for its evaluation. *Newberg on Class Actions* 2nd ed. at 1125

(*citing Liebman v. J.W. Peterson Coal & Oil Co.*, 73 F.R.D. 531 N.D. Ill. 1973); *See also In re*

*Relafen Antitrust Litig.*, 2005 WL 2386119 (D.Mass. Sept. 28, 2005) at *5-8 (detailing history of

parties' negotiations and court's rejection of settlement prior to granting preliminary approval).

## C.    THE PROPOSED NATIONWIDE SETTLEMENT CLASS SHOULD NOT BE CERTIFIED BECAUSE IT IS OVERBROAD.

The proposed settlement class is defined as, "[a]ll persons in the United States who

either: (1) provided their Personal Information to Countrywide prior to July 1, 2008; or (2)

whose mortgage was serviced by Countrywide prior to July 1, 2008." Settlement Memo. at 7.

This Class consists of 17 million people.  *See* Notice Plan at page 37 of 121.  This Class far exceeds the litigation Class of 2.4 million people originally sought to be represented by every plaintiff in this MDL.  It also exceeds by more than seven-fold the group identified by Countrywide as having been affected by the Rebollo data breach.  Because the class prerequisites Rule 23(a) and Rule 23(b)(3) must be satisfied and cannot as to the proposed Settlement Class, the proposed Class should be denied.

None of the Complaints filed in this MDL alleged such a sweeping Class.  None of the Complaints allege injury to such a broad category of persons.  On its face, the Settlement Class sought to be certified is overbroad.  It makes no attempt to narrowly define the Class consistent with the litigation, which limited the Class properly to only those persons whose confidential information was stolen by Rebollo.  Such a Class of persons is entirely knowable, if not already known by Countrywide as a result of its cooperation with the FBI investigation.  The names and addresses of this confined group of people are within Countrywide's possession for purposes of direct-mail notice.

As discussed below, the massive media campaign proposed as part of Settling Plaintiffs' Notice Plan could reach the entire nation of 300 million.  *See* www.census.gov.  Such a media campaign necessarily would result in millions of unaffected individuals being told about a situation that does not concern them.  However, because the proposed Settlement Class includes those "whose mortgage was serviced by Countrywide prior to July 1, 2008," these many unaffected people likely will be confused, and forced to investigate further whether they are in the proposed Settlement Class.  Their efforts in this regard are not compensable under the proposed settlement.  The inclusion of so many people not affected by the data breach at issue in

this case would likely cause many people to opt-out, even though they are not members of the Settlement Class and did not have their data stolen, simply adding to the confusion, burden and expense of administration. *See* discussion *infra*. re Notice.

The Settlement Agreement concedes that "Rebollo worked in Countrywide's subprime mortgage division, and ultimately downloaded and made available the Private Information of what is believed to be *approximately 2.4 million individuals* to third parties." Settlement Agreement at 2 (emphasis added). Plaintiffs' Motion for Preliminary Approval also acknowledges that "financial and personal information was compromised for *approximately 2.4 million individuals* throughout the United States ..." Motion at 7 (emphasis added). These statements are confirmed by the Affidavit of F.B.I. Agent Richard Ryan and Criminal Complaint against Defendants Rebollo and Siddiqi – upon which MDL plaintiffs relied in filing their respective Complaints in this Court. Agent Ryan states that "Rebollo estimated that he downloaded approximately 20,000 Countrywide Home Loan customer profiles every week for approximately two years." Agent Ryan Affidavit at ¶ 9(g). Therefore, by the FBI's reasonable estimates, only 2,080,000 customers were affected by Rebollo's conduct – *i.e.*, 104 weeks (2 years) times 20,000 customer profiles per week.

Countrywide has represented that it sent notification letters to 2.4 million people whom it concluded were affected by the Rebollo data breach. That is 320,000 more individuals than the FBI's reasonable estimate. While it is known that certain spouses, co-signers and guarantors of individuals who had their data stolen did not receive letters, assuming such persons also had their data stolen, this group of individuals is still nowhere near the 14-plus million people the Settlement Class seeks to sweep in. At most, the inclusion of these additional "co-parties" would

double the size of affected people to between 4,160,000 (based upon FBI's estimates) and 4,800,000 (based upon Countrywide's estimates). Either way, the final number is millions less than the proposed Settlement Class.

The Holmes Group suggests that a properly limited Class in this case would include only those individuals whose confidential information was in fact stolen by Rebollo. To extend the proposed settlement benefits and corresponding release to any individual who simply provided confidential information to Countrywide without regard to the data breach at issue would serve to improperly involve millions of people in a case in which they do not belong. It is respectfully submitted that the class action device does not permit such an expansion of litigation.

In prior decisions, this Court rejected similar attempts to certify expansive classes which included persons not presently injured by the conduct at issue in the lawsuit. For instance, late last year, this Court found the named plaintiffs' claims atypical of a proposed Class of inmates of the McCracken County Detention Center where the named plaintiffs, former inmates of the jail, alleged that the policies and procedures of the jail violated their constitutional rights. *See Taber v. McCracken County, et, al.,* 5:06-cv-00144 (W.D. Ky.) at Docket No. 66. In denying class certification, the Court noted that, "[i]n pursuing their own claims for damages for injuries they have suffered, the named plaintiffs would not advance the interests of the entire class of inmates who, after September 6, 2005, first developed symptoms consistent with MRSA after confinement in the jail for a period of more than ten days." *Id.* at 10. The Court also noted that "[f]atal to the injunctive class is that the named representatives, former inmates of the jail, are not members of a class composed of present and future inmates of the jail." *Id.* at 13.

In another case, this Court denied certification of a sprawling class of purchasers of concrete. The Court held, in response to defense arguments that the class was overbroad and did not meet the requisites of Rule 23, and despite class plaintiffs' efforts to limit the class to residents of Kentucky, that the case was not proper for partial class adjudication largely due to the fact that "[t]hese claims of Class members are extremely disparate, ranging from members with no discernable damages to a few class members with extremely large damages." *See Adams et. al. v. The Federal Materials Co., Inc., et, al.,* 5:05-cv-00090 (W.D. Ky.) [Docket No. 143] at 20.

As in the *McCracken County* and *Federal Materials* cases, there is no basis for expanding the litigation Class definition in this case to include millions of unaffected individuals. This is especially true where there is no reason to believe that persons other than those directly affected by the Rebollo data breach have had their confidential information exposed. Such an expansion unnecessarily interjects "extremely disparate" issues into on otherwise cohesive litigation class. In the absence of an evidentiary proffer by either Settling Plaintiffs or Countrywide,[6] this Court should limit the Settlement Class to the scope of the litigation Class in this case.

### C.   THE PROPOSED NOTICE PLAN SHOULD BE REJECTED TO THE EXTENT IT SEEKS TO REACH PERSONS UNAFFECTED BY THE DATA BREACH.

Because the proposed Settlement Class is overbroad, the Notice Plan designed to reach the members of such Settlement Class is necessarily equally overbroad.

---

[6]   Of course, if the settling parties had cause to believe there have been data breaches apart from the Rebollo incident, the Holmes Group would have expected such evidence to have been provided as part of the confirmatory discovery disclosure ordered by this Court. No such evidence has been provided, despite timely requests for the same. *See* Exhibit "B".

In *Mullane v. Central Hanover Trust,* the Supreme Court stated that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. … When notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." 339 U.S. 306, 315 (1950). In that case, the Court held that publication notice is not sufficient under the Fourteenth Amendment for persons whose whereabouts are known, since it is not impracticable to make serious efforts to notify them at least by ordinary mail to their addresses on record. *Id.* Specifically, the Court held that "[w]here the names and post office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency." *Id.*

In this case, Settling Plaintiffs have proposed a costly Notice Plan that includes notice by first class mail as well as an expansive media campaign of publication notice. The Notice Plan specifically allows for direct mail notice to the approximately 2.4 million Countrywide customers previously identified as having their confidential information stolen by Rebollo. Notice Plan at page 5 of 121. The Notice Plan does not detail how and/or why Countrywide already possesses the identities of the 2.4 million people, but it is self-evident that Countrywide would have the addresses of its customers. What is unexplained is why the Notice Plan chooses to notify only these 2.4 million people by first class mail, and relies exclusively on publication notice to reach the remaining 14-plus million proposed Settlement Class members.

Although the Holmes Group maintains that the proposed Class is grossly over-inclusive of the universe of Countrywide's customers in seeking to sweep in an estimated 17 million people under the terms of the proposed settlement, when little more than 2.4 million people were actually affected by the data breach,[7] even if this Court chooses not to narrow the Class to only those whose confidential information was actually stolen, the same notice requirements apply. Since the Settlement Class definition purports to include all persons who provided their Personal Information to Countrywide and/or had their mortgage serviced by Countrywide, it follows that Countrywide has the personal information, and more specifically the post office addresses, of each of the 17 million proposed Settlement Class members. Therefore, should the Court choose to certify the proposed Settlement Class defined in the Settlement Agreement, notice of the proposed Settlement Agreement should be sent via first class mail to all Settlement Class members. *See Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 139 (W.D.Ky.,1992) ("Because the names and last known addresses of all class members were available from the defendant's business records, the mailing of the notice of the proposed settlement agreement and the fairness hearing was the best notice practical under the circumstances.") (*Citing Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 315 (1950)).

The Barnow Group chose to interject as relevant to this case the matter of *In re Pharmaceutical Industry Average Wholesale Price Litigation,* MDL 1456, (hereafter "*AWP Case*") currently being litigated in the Federal District Court for the District of Massachusetts. *See* Settling Plaintiffs' Opposition to Plaintiffs Matthew and Danielle Holmes' Motion for Appointment [Docket No. 25] at 6 (citing the "obviously relevant opinions" of Judge Saris in the

---

[7]    As discussed above, various spouses, co-signors and guarantors may have been exposed by Rebollo's data theft, although they were not sent notification letters by Countrywide and are not included in the 2.4 million figure.

*AWP Case*).   In the *AWP Case*, Judge Saris recently rejected a similar ambitious publication notice plan, which, like the one proposed here, includes publication in expansive national newspaper supplements like *Parade* and *USA Weekend.*.   *See* Motion for Approval of Further Communications and Kinsella Affidavit, collectively attached as Exhibit "C" .   The notice plan in the *AWP Case* also included publication in some of the same national magazines as here including, *National Geographic, People, Reader's Digest* and *Sports Illustrated*.   *Compare id.* with Notice Plan at Docket No. 29-2.   Though admittedly extensive and costly, as discussed below, the *AWP Case* notice plan did not include individual publication in the hundreds of local newspapers throughout the country that the Settling Parties propose here.   Notice Plan at 44 of 121.

Judge Saris voiced serious concerns over implementing an expensive publication notice plan, described by the court as a "media blitz", when names and addresses of class members were readily available by which to disseminate direct mail notice.   *See* Excerpts from Transcript of March 14, 2008 Hearing on Preliminary Approval of Track II Settlement, attached hereto as Exhibit "D", at 23:4.   In analyzing the proposed notice plan for a present proposed settlement, the court inquired about the previous success of "media blitz" in a prior settlement.   The court was told by class counsel that the class response to the media blitz "was not good" and "may have been one percent or less that are responses related to the publications." *Id.* at 22:20-23:2. Class counsel estimated the cost of the media campaign in that case to be "not much less than $2 million." *Id.* at 23:6.   Judge Saris, concerned about maximizing the notice plan's "bang for the buck", *id.* at 23:7-8, inquired as to whether it would be more cost effective to use some of that money to defray the costs of further first class mail notice.   She also made clear during

12

consideration of preliminary approval of the settlement her concerns that the notice should be limited to only those people who are in the Class. *Id.* at 26:6-11 ("I want to know everything right now, so I'm not sending out notices to people and then I later find out that I may or may not agree with who's in the class.")

Aside from providing the lessons about maximizing the "bang for the buck" with class settlement notice, the widespread media campaign utilized in the *AWP Case* demonstrates what can result from over-noticing through national media. The proper use of the "media blitz" in the *AWP Case* resulted in an inordinate number of opt-outs which class counsel reported was due to widespread confusion among class members. *See* Motion for Approval of Further Communications at 3 (at Exhibit "C" hereto). Class counsel in the *AWP Case* were forced to move for permission to send out a supplemental letter to the approximately 22,750 individual consumers who opted out of the proposed settlement after receiving notice. The purpose of the follow-on letter was to "further explain[] the consequences of excluding themselves and, in the event they mistakenly excluded themselves, giving them an opportunity to rescind their exclusion by executing and returning the letter to [the Claims Administrator]". *Id.*

In this case, a widespread publication notice campaign has been proposed by the Settling Plaintiffs which utilizes many of the same national publications as in the *AWP Case*. Because it proposes to utilize local publication in approximately 979 individual newspapers, it is likely that the publication costs in this case will exceed those of the *AWP Case*.[8] The proposed Notice Plan here looks to target the same national audience and, as a result, could result in the same confusion among Class members and persons who are not part of the Settlement Class. In this

---

[8]     The Holmes Group inquired of the Barnow Group about the costs of the proposed Notice Plan, but the Barnow Group refused to divulge these figures. We would ask the Court make appropriate inquiry at the preliminary approval hearing.

case, unlike in the *AWP Case*, there is a defined set of individuals who had their confidential information stolen from Countrywide's computers.  Most of these people already received a letter from Countrywide advising them about the data breach.  To the extent more people need to be notified, Countrywide has their names and addresses.  The proposed Notice Plan seeks to notify an overbroad Settlement Class which, even though it includes far more individuals than were actually harmed by the conduct at issue, could still receive the same direct mail notice because Countrywide has their names and addresses

> **D.    THE COURT CANNOT FIND THAT THE PROPOSED SETTLEMENT IS REASONABLE WITHOUT SOME CONSIDERATION OF THE RANGE OF POSSIBLE OUTCOMES**

"'Basic to [the process of deciding whether a proposed compromise is fair and equitable] in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.'  In so doing, a court must 'apprise [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated'"  *Acosta v. Trans Union, LLC,* 243 F.R.D. 377, 389 (C.D.Cal.,2007) (internal citations omitted).  The proponents of the nationwide settlement here agree that, "[p]reliminary approval is the first step of this process, and the court must simply determine whether the proposed settlement falls with the range of possible approval...."  Pltfs' Memo at 20 (citing cases).  However, the proponents fail to provide even a preliminary evaluation of the reasonableness of the settlement.  The extent of their discussion regarding the reasonableness of the settlement is one paragraph listing the "terms" of the settlement and touting the "groundbreaking" and "innovative" nature of the settlement, and a second paragraph comparing the settlement with the "possibility of no relief should the claims of Representative Plaintiffs be denied." Motion at 23.

We respectfully submit that there is nothing "groundbreaking" or "innovative" about a settlement that is dominated by relief that was previously offered to the Class at no cost.

The Motion for Preliminary Approval provides no range of possible recoveries considered in arriving at the conclusion that proposed terms of the settlement represent a reasonable settlement, *i.e.*, one "within the range of possible approval."  Motion at 20.  In absence of any proffer of a range of possible recoveries, it is not possible for this Court to exercise the discretion necessary to preliminarily approve the settlement.  Neither the Holmes Group nor the Court can determine from the moving papers whether the proponents of the settlement think the Class has recovered one, five or fifty percent of possible damages recoverable in the lawsuit.  Respectfully, without that knowledge, this Court cannot conclude that the settlement appears reasonable at this point in time.  *See, e.g., Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 285 (7th Cir. 2002) (reversing settlement approval because "the judge made no effort to translate his intuitions about the strength of the plaintiffs' case, the range of possible damages, and the likely duration of the litigation if it was not settled now into numbers that would permit a reasonable evaluation of the reasonableness of the settlement.")

Nothing has been provided to this Court to establish the factual bases for finding that the settlement appears to fall within a range of reasonableness.  Despite Court-ordered disclosure of confirmatory discovery and a meet and confer between the parties, the Holmes Group still has no idea what Settling Parties deem the "range of reasonableness."  The suggestion that the proffered settlement amount is greater than zero and therefore within the range avoids the question altogether as every class action settlement is by definition greater than zero.  Such reasoning

would lead to the absurd result that every proposed class action settlement would be reasonable simply because it offers a value greater than zero.

Although the Holmes Group believes that the actual terms of the Proposed Settlement are not fair, reasonable and adequate, the failure of the proponents of the settlement to provide this Court with the necessary information they considered in arriving at what they deemed a fair final settlement amount is fatal to their application for preliminary approval.   As such, it is respectfully suggested that the concerns shared by the Holmes Group regarding the reasonableness and adequacy of the individual components of the proposed Settlement Agreement[9], as well as the Settlement as a whole, should be addressed now, even assuming the Court were inclined to grant preliminary approval of the proposed settlement in light of the class concerns.

1.       The Lack of Discovery by the Settling Plaintiffs Should Make this Court Skeptical in Reviewing the Proposed Settlement.

"Federal courts are inherently skeptical of pre-certification settlements, precisely because such settlements tend to be reached quickly before the plaintiffs' counsel has had the benefit of the discovery necessary to make an informed evaluation of the case and, accordingly, to strike a fair and adequate settlement." *Acosta v. Trans Union*, LLC, 243 F.R.D. 377, 397 (C.D.Cal. 2007).

Without discovery, it is difficult, if not impossible, to know the size of the Class. Countrywide chose to notify 2.4 million people whom it determined were victims of the underlying data breach.  Every plaintiff in this MDL proceeding – including all Settling Plaintiffs – filed Complaints alleging only that a data breach was caused by a Countrywide employee named Rene Rebollo "in a scheme to steal and sell Sensitive Information from as many as 2

---

[9]        *See* Letter at Exhibit "A" hereto.

million Countrywide customers and mortgage applicants." *See e.g., Moses v. Countrywide Financial Corp., et. al*, 2:09-cv-05416 (D.C. Cal. Aug. 18,2 008) at ¶ 36.[10]  In the absence of any discovery, there is no reasonable basis for concluding that the data breach affected many more than the 2.4 million people identified by Countrywide as a result of the FBI investigation, except for some additional spouses, co-signors, co-applicants and guarantors who did not receive letters from Countrywide.[11]  There is certainly no basis for concluding that the Class of affected people is 17 million strong.

Respectfully, this Court cannot assess the value of the proposed settlement to the proposed Settlement Class without the benefit of at least some confirmatory discovery and without knowing the circumstances surrounding the underlying data breach, especially considering that Settling Plaintiffs wish to expand the litigation Class from 2.4 million-plus to 17 million.  As outlined in *Acosta*,

> for a court to approve a proposed settlement, the parties must have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement. In considering a proposed settlement, a court therefore bears an obligation to evaluate the scope and effectiveness of the investigation plaintiffs' counsel conducted prior to reaching an agreement ... 'An early settlement [such as the instant proposed settlement] will find the court and class counsel less informed than if substantial discovery had occurred. As a result, the court will find it more difficult to access the strengths and weaknesses of the parties' claims and defenses, determine the appropriate membership of the class, and consider how class members will benefit from settlement.'

---

[10]     The *Moses* case was the first case filed by the Barnow Group.

[11]     In the case of the Holmes, a notification letter was addressed and sent by Countrywide to Mr. Matthew Holmes, but his wife, Danielle, did not receive a letter, even though they were co-applicants on the loan form Countrywide.  Several other plaintiffs in the Holmes Group did not receive notification letters from Countrywide, although their spouses received letters.  Without discovery, we cannot know all the individuals who were affected by the Rebollo data breach.

243 F.R.D. at 397 (*citing Polar Int'l Brokerage Corp.*, 187 F.R.D. 108, 113 (S.D.N.Y. 1999) (*quoting Manual for Complex Litigation* 2d § 30.45 (3d Ed. 1995)).

E.   **THE PROPOSED SETTLEMENT CLASS FAILS TO PROVIDE ADEQUATE REPRESENTATION FOR AND NOTICE TO FUTURE CLAIMANTS.**

The overbroad Settlement Class seeks to foreclose the rights of persons who have not suffered any cognizable injury from the data breach, but who may have their identities stolen in the future as a result of the breach.  This scenario sets forth a classic "future claims" problem addressed in the Supreme Court's seminal decision in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).

In *Amchem*, the United States Supreme Court held that the discretion a district court has in certifying a class for settlement purposes does not permit a district court to ease the demands of Rule 23 of the Federal Rules of Civil Procedure.  To the contrary, the Court held that a district court must apply "undiluted, even heightened attention" to the requirements of Rule 23 in the settlement context." *Amchem*, 521 U.S. at 621.  *See also Walker v. Liggett Group, Inc.*, 175 F.R.D. 226, 230 (S.D.W.V. 1997) ("*Amchem* decimated the notion of some circuits that Rule 23 requisites were relaxed in the settlement context").  Specific to this Court's inquiry at the preliminary approval stage, the Supreme Court admonished that "Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the precertification stage, quite independently of the required determination at postcertification fairness review under subdivision (e) that any settlement is fair in an overriding sense."  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 858 (1999). *See also Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) ("In the context of a case in which the parties reach a settlement agreement before class certification,

courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement"); *D'Amato v. Deutsche Bank*, 236 F. 3d 78, 85 (2d Cir. 2001) (noting that where a settlement has been negotiated prior to class certification, "it is subject to a higher degree of scrutiny in assessing its fairness").

     In the *Amchem* settlement litigation, which purported to settle the claims of all persons exposed to asbestos regardless of whether they had existing or future manifestations of injury, the Court of Appeals for the Fifth Circuit found that the obstacles to providing adequate notice to future victims were "insurmountable." *See Georgine v. Amchem Products, Inc*., 83 F.3d 610, 633 (5th Cir. 1996). And, while the Supreme Court was not required to rule definitively on the notice issue in its *Amchem* decision, Justice Ginsberg recognized "the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could *ever* be given to legions so unselfconscious and amorphous." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 628 (1997)(emphasis added). *See also In re "Agent Orange" Prod. Liab. Litig*., 996 F.2d 1425, 1435 (2d Cir. 1993) (acknowledging that providing an opt-out right to a person "unaware of an injury would probably do no good").

     The proposed settlement class here seeks to release the claims of millions of persons across the nation who provided personal information to Countrywide at any time before July 1, 2008. *See* Settlement Memo. at 7. While the settlement purports to provide a remedy for persons whose identity will be stolen in the future as a result of the theft of their personal information, these people have yet to experience any injury from identity theft. Nevertheless, their inclusion in the Settlement Class requires them to assess *now* whether to accept the settlement and release their future claims against Countrywide, or opt out. Even the most

carefully-crafted notice cannot adequately apprise class members of information necessary to evaluate a proposed settlement of a claim that has not yet accrued.  The proposed Settlement Class is thus infirm, as it does not (and cannot) meet the requirement of adequate notice under Rule 23(e)(1)(B). As the Supreme Court made clear in both *Amchem* and *Ortiz*, a class that includes persons with only future injuries along with presently-injured plaintiffs is driven by inherently conflicting interests.  Persons with present injuries necessarily seek to maximize payment of settlement benefits now, while those who may suffer injury later seek to minimize the present payment of benefits to preserve settlement funds for future claimants.  These conflicting interests make it impossible for presently-injured class representatives and their counsel to provide adequate representation to the members of a "future-injured" class.  *See Amchem*, 521 U.S. at 625-28; *Ortiz*, 527 U.S. at 853.

There is no indication that the Barnow Group even considered, much less resolved, conflicts among the various groups to be included in the proposed Settlement Class. Indeed, it appears that potential claimants with the most substantial interests in this litigation (those who have actually suffered identity theft) were not separately represented at all.  Therefore, the proposed Settlement Class – which includes future claimants – should not be certified, regardless of whether the Court believes the substantive terms of the settlement are sufficient for preliminary approval.

There are four (4) reasons for denying certification to such a sprawling Settlement Class at this juncture, as it concerns the future claimants in the Settlement Class proposed here: (1) there is an unresolved conflict of interest between present and future claimants, (2) the Notice Plan does not address the problem of notifying future claimants, (3) no meaningful right of opt

out has been provided, and (4) any Judgment and Release obtained concerning such future claims would be constitutionally infirm and subject to collateral attack under *Amchem*.

      1.      <u>The Unresolved Conflict of Interest Between Present and Future Claimants Bars Certification of the Settlement Class for Purposes of Preliminary Approval and Dissemination of Class Notice.</u>

It is a fundamental tenet of due process that a party may not be bound by a judgment in a representative suit if he or she was not adequately represented in the proceedings leading to that judgment." The Supreme Court has consistently so held.  *See, e.g.*, *Richards v. Jefferson County*, 517 U.S. 793, 794 (1996); *Phillips Petroleum Company v. Shutts*, 472 U.S. 797, 812 (1985); *Hansberry v. Lee*, 311 U.S. 32, 41-42 (1940)(noticing that adequacy of representation is the "touchstone" for the due process treatment of absent class members).  The stringent analysis of the "adequacy" requirement of Rule 23(a)(4) compelled by *Amchem* and *Ortiz* is not relaxed in the settlement context, or as part of the Court's consideration of class certification at the preliminary approval phase.  Adequate representation is a fiduciary obligation that demands the protection of class members' interests through the class representative's vigorous advocacy.[12]

Adequacy is also a constitutional requirement.  "[A]dequate representation is the foundation of all representative actions ...." *In re G.M. Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1121 (7th Cir. 1979)(*citing Hansberry*); *see also, Walker*, 175 F.R.D. at 231 ("[t]he bedrock consideration for the court in any certification decision is 'whether a proposed class has

---

[12]      "A class representative, by assuming a representative role on behalf of the absent class members, accepts a fiduciary obligation toward the class that may not be abandoned at will or by agreement with the defendant if prejudice to the absent class members would inhere ...." *Blanchard v. Edgemark Financial Corp.*, 175 F.R.D. 293, 298 (N.D. Ill. 1997).  *See also, Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528 (1949).  Indeed, the class representative must continue to satisfy those fiduciary obligations even after the resolution of the litigation.  *Doe v. Heckler*, 580 F. Supp 1224, 1229 (D. Md. 1984) ("[T]he fiduciary responsibility undertaken by the class representatives and their counsel to assure that the rights of unnamed class members are adequately represented ... does not end on the day a judgment is handed down").

sufficient unity so that absent members can fairly be bound by decisions of class representatives'"). The federal courts have long recognized that adequate representation is mandated by due process. *Susman v. Lincoln American Corp.*, 561 F.2d 86, 89-90 (7th Cir. 1977) ("due process requires that absent class members be adequately represented in order to be bound by a court's judgment"). *See also, Nat. Assoc. of Regional Medical Programs. v. Mathews*, 551 F.2d 340, 346 (D.C. Cir. 1977) ("adequacy of class representation has a constitutional dimension").

As the Supreme Court made clear in both *Amchem* and *Ortiz*, a class that includes both presently injured plaintiffs and those who will manifest harm only in the future is riven by inherently conflicting interests. Those conflicts mean that it was not possible that the proposed Settlement Class representatives and the Barnow Group provided "adequate representation" to the members of the futures class. *Amchem*, 521 U.S. at 625-28; *Ortiz*, 527 U.S. at 853.

This conflict is starkly exemplified in this case.

When the Barnow Group agreed to a settlement, offering funds of $1.5 million and $5 million respectively to be distributed entirely among the members of the Class, the sole basis for a finding of adequate representation vanished. None of the proffered Settlement Class representatives have alleged that they are presently injured claimants. Nevertheless, they all will share in and exhaust the settlement proceeds. Quite obviously, there is not adequate representation (indeed, there is no representation) of the interests of later-injured Class members – *i.e.* the persons who suffer identity theft after this Court approves the settlement. The named representatives cannot adequately represent the absent Class members "at all times," as required by the Supreme Court. *Hansberry v. Lee*, 311 U.S. at 43; *Shutts*, 472 U.S. at 812.

It is a well-settled rule, as echoed by Justice Rehnquist for the Supreme Court in *Shutts*, that "a court adjudicating a dispute may not be able to predetermine the *res judicata* effect of its own judgment." 472 U.S. at 895[13].  This rule is equally well-established in the context of class actions.

> Where a person is not a party to a class action, the judgment therein has conclusive effect against him only if his interests were adequately represented.... [A] person as to whom a class action is ineffective is not required to seek relief during the continuance of the action.

Restatement of Judgments § 116 comment b, at 563-64 (1942).

As discussed herein, in the absence of minimum contacts with the forum, a court cannot constitutionally compel an absent class member to appear and raise objections to the adequacy of representation.  Nor does Rule 23 compel him to do so.  Indeed, "an absent class-action plaintiff is not required to do anything." *Shutts*, 472 U.S. at 510.  *See generally*, Patrick Woolley, The Availability Of Collateral Attack For Inadequate Representation In Class Suits, 79 Tex. L. Rev. 383 (2000).

In the case of members of the "future class," since neither the Court nor the proponents of the settlement know who they are, as they have not themselves been identified as persons who suffered injury as a result of the Countrywide data breach, it is axiomatic that they cannot be compelled to do anything respecting this Court.  It goes without saying that this Court lacks the constitutional authority to release their unmanifested claims for identity theft.

---

[13]     The Advisory Committee's Note accompanying the 1966 amendment to Rule 23 confirms that:

> [The Rule] does not disturb the recognized principle that the court conducting the [class] action cannot predetermine the res judicata effect of the judgment; this can be tested only in a subsequent action.

2.      The Proposed Notice Plan Does Not Provide Due Process to Future Claimants.

As the Settling Plaintiffs acknowledge, Rule 23(e)(1)(B) requires that this Court direct reasonable notice to all class members who will be bound by the proposed settlement. *See* Settlement Brief at 15. Adequate notice is required to afford class members due process. *Id*.

In *Phillips Petroleum Company v. Shutts*, 472 U.S. 797 (1985), the Supreme Court set forth the minimum procedural due process requirements necessary if res judicata is to bind an absent class action plaintiff:

> If the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, ... The notice must be the best practicable, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." The notice should describe the action and the plaintiffs' rights in it. Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.

472 U.S. at 811-12 (citations omitted).

As the Supreme Court has acknowledged, "when notice is a person's due, process which is a mere gesture is not due process." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). Commentators largely agree that it is difficult if not impossible to provide constitutionally-mandated notice to absent class members who may suffer future injury. In Professor Coffee's view, "a future claims class action trivializes the right to opt out." John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343,

1446 (1995).  Although he may be notified of a potential claim, one who has not manifested any present injury lacks the basic information needed to make an intelligent decision about whether to remain in the class or to pursue a tort action that has not accrued, and might not ever accrue. *See* Brian Wolfman and Alan B. Morrison, *Representing The Unrepresented In Class Actions Seeking Monetary Relief*, 71 N.Y.U. L. Rev. 439, 451-55 (1996).

The problems of giving notice to a class of unknown persons who are themselves unaware that they are "injured" are potentially insurmountable.  Neither the proposed Settlement Class representatives nor their counsel can represent both presently harmed claimants and future victims due to their inherently conflicting interests.  Providing the opportunity to opt out is a meaningless gesture for a class member who may manifest some injury sometime in the future. Inherently, members of a "futures class" lack the crucial information that is essential to making a knowing and intelligent decision whether to opt out of the settlement.

The only fix is to reject the settlement, as proposed, and have structural protections imposed by the Court through the separate representation of future claimants.  Then, provided a settlement can be reached which affords separate rights to future claimants, the problem of giving constitutionally mandated due process through notice can be addressed.  The Holmes Group proposed such a solution to the Barnow Group during their meet and confer conference, but the same was rejected.  *See* Exhibit "A" hereto.

In ordinary litigation, failure to provide notice and an opportunity to be heard renders a judgment vulnerable to collateral attack.  *See*, *e.g.*, *Griffin v. Griffin*, 327 U.S. 220, 228 (1946) ("Because of the [lack of notice], and to the extent that petitioner was thus deprived of an opportunity to raise defenses ...  there was a want of judicial due process, and hence want of that

jurisdiction over the person of petitioner prerequisite to the rendition of a judgment in personam against him.").  The Supreme Court's opinion in *Shutts*, quoted above, makes clear that the same rule applies in class actions.  *See, e.g.*, *Richards v. Jefferson County*, 517 U.S. 793, 797 (1996) (in which a unanimous Court held that it violated due process to bind plaintiffs by a prior judgment of which they had inadequate notice.  Justice Stevens wrote, "We have long held, however, that extreme applications of the doctrine of res judicata may be inconsistent with a federal right that is 'fundamental in character.'").  *See generally*, Patrick Woolley, Rethinking the Adequacy of Adequate Representation, 75 Tex. L. Rev. 571 (1997).

The inherent difficulties of conveying meaningful notice to large numbers of unknown Class members are immediately apparent.  There is no reliable assurance that notices and media announcements actually reach a substantial portion of the Class.  Even more problematic is the fact that, by definition, the members of the "future class" have no current injury as they may not have suffered any present harm as a result of the Countrywide data breach.  Consequently, many are likely to disregard notices they reasonably assume are inapplicable to them.

Finally, as a means of apprising such unaffected Class members of their opportunity to be heard and to participate in the proceedings, notice at this time is a meaningless gesture.  Basic information that is crucial and typically available at the time a plaintiff's cause of action accrues – the awareness that one was affected by the data breach and has manifested injury as a result – is lacking.

The proposed notice to such a Settlement Class which includes future claimants in this case is an empty exercise.  *See  Mullane*, 339 U.S. at 314-15 ("when notice is a person's due, process which is a mere gesture is not due process.").

3.      Future Victims Cannot Be Provided With A Meaningful Opportunity At Settlement To Opt Out.

A third essential requirement of due process is satisfied by "affording absent class members, whose claims for money damages would be entitled to a jury trial an opportunity to remove himself from the class." *Shutts*, 472 U.S. at 811; Cf. *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 392 (9th Cir. 1992), *cert. dism. as improvidently granted*, 511 U.S. 117 (1994) (where Brown had no opportunity to opt out of class action, "there would be a violation of minimal due process if Brown's damage claims were held barred by *res judicata*.").

The right to opt-out of the class action serves both the command of the Seventh Amendment and "our 'deep- rooted historic tradition that everyone should have his own day in court,'" *Ortiz*, 527 U.S. at 846 (quoting *Martin v. Wilks*, 490 U.S. 755, 762 (1989)).  Tort victims in particular have a "vital interest" in having some measure of control over litigation that may affect their lives.  *Yandle v. PPG Indus. Inc.*, 65 F.R.D. 566, 572 (E.D. Tex. 1974); *Causey v. Pan Am World Airways, Inc.*, 66 F.R.D. 392, 299 (E.D. Va. 1975); *Hobbs v. Northeast Airlines*, 50 F.R.D. 76, 79 (E.D. Pa. 1970); Robert G. Bone, Rethinking the "Day in Court" Ideal and Nonparty Preclusion, 67 N.Y.U. L. Rev 193, 286-87 (1992).  *See also* Roger H. Trangsrud, Mass Trials in Mass Tort Cases: A Dissent, 1989 U. Ill. L. Rev. 69, 74 ("the right to control personally the suit whereby a badly injured person seeks redress from the alleged tortfeasor has long been valued both here and in England.").

The very structure of the proposed class action settlement here – that purports to include unknown future victims – makes it impossible for the present opt-out procedure to protect due process.  In Professor Coffee's view, "a future claims class action trivializes the right to opt out." John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev.

1343, 1446 (1995).  As noted above, the obstacles to notifying and informing future victims of their opt-out rights can be insurmountable, unless properly addressed.  More importantly, one who has not manifested any present injury, even if notified, lacks the basic information needed to make an intelligent decision whether to remain in the class or to pursue a tort action that has not accrued, and might not ever accrue.  *See* Brian Wolfman and Alan B. Morrison, Representing The Unrepresented In Class Actions Seeking Monetary Relief, 71 N.Y.U. L. Rev. 439, 451-55 (1996).  Early on in the famous *Agent Orange* litigation, the Court of Appeals for the Second Circuit candidly stated that providing an opt-out right to a person "unaware of an injury would probably do no good." *In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425, 1435 (2d Cir. 1993), *cert. denied*, 510 U.S. 1140 (1994).

The late Professor Newberg, a leading scholar in the field of class actions, pointedly agrees:

> For class members who cannot currently identify themselves for purposes of protecting their interests with respect to a class action purportedly commenced on their behalf, an opt-out right within a court-designated period of time ... is of no beneficial use.

1 Herbert B. Newberg, Class Actions § 1.23 at 1-55 (1992).

This situation is little more than a new variation on an old injustice: rigid statutes of limitations or statutes of "repose" under which a person's cause of action in tort can become time-barred even before any harm may occur or became manifest.  The harsh rule was famously lampooned by Judge Frank in *Dincher v. Marlin Firearms Co.*, 198 F.2d 821, 823 (2d Cir. 1952) ("Except in topsy-turvy land, you can't die before you are conceived, or be divorced before ever you marry, or harvest a crop never planted ...").  Nearly every jurisdiction has rejected this harsh

result in favor of a "discovery rule," under which the limitations period does not begin to run until the person knows or should have known of his or her injury.  *See*, *e.g.*, *Urie v. Thompson*, 337 U.S. 163 (1949). Nor is it fair to strip the future victims of identity theft of the right to legal redress and a jury trial for failing to opt out of a class action long before they could have known of their injury.

      4.    <u>Judgment Concerning and Release of Future Claims Would Be Constitutionally Infirm.</u>

The proposed settlement is constitutionally infirm insofar as the presently harmed named plaintiffs seek to bargain away not only their own rights to seek damages in a jury trial, but also the rights of unknown and unaware Class members who may not manifest any harm from Countrywide's conduct until sometime in the future.[14]  As to the members of that "futures class," the right to trial by jury is not "preserved" as commanded by the Seventh Amendment.[15]  *See Ortiz*, 527 U.S. at 846 (a settlement is constitutionally infirm  if it "compromises [future claimants'] Seventh Amendment rights without their consent.")  The historical background of the Seventh Amendment demonstrates the importance of jury trial as a fundamental right.  Its denial renders the proposed settlement unconstitutional, and therefore unable to be approved preliminarily.

Judgments that are obtained in violation of due process are clearly subject to collateral attack.  In the context of class actions, due process requires three (3) essential proofs:

---

[14]    This situation is caused largely by the fact that the Settling Plaintiffs have simply traded away the rights of Class members to have declaratory or injunctive relief against Countrywide. Such relief was actively being sought by the Holmes Group at the time the settlement was announced.

[15]    "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of common law." U.S. Const., Amend vii.

(1)     that absent members be given meaningful notice;

(2)     that named representatives adequately represent the interests of absent

members at all times; and

(3)     that class members be afforded the opportunity to opt out of the class.

Because the Settlement Class seeks to include future claimants, the class action

proceedings in this case can not satisfy any of these three due process requisites.  To be clear, it

is the inclusion of the claims of a large number of unknown persons who may manifest injury

sometime in the future which causes the failure.  As a result, the potential fix lies in the exclusion

of these claims from the settlement and release, or, alternatively, a Court-ordered re-negotiation

of the terms of the settlement to see if a proper fix can be worked out.  Otherwise, the existing

Settlement Class cannot satisfy the requirements of due process set forth herein.

Perhaps the biggest problem with the Settling Plaintiffs' inclusion of future claimants in

the Settlement Class is the fear of collateral attack on the Judgment and Release down the road.

Americans are entitled to seek legal redress in court and to present their case before a jury to

hold companies accountable for injuries caused to them.  Those rights are guaranteed by the

Constitution.  Early in our nation's history, Chief Justice Marshall declared:

> [T]he very essence of civil liberty certainly consists in the right of
> every individual to claim the protection of the laws, whenever he
> receives an injury.  One of the first duties of government is to
> afford that protection.

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803).

In this case, however, the Barnow Group and Countrywide propose to bargain away the

constitutional rights of persons who may suffer identity theft in the future.  They seek this

Court's approval to trade away the constitutional rights not only of those who suffered actual

losses up until the date of this Court's final approval – who will be given a choice to opt out – but also the rights of all those who would suffer losses in the future.  In exchange, they propose a settlement that does not offer any compensation for their traded rights.  Because the settlement violates fundamental constitutional rights, this Court must reject the settlement, as proposed.

While the proponents of the settlement have argued that the law favors settlements and that therefore, presumably, without the authority to bind all class members Countrywide will not enter into such a global settlement, that is no reason to curtail the constitutional rights of the "future class."  Administrative efficiency, though laudable, does not trump the Seventh Amendment.  The Supreme Court emphasized this point in holding that Congress may not transfer legal claims from Article III courts to non-jury bankruptcy tribunals:

> It may be that providing jury trials in some fraudulent conveyance actions... would impede the swift resolution of bankruptcy proceedings and increase the expense of Chapter 11 reorganizations.  But 'these considerations are insufficient to overcome the clear command of the Seventh Amendment.'

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 63 (1989), *quoting Curtis v. Loether*, 415 U.S. 189, 198 (1974). As then-Justice Rehnquist once observed:

> [N]o amount of argument that the device provides for more efficiency or more accuracy or is fairer will save it if the degree of invasion of the jury's province is greater than allowed in 1791.  To rule otherwise would effectively permit judicial repeal of the Seventh Amendment...
> [T]he civil jury was surely a burden to the English governors who, in its stead, substituted the vice-admiralty court.  But, as with other provisions of the Bill of Rights, the onerous nature of the protection is no license for contracting the right secured by the Amendment.

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 346 (1979) (Rehnquist, C.J., dissenting).

As set forth above, in determining whether the proposed settlement preliminarily meets

the due process requirement of adequacy of representation under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the Court must apply the principles enunciated by the Supreme Court in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  According to these cases, the Rules Enabling Act plainly precludes a court from applying Rule 23 in a manner that violates the jury rights of future victims.  As described above, the right to trial by jury is deeply rooted in our historical tradition.  The Rules Enabling Act provides that the rules of civil procedure shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution.  28 U.S.C. § 2072 (1958 ed.) (emphasis added).[16]

The Supreme Court has observed that a "[c]ourt is justified in saying that there has been a failure of due process only in those cases where it cannot be said that the procedure adopted fairly insures the protection of the interests of absent parties who are to be bound by [the judgment]."  *Hansberry v. Lee*, 311 U.S. 32, 42 (1940).  This is exactly such a case.

In sum, a class action settlement that purports to extinguish the jury rights of unknown class members who will manifest injury in the future but without reasonable notice or the opportunity to opt out, as here, cannot provide those class members with the essential procedural guarantees of due process.  They cannot be bound by the judgment.

**CONCLUSION**

For the foregoing reasons, the undersigned counsel for the Holmes Group respectfully submit that the Motion for Preliminary Approval of Class Action Settlement should be denied.

---

[16]     The Rules Enabling Act was amended in 1988, and the specific reference to the jury right was omitted. The clause apparently was deemed superfluous; Congress could not and did not authorize rules of procedure that violate the Seventh Amendment. "[T]he Constitution needs no statute to remind us that neither a rule nor a statute can upset a constitutional requirement." David D. Siegel, Commentary on 1988 and 1990 Amendments, reprinted in 28 U.S.C.A. § 2072 (1991).

Respectfully Submitted,

Dated: March 3, 2009

 s/Stacey A. Blankenship
Stacey A. Blankenship, Esquire
Doug Moore, Esquire
DENTON & KEULER
555 Jefferson Street, Suite 301
Paducah, KY 42001
270-443-8253 telephone

Donald E. Haviland, Jr., Esquire
Michael J. Lorusso, Esquire
THE HAVILAND LAW FIRM, LLC
111 South Independence Mall East, Suite 1000
Philadelphia, PA 19106
(215) 609-4661 telephone

Kent M. Williams, Esquire
WILLIAMS LAW FIRM
1632 Homestead Trail
Long Lake, MN 55356
(763) 473-0314

Barry Eichen, Esquire
EICHEN LEVINSON CRUTHLOW, LLP
40 Ethel Road
Edison, NJ 08817
(732) 777-0100 telephone

ATTORNEYS FOR THE HOLMES GROUP

## CERTIFICATE OF SERVICE

I hereby certify that on this date, March 3, 2009, I caused a true and correct copy of the

Holmes Group's Response to Motion for Preliminary Approval of Proposed Class Action

Settlement to be served on all counsel of record via ECF filing.


__ s/Stacey A. Blankenship_____
Stacey A. Blankenship, Esquire
Doug Moore, Esquire
**DENTON & KEULER**
555 Jefferson Street
Suite 301
Paducah, KY 42001