IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

|  |  |
|---|---|
| IN RE: COUNTRYWIDE FINANCIAL CORP. CUSTOMER DATA SECURITY BREACH LITIGATION <br><br> This Document Relates to: <br>  All Actions | ) <br> ) No.: 3:08-md-01998-TBR <br> ) MDL No. 1998 <br> ) <br> ) Honorable Thomas B. Russell <br> ) United States District Judge <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**OBJECTION BY THE PRIVACY RIGHTS CLEARINGHOUSE TO THE
PROPOSED SETTLEMENT AGREEMENT AND REVISED NOTICE PLAN**

The Privacy Rights Clearinghouse ("PRC" or "Objector"), through its undersigned attorneys, submits this Objection to the proposed settlement agreement and revised notice plan ("Objection") and in support thereof states as follows:

**I.    INTRODUCTION**

On January 21, 2009, Settling Plaintiffs[1] filed papers requesting preliminary court approval of a class-wide settlement of all proceedings before the Court, the issuance of settlement notice, and the setting of a final fairness hearing ("Proposed Settlement.") (Dkt # 7). These papers were filed a mere one (1) month after the first cases were transferred to this MDL. The timing of and the terms of the Proposed Settlement raise serious questions as to whether all Class Members were adequately

---

[1] The "Settling Plaintiffs" include Cody M. Dragon, Laila Elkettab, Jay B. Gaumer, Scott Gregg, Matthew B. Martin, Harold L. Mooney, Edmund Moses, Thomas A. Munz, Michael J. Rich, and Kim Wickman.

represented in the negotiating process. Additional discovery is necessary to properly evaluate whether the Proposed Settlement is fair, reasonable and adequate.

## II. INTERESTS OF THE OBJECTORS

The PRC is a nonprofit consumer organization with a two-part mission -- consumer information and consumer advocacy. The PRC was established in 1992 and is based in San Diego, California, but serves individuals nationwide. The PRC's goals are to:

- Raise consumers' awareness of how technology affects personal privacy.

- Empower consumers to take action to control their own personal information by providing practical tips on privacy protection.

- Respond to specific privacy-related complaints from consumers, intercede on their behalf, and, when appropriate, refer them to the proper organizations for further assistance.

- Document the nature of consumers' complaints and questions about privacy in reports, testimony, and speeches and make them available to policy makers, industry representatives, consumer advocates, and the media.

- Advocate for consumers' privacy rights in local, state, and federal public policy proceedings, including legislative testimony, regulatory agency hearings, task forces, and study commissions as well as conferences and workshops.

As a result of its ongoing work in advocating, educating and assisting consumers in protecting their personal information the PRC is uniquely qualified to assess whether the Proposed Settlement and notice plan are fair, reasonable, and adequate.

### III.  STATEMENT OF THE FACTS

Beginning in or about August 2008 defendant Countrywide[2] distributed letters to 2.4 million mortgage customers notifying them that their private information including their names, addresses, mortgage loan numbers, social security numbers, and various other loan and application information had been purloined by a Countrywide employee for sale to a third party in violation of state and federal laws. Countrywide offered these customers free enrollment in a two (2) year credit monitoring service.

Following this notification several lawsuits were filed across the country most of which were transferred to this Court by the Judicial Panel on Multidistrict Litigation ("JPML") in December 2008 for consolidated pre-trial proceedings. All of the lawsuits transferred to this Court by Order of the JPML arise out of a series of thefts of electronic data containing private financial information belonging to Countrywide's customers occurring over a two (2) year period. During this period the thief, Mr. Rene Rebollo, was employed as a senior loan analyst with Full Spectrum - a subsidiary of CFC, and a division of Countrywide Home - specializing in mortgage originations to subprime borrowers.

On January 21, 2009, Settling Plaintiffs filed papers requesting preliminary court approval of the Proposed Settlement, issuance of settlement notice, and setting of a final fairness hearing. On June 30, 2009, the Court issued an Order (Dkt # 89) expressing concern that the proposed notice plan ("Proposed Notice Plan") (Dkt # 29) failed to satisfy the due process requirements of Rule

---

[2] For purposes of this Objection the term "Defendants" and/or "Countrywide" include Countrywide Financial Corporation ("CFC"), Countrywide Bank, FSB ("Countrywide Bank"), Countrywide Home Loans, Inc. ("Countrywide Home"), Full Spectrum Lending Division ("Full Spectrum"), and Bank of America Corporation ("BAC").

23(c)(2) and 23(e) of the Federal Rules of Civil Procedure ("FRCP"), and encouraged the Settling Plaintiffs to revise it. On July 24, 2009, Settling Plaintiffs filed a Second Amendment to the Settlement Agreement ("Revised Settlement Agreement") and Revised Notice Plan ("Revised Notice Plan") (Dkt # 94). On December 22, 2009, the Court entered an Order (Dkt # 111) certifying the settlement Class, preliminarily approving the settlement, and approving the Revised Notice Plan.

## IV. ARGUMENT

To approve a class action settlement, a court must find that the settlement agreement is "fair, adequate, and reasonable," and not a product of collusion. Bell v. DuPont Dow Elastomers, LLC 640 F.Supp.2d 890, 895 (W.D. Ky. 2009). Fairness is determined upon review of both the terms of the settlement agreement and the negotiating process that led to such agreement. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005).

This Court is guided by seven factors in determining whether a proposed class settlement is fair, reasonable, and adequate: "(1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen. Motors Corp., 497 F.3d 615, 631 (6th Cir. 2007) (citations omitted). "The Court may choose to consider only those factors that are relevant to the settlement at hand and may weigh particular factors according to the demands of the case." Crawford v. Lexington-Fayette Urban County Government, Civil Action No. 06-299-JBC, 2008 WL 4724499, at *3 (E.D. Ky., Oct. 23, 2008) (citation omitted).

4

### A. THE RISK OF FRAUD OR COLLUSION

#### 1. Pre-certification Settlements are Subject to Heightened Scrutiny.

Because settlement classes can, depending on how they are used, evade the processes intended to protect the rights of absentee class members pre-certification settlements are held to a higher degree of scrutiny in assessing their fairness. D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) (citations omitted). For instance, courts recognize that unauthorized settlement negotiations occurring before the certification determination "create the possibility of negotiation from a position of weakness by the attorney who purports to represent the class." In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability ("In re GM Pick-Up Truck"), 55 F.3d 768, 788 (3rd Cir. 1995); Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30, 33 (3rd Cir. 1971) (recognizing that a person who unofficially represents the class during settlement negotiations may be under strong pressure to conform to the defendants' wishes because, lacking official status, the individual knows that a negotiating defendant may try to reach a settlement with another member of the class). Similarly, "use of a settlement class can lead to a settlement that provides inadequate consideration in exchange for the release of class [members'] claims" where "both parties have less information on the merits." In re GM Pick-Up Truck, 55 F.3d at 788-89. Without the benefit of more extensive discovery, both sides may underestimate the strength of the plaintiffs' claims.

These concerns, framed as an issue of FRCP 23(a) requisites, implicate adequacy of representation issues: "[a]rguments in opposition to settlement classes have merit when they are addressed to the problem of inadequate representation or possible collusion among the named plaintiffs and some or all defendants." In re Baldwin United, Corp., 105 F.R.D. 475, 480 (S.D.N.Y.

1984). The very concerns raised by federal courts when considering pre-certification settlements are at issue here. The timing of the settlement negotiations and the Proposed Settlement so early in this complex litigation, drafted by only a fraction of the parties involved in this MDL, without involvement from or notice to counsel for plaintiffs in many of the other actions in this MDL, or the Court, or the benefit of confirmatory discovery raise serious questions about whether the interests of all Class Members were adequately represented during the negotiation process, the vigor with which the case was prosecuted, and the potential for coercion or collusion.

    2.    <u>The Disparate Benefits Negotiated for Class Members Show that Counsel for Settling Plaintiffs did not Adequately Represent the Interests of the Entire Class</u>.

"[C]ourts examining settlement classes have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant" finding that these "points require attention in view of the lack of significant discovery and the extremely expedited settlement of questionable value accompanied by an enormous legal fee." In re GM Pick-Up Truck, 55 F.3d at 801. Here, the second and third points require close attention in view of the negotiation of an extremely expedited settlement of questionable value accompanied by a rather substantial legal fee anticipated to be requested by Class counsel (*i.e.*, $3.5 million). In re General Motors Corp. Engine Interchange Litigation ("In re GM Engine"), 594 F.2d 1106, 1128 (7th Cir. 1979) (one factor suggesting that the representation of the class during settlement negotiations was less than vigorous was the relatively early stage in which it was reached).[3]

---

[3] *See, also e.g.*, In re GM Pick-Up Truck, 55 F.3d at 796 (citations omitted) ("recognizing that the settlement evaluation involves two types of evidence: a substantive inquiry into the terms of the settlement relative to the likely rewards of litigation, and a procedural inquiry into the negotiation process"); In re GM Engine, 594 F.2d at 1124 n.20 (finding that the conduct of

6

A number of factors militate against the conclusion that the Class Members' interests were sufficiently pursued by counsel for Settling Plaintiffs. First, the Proposed Settlement divides Class Members into two groups (1) those who Countrywide determined it was "reasonably possible" that their personal information was disclosed to third parties (2.4 million Class Members sent the Countrywide Letter[4]) versus (2) those who Countrywide determined it was only "logically possible" that their personal information was disclosed to third parties (remaining 14.6 million Class Members) providing each group with different benefits. Only those in the first group may elect to enroll in the credit monitoring protection package, the second group is eligible to receive this relief only if they produce evidence sufficient to convince Countrywide that they experienced a loss as a result of identity theft that was more likely than not a result of the data breach by Rebollo. Proposed Settlement at ¶ 2.1(b)(iii). Further, only the first group may participate in the out-of-pocket reimbursement relief despite the fact that all Class Members are equally likely to incur such costs as printing new checks for a new checking account, freezing their credit report, changing telephone numbers, or replacing drivers' licenses.

---

settlement negotiations was relevant to the fairness of the settlement); In re Baldwin-United Corp., 105 F.R.D. at 482 ("In order to supplement judicial examination of the substance of a compromise agreement, and because a court cannot conduct a trial in order to avoid a trial, attention must be paid to the process by which a settlement has been reached.")

[4] "Letter" is defined by the Proposed Settlement as "a letter from Countrywide dated anytime from August 2, 2008 to and including November 2, 2008, notifying a Person that their Private Information (as defined in ¶ 1.18) was involved in the alleged theft committed by a Countrywide employee." Proposed Settlement at ¶ 1.12. "Settlement Class" is defined as "all Persons in the Unites States who: (1) received a letter from Countrywide anytime from August 2, 2008 to and including November 2, 2008, notifying them that their personal information was involved in an alleged theft committed by a Countrywide employee; or (2) who obtained a mortgage from Countrywide or whose mortgage was serviced by Countrywide prior to July 1, 2008." Third Amendment to the Settlement Agreement at ¶ 1.24 (Dkt # 105).

The 2.4 million Class Members that received a Letter from Countrywide were not the only ones whose private information was accessible by Rebollo and potentially disclosed to third parties, up to 14.6 million additional Class Members were affected. All 17 million Class Members were threatened by identity theft and all should be entitled to (1) immediately elect to enroll in the credit monitoring protection package, and (2) have the ability to submit a claim for reimbursement of certain out-of-pocket expenses incurred as a result of the data breach.

Second, Class counsel effected a settlement that would yield very substantial rewards to them ($3.5 million attorney fee request) for negotiating a settlement that provides the majority of Class Members with virtually no benefits, while releasing any and all claims they may have that are associated in any manner with the Countrywide data breach.

### 3. Notice Provided to the Majority of Class Members Failed to Satisfy Due Process.

An additional factor militating against a conclusion that the Class Members' interests were adequately represented by counsel for Settling Plaintiffs is evidenced by the negotiation of a notice plan that failed to satisfy due process for a majority of Class Members. In its June 30, 2009 Order, the Court expressed concern that the original notice plan failed to satisfy the due process requirements of FRCP 23(c)(2)(B) and 23(e). The gravamen of the Court's concern was the extensive size of the proposed settlement class (17 million) in comparison to the small percentage of class members that were to receive direct notice (2.4 million).

The Revised Notice Plan failed to cure the due process defects where the 2.4 million Class Members that received a Letter were mailed a detailed notice packet whereas an additional (estimated to be 7.8 million) Class Members that did not receive the Letter, but who were determined to be active mortgage customers of Countrywide as of July 8, 2009 were to receive

"direct notice" in the form of a Summary Postcard. The Summary Postcard Notice failed to satisfy due process concerns or meet the requirements for "direct notice" required by the federal rules.

"The Due Process Clause gives unnamed class members the right to notice of the settlement of a class action." Fidel v. Farley, 534 F.3d 508, 513 (6th Cir. 2008) (citations omitted). Pursuant to FRCP 23(e)(1), a district court, when approving a class action settlement, "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Additionally, "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FRCP 23(c)(2)(B). "To comport with the requirements of due process, notice must be 'reasonably calculated to reach interested parties.'" Fidel, 534 F.3d at 514 (citations omitted).

The Summary Postcard Notice provided to the 7.8 million settlement Class Members who were not sent a Letter, but for whom the settling parties had an address, was not the best notice practicable under the circumstances. Further, the Summary Postcard Notice failed to satisfy the notice requirements set forth in FRCP 23(c)(2)(B).[5]

For instance, the Summary Postcard Notice did not properly define the nature of the action or identify the class claims, issues, or defenses. Instead, it merely stated that a "settlement has been reached with Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide

---

[5] The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3). FRCP 23(c)(2)(B).

9

Bank, FSB, Full Spectrum Lending Division, and Bank of America Corporation (together called "Countrywide") about the theft of personal and financial information from their customer databases. . . The lawsuit alleged that Countrywide did not adequately protect confidential personal and financial information. Countrywide denies all of the claims." Revised Notice Plan, Exh. A, Dkt # 94-12 at pgs. 7-8. Nor did it define the Class where it states only "[y]ou are included in the settlement Class and you have legal rights and options, such as submitting a claim for benefits, excluding yourself from, or objecting to, the settlement." *Id.* Further, the settlement benefits afforded by the Proposed Settlement were described in one vague sentence stating that "Class Members are eligible to receive reimbursement for identity theft of up to $50,000 per incident." Lastly, the Summary Postcard Notice did not inform these 7.8 million Class Members how they could exclude themselves from the Class or how they should go about objecting to the Proposed Settlement.

It is unclear why the 2.4 million Class Members who received the Countrywide Letter were entitled to detailed Summary Notice, while the 7.8 million settlement Class Members, for whom the settling parties had mailing address received only the Summary Postcard Notice revealing virtually no details about the Proposed Settlement, thus further highlighting the disparate and conflicting treatment of Class Members. Additional discovery or clarification by the settling parties is necessary to explain the basis for this disparity.

### B. THE AMOUNT OF DISCOVERY ENGAGED IN BY THE SETTLING PARTIES

Further evidence that Class Members were inadequately represented during settlement negotiations is the fact that **no** confirmatory discovery was produced by Countrywide **prior to** the Settling Plaintiffs filing their motion for preliminary approval of the Proposed Settlement. It

10

remains unclear what information counsel for Settling Plaintiffs relied on during settlement negotiations, and thus whether they had sufficient information to make an informed decision about settlement. Although "in the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table'" the parties must still have sufficient information to make an informed decision about settlement. Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1239 (9th Cir. 1998); Olden v. Gardner, No. 07-1953, 2008 WL 4297245 (6th Cir., Sept. 18, 2008) (the fact that class counsel negotiated a settlement agreement without first obtaining any expert opinions or engaging in formal discovery suggested that class counsel may not have obtained the best agreement possible for the settlement class.)

The record makes clear that the belated and limited confirmatory discovery produced by Countrywide was not sufficient to explain the root cause and extent of Countrywide's data breach, the sufficiency of the notice affected customers beginning in August 2008, and the adequacy of remedial measures undertaken by Defendants.[6] This information is necessary in order to fairly gauge the reasonableness of the Proposed Settlement. Moreover serious questions exist as to the true value of the Proposed Settlement and its benefit to the Class as a whole, making any decision as to whether it is fair, reasonable, and adequate premature without additional confirmatory discovery and/or supplemental briefing prior to final approval where it remains unclear as to:

Credit Monitoring Protection Package:

(1) What is the true value of the Proposed Settlement where eligible Class Members must affirmatively subscribe for the credit monitoring protection package within 90 days following receipt of notice or 120 days from the first date of publication of notice, rather than being automatically enrolled, thereby reducing Countrywide's

---

[6] The Objector incorporates by reference previous briefing by it in response to the Proposed Settlement and corresponding notice plan(s), including Docket Numbers 14, 31, 48, 63, 70, 76, 79, 80, 97, and 101.

11

liability and the overall value of the Proposed settlement by the number of Class Members who do not sign up for this relief at all or on time.

(2) What restrictions are placed on Experian's use and/or sale of information collected by Class Members that elect the credit monitoring protection package and whether Experian will profit from the collection and/or sale of information submitted by Class Members in association with the credit monitoring relief.

(3) Whether Experian will automatically terminate a Class Member's account created for the purpose of providing them the credit monitoring protection package at the conclusion of two (2) years (or three (3) years), or whether Experian will proceed to charge Class Members electing this relief the company's usual fee for the service, until a Class Member affirmatively cancels this service resulting in a windfall to Experian.

(4) Whether difficulties expressed by numerous Class Members who received the Letter and took advantage of Countrywide's initial offer to enroll in the Triple Advantage℠ credit monitoring program (as revealed during confirmatory discovery) were investigated and resolved, and whether their resolution resulted in any actual or contemplated changes in the procedures to be followed when enrolling Class Members in the credit monitoring protection package.

Additional Identity Theft Reimbursement Relief:

(5) What is the true value of the Proposed Settlement where Class Members must exhaust all identity theft insurance and the Experian Guarantee before Countrywide is responsible for making any payments pursuant to the Additional Identity Theft Reimbursement relief, thereby substantially reducing Countrywide's liability.

(6) What is the true value of the Proposed Settlement where Countrywide's liability for the Additional Identity Theft Reimbursement relief is capped at $5 million despite a class size of approximately 17 million.

Expense Reimbursement:

(7) What is the true value of the Proposed Settlement where Countrywide's liability for the Expense Reimbursement relief[7] is capped at $1.5 million for the 2.4 million Class Members who are eligible to participate in this relief, and where the remaining 14.6 million Class Members are not eligible to participate in this relief.

---

[7] Reimburses Class Members up to a maximum of $60 for (a) the cost of telephone calls, postage related to inquiries on a claimant's bank accounts, financial accounts, mortgage accounts and/or credit reports, (b) lost time (calculated at $10.00 per hour), (c) the cost of placing a freeze on a claimant's credit report, *and/or* (d) the cost of changing a claimant's phone number. Proposed Settlement at ¶ 2.1(c).

12

Notice:

(8) Why the 2.4 million Class Members who received the Countrywide Letter were entitled to detailed Summary Notice, while the 7.8 million settlement Class Members, for whom the settling parties had mailing address received the Summary Postcard Notice revealing virtually no details about the Proposed Settlement.

Class Definition and Release:

(9) The propriety of the Class definition being that it is either under-inclusive as revealed by confirmatory discovery indicating that Rebollo had access to the private information of substantially more persons than the current class definition includes, or over-inclusive if the settling parties are in fact seeking to settle the claims of only those persons whose private information was stored on a particular database (*i.e.*, the iSeries mainframe). Either way the fairness of the release and the compensation caps warrant further discovery or clarification by the settling parties.

Other:

(10) With respect to the seventy-five (75) claims received by Countrywide indicating possible identity theft affecting the 2.4 million Class Members who received the Letter, how did Countrywide determine that no identity theft took place or if there was identity theft it was not related to the Rebollo incident. Further, how many Class Members, not just those sent a Letter, have informed Countrywide of a possible instance of identity theft following the Rebollo breach.

(11) How or why the Class was limited to only those customers who had a mortgage originated or serviced through Full Spectrum (and thus had their customer data maintained on Defendants' "iSeries mainframe"), as opposed to mortgage customers with Countrywide Homes and/or Countrywide Bank whose information was reposed on databases other than the iSeries mainframe when Rebollo apparently had access to all databases within Countrywide's computer systems not just the iSeries.

(12) Why, for instance, a husband and wife who were co-mortgagees, only received a single Letter thus making only one of them (but not the other) eligible to elect the credit monitoring relief even though both of their private information (*i.e.*, names, addresses, mortgage loan numbers, social security numbers, and various other loan and application information) were possibly compromised.

(13) How Countrywide determined that although Rebollo had access to mortgage-related information about more than 14.6 million customers, in addition to those who received the Letter, disclosure of their information to third parties was not reasonably possible entitling them to diminished settlement benefits and limited notice.

A court has inherent authority when passing upon the fairness and adequacy of a proposed class settlement to delay approval pending clarification of issues or development of evidence:

> [A] court may feel a lack of an adequate basis to rule on the reasonableness of a proposed class settlement when there has been only minimal, or no, discovery, and when major uncertainties, which cannot be circumscribed in some manner, foreclose a fair opportunity to determine the likelihood of success or the measure of recovery. In those rare instances, a court may exercise its discretion to deny or defer without prejudice its approval of the proposed class settlement pending further clarification of the issues or development of evidence, through discovery or other means.

See 4 Newberg on Class Actions § 11.45 pg. 130, and authorities cited therein.

Courts have permitted objectors to conduct discovery relevant to objections, including discovery of evidence pertaining to settlement negotiations where the party seeking such discovery has laid a foundation by adducing from other sources evidence indicating that the settlement may be collusive. In re Sorrel, No. Civ.A. 6:04 CV 1101, 2006 WL 724821, at *1 (W.D. La., March 20, 2006); see also In re GM Engine, 594 F.2d at 1125(trial court abused its discretion when it did not permit objectors discovery concerning settlement negotiations because conduct of the negotiations was relevant to the fairness of the settlement); Staton v. Boeing Co., 327 F.3d 938, 951 (9th Cir. 2003) (allowing limited discovery by objectors); Hemphill v. San Diego Ass'n of Realtors, Inc., 225 F.R.D. 616, 620 (S.D. Cal. 2005) (granting objectors access to limited discovery). Here, additional discovery is necessary regarding the issues outlined above prior to the Proposed Settlement being finally approved. The need for additional discovery and/or supplemental briefing is intensified by the fact that no confirmatory discovery took place during settlement negotiations, and ex post facto confirmatory discovery left unanswered glaring questions regarding whether the scope of the Class definition and the corresponding release are fair in comparison to the benefits provided Class Members by the Proposed Settlement. Objector requests the opportunity to conduct limited discovery into the issues presented herein so that the Court may properly evaluate the fairness, reasonableness and adequacy of the Proposed Settlement.

## C. THE REACTION OF ABSENT CLASS MEMBERS

As of the date this Objection was filed the court docket indicated that fifty-three (53) individuals objected to or opted-out of the Proposed Settlement. Because most of these were filed under seal Objector has not had the benefit of reviewing the substance of these communications. However, Objector believes that a careful review of these filings will reveal a significant discontent on the part of Class Members with the terms of the Proposed Settlement.

Moreover, the response by Class Members must be evaluated in conjunction with the failure to provide the majority of Class Members with adequate notice. It is likely that a much higher response rate would have resulted if these Class Members were provided with notice sufficient to afford them due process.

Lastly, any analysis of this factor must consider whether the Class definition is fair, adequate and reasonable. For instance, the percentage of objectors and opt-outs is going to vary substantially if the class remains as it is currently defined to include approximately 17 million consumers compared to if it is redefined to include only those 2.4 million consumers that received the Letter and who are afforded the true benefits provided by the Proposed Settlement.

## D. THE PUBLIC INTEREST

The public's interest in being assured that corporations that collect their personal private information for business purposes will adequately safeguard that information and protect it from improper disclosure or otherwise face appropriate retribution counsels against approving the Proposed Settlement in its current state. While this case involves failures by Countrywide to properly and effectively secure the sensitive personal information of 17 million Class Members, the Proposed Settlement does not address this issue in any way.

15

For example, the Proposed Settlement does not require Countrywide to implement and maintain enhanced security procedures designed to prevent such occurrences from happening in the future. The only mention of this issue is found in the Proposed Settlement ¶ 10.4 indicating that representative plaintiffs are entitled to conduct confirmatory discovery concerning "evidence of corrective action undertaken by Countrywide to prevent future such incidents from occurring and enhancement of the security of consumers' information entrusted to Countrywide and its Related Entities." The Proposed Settlement should at the very least outline enhanced security procedures Countrywide will implement to protect customer's sensitive personal information and provide a way for Class counsel to monitor these procedures for a limited period of time to ensure they are effective and are being properly implemented.

### E. THE REMAINING FACTORS

In deciding whether to approve a particular settlement courts "need not give greater weight to any particular relevant factor" and are "not required to consider all factors." Vermont Pure Holdings, Ltd. v. Berry, No. 0601814(BLS1), 2010 WL 1665258, at *11 (Mass. Super., Feb. 8, 2010). Further, "[n]o one factor controls and the trial court has the discretion to weigh each case individually." MacLean Townhomes, LLC v. Charter Oak Fire Ins. Co., No. C06-1093BHS, 2008 WL 4542412, at *1 (W.D. Wash., Oct. 9, 2008). At this juncture the Court need not consider the remaining factors: (1) the opinions of Class counsel and Class representatives; (2) the complexity, expense and likely duration of the litigation; and (3) the likelihood of success on the merits where the factors addressed herein strongly weigh in favor of the Proposed Settlement being denied until the conclusion of necessary additional discovery and/or supplemental briefing and/or until the Proposed Settlement is modified accordingly.

## V. REQUEST TO PARTICIPATE IN THE FAIRNESS HEARING

The PRC, by and through its undersigned counsel, respectfully requests the opportunity to be heard before the Court in this matter during the Final Fairness Hearing on July 19, 2010 at the United States District Court for the Western District of Kentucky, Gene Snyder U.S. Courthouse, 601 West Broadway, Louisville, Kentucky.

## VI. CONCLUSION

For the reasons set forth herein final approval of the Proposed Settlement should be denied and Objectors should be permitted to conduct limited discovery and supplemental briefing necessary to properly evaluate whether the Proposed Settlement is fair, reasonable, and adequate to all Class Members.

Dated: June 24, 2010

Respectfully submitted,

By: s/ Mark L. Knutson
Mark L. Knutson, Esq.

Jeffrey R. Krinsk
FINKELSTEIN & KRINSK, LLP
501 West Broadway, Suite 1250
San Diego, California 92101
Tel: (619) 238-1333
Fax: (619) 238-5425
jrk@classactionlaw.com

Hans G. Poppe
Warner T. Wheat
THE POPPE LAW FIRM
6004 Brownsboro Park Boulevard, Suite E
Louisville, Kentucky 40207
Tel: (502) 895-3400
Fax: (502) 895-3420
hans@poppelawfirm.com

17

Ron Parry
PARRY DEERING FUTSCHER & SPARKS, PSC
411 Garrard Street
P.O. Box 2618
Covington, Kentucky 41012
Tel: (859) 291-9000
rparry@pdfslaw.com

*Attorneys for Privacy Rights Clearinghouse*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2010, I electronically filed a true and correct copy of the Objection by the Privacy Rights Clearinghouse to the Proposed Settlement Agreement and Revised Notice Plan ("Objection") with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List. In addition, a copy of this Objection was mailed via U.S. Mail postmarked June 24, 2010 to the following three addresses:

| | | |
|---|---|---|
| Clerk of the Court | Ben Barnow | Mark S. Melodia |
| Gene Snyder U.S. Courthouse | Barnow and Associates, P.C. | Reed Smith LLP |
| 601 West Broadway | One North LaSalle St., Ste. 4600 | Princeton Forrestal Village |
| Louisville, KY 40202 | Chicago, IL 60602 | 136 Main St., Suite 250 |
| | | Princeton, NJ 08543-7839 |

Dated: June 24, 2010

                   _s/ Mark L. Knutson_
                   Mark L. Knutson