IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN RE: COUNTRYWIDE FINANCIAL CORP. CUSTOMER DATA SECURITY BREACH LITIGATION | Case No. 3:08-MD-01998-TBR<br><br>MDL No. 1998<br><br>HONORABLE THOMAS B. RUSSELL |

## THE HOLMES GROUP'S OBJECTION TO THE FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT

## I.   INTRODUCTION

Plaintiffs, the Holmes Group,[1] by and through their undersigned counsel, hereby object to the Final Approval of the Proposed Class Action Settlement and set forth the following grounds for objection and legal support thereof.  Plaintiffs incorporate by reference herein the allegations contained in the Holmes Group's First Amended Complaint, Dkt. No. 23 and the objections set forth in their papers submitted in opposition to preliminary approval of the settlement.

The Holmes Group has several remaining concerns with the proposed settlement that are relevant to this Court's final assessment of its fairness and adequacy, including, *inter alia*: (1) the failure of the Settlement Agreement to adequately address the lingering security issues which exist at Countrywide and Bank of America and continue to expose Bank of America to future data breaches; (2) the failure to take any steps to trace (and recover) the stolen personal confidential information of the Class members, and otherwise ensure that the effects of the data breach are remedied; and (3) the failure of the settlement to adequately compensate Class members for present and future harm as a result of the preventable theft of their personal

---

[1]     While the Holmes Group consists of several individual plaintiffs defined in the Holmes complaint, since the Holmes and Stiers have decided to opt out and pursue their individual claims against Defendants, this objection is not filed on their behalf.

information.  The Holmes Group also has several concerns with the proposed settlement Class, which relate to the proposed settlement: (1) the tremendous size of the proposed Settlement Class with no reasonable or fair compensation for all Class members in return for the surrender of their substantial rights, and (2) the inclusion of millions of future claimants without any adequate representation or protections, or compensation for their potential future losses.

In view of these overarching deficiencies, combined with the deficiencies in the actual terms of the settlement – which absent Class members appear to have resoundingly rebuked in letters filed with the Court but largely shielded from public view[9] -- the Court should deny final approval and allow this case to proceed far enough into litigation to reasonably assess the nature and scope of Countrywide's negligence and the harm to the Class caused thereby.  This proposed settlement – brokered by lawyers who had no idea of the merits of the action when they were approach by Countrywide's lawyers to settle (as they did not even have in hand the documents that were publicly available) – is the product of an aggressive seller finding a all-too-willing buyer who was willing to trade the rights of millions for a promise of attorneys' fees.  It is not the sort of thing that typically happens in massive MDL litigation such as this case, and for good reason.  "Sweetheart" deals tend to benefit the Class very little, but the lawyers greatly.  The original deal that was accepted here by the lawyers traded away the rights of over 17 million people for $5 million in limited funds and a back-end promise of $3.5 million in attorneys' fees. The consumers who were harmed in this case deserve better than they have received at the hands

---

[9] For reasons unknown to the Holmes Group, the dozens of letters that have been sent to the Court and the Settling Parties by absent Class members have been sealed from public view by the court clerk, with no reasonable explanation for such an extraordinary circumstance.  The Holmes Group respectfully requests the Court to release these letters to the public by opening up the Electronic Case File ("ECF") so that the objecting members of the Holmes Group may be able to see what other objecting Class members are saying about the settlement.  It is fundamental to procedural and substantive due process rights are denied by permitting the Settling Parties to view these objections

of a company that has allowed personal confidential information to be breached not once, not twice, but three times!  This Court is charged as the fiduciary for consumer to ensure that they are treated fairly, reasonably and adequately.  Respectfully, this settlement does not, and it should be rejected.

## II.   <u>ARGUMENT</u>

### A.   **STANDARDS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS**

The district court owes a fiduciary duty to class members in approving a class action settlement.  "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002 ("We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries.").  The fiduciary responsibility of the district court includes the obligation of ensuring that "the class members' interests were represented adequately." *Int'l Un. of Electronic, Electrical, Salaried, Machine & Furn Workers, AFL-CIO v. Unisys Corp.*, 858 F. Supp. 1243,1264 (E.D.N.Y. 1994).  This duty does not allow the district court to acquiesce in the class representative's inadequate representation of class members.  *Watson v. Ray*, 90 F.R.D. 143, 146 (S.D. Iowa 1981).

This fiduciary duty extends to the Court's review of the terms of a proposed settlement and the conduct of counsel in achieving the settlement.  *See generally, Reynolds v. Beneficial Nat. Bank,* 288 F.3d 277 (7th Cir. 2002).  Only this Court – as the ultimate fiduciary for the

members of the Class and the final arbiter of who is best suited to represent their   – can prevent a miscarriage of justice by an ill-timed, uninformed and overbroad settlement that attempts to bind millions of unaffected people into a broad sweeping release.

> Federal Rule of Civil Procedure 23(e) concerning class action settlements, provides:
>
> The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

Fed.R.Civ.P. 23(e).

Approving a class action settlement is a two-step process.  In the first step – preliminary approval – the court reviews the proposed settlement for obvious deficiencies, schedules a formal fairness hearing and determines the propriety and scope of the class to which to provide notice of the proposed settlement and hearing.  In the second step, the court considers final approval of the proposed settlement at the previously scheduled fairness hearing, where arguments and evidence may be presented in support of and in opposition to the settlement.  This two-step approach is widely used by federal and state courts throughout the country.  *See generally, Newberg on Class Actions,* Second Ed. at § 11.25.  On December 22, 2009, this Court entered an Order certifying a settlement class and preliminarily approving the proposed class action settlement, over the

---

[5]      Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the Court must undertake a distinct inquiry into what counsel is "best able to represent the interests of the class" for purposes of its class counsel appointment.  Fed.R.Civ.Proc. 23(g)(2).

detailed objections of several parties, including the Holmes Group. (hereafter "Preliminary Approval Order"). Accordingly, having preliminarily approved the proposed class action settlement, this Court must now act as a fiduciary to the Class in determining whether the proposed settlement is truly fair, reasonable and adequate.

The Sixth Circuit has identified seven factors to guide a District Court's inquiry as to whether a class action settlement is fair, reasonable, and adequate: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *International Union, United Auto., Aerospace, and Agr. Implement Workers of America v. General Motors Corp.,* 497 F.3d 615, 631 (6th Cir. ,2007) (citations omitted). A brief analysis of several of those factors with respect to the proposed settlement reveals the inadequacy of the proposed settlement and respectfully should dissuade this Court from granting final approval to the settlement.

### B. The Settlement Agreement Fails to Adequately Address the Lingering Security Vulnerability that abounds at Countrywide and Bank of America and Continues to Expose the Companies to Future Data Breaches

The Holmes Group has consistently argued to this Court that rectifying the obvious security vulnerabilities at Countrywide and Bank of America to prevent instances like the Rebollo incident, which was the catalyst for each and every one of the various MDL complaints, from happening again in the future is among the most important considerations and objectives to the instant lawsuits. Upon reviewing the proposed settlement, the Holmes Group immediately questioned the lack of adequate, detailed provisions requiring that Defendants take steps to

improve their obviously vulnerable security systems.  As detailed in the Holmes Group's prior

opposition paper, an independent and knowledgeable third party should have been charged with

assessing the steps taken by Defendants to assure such a monumental security breach does not

happen again and only upon approval by such an expert should the Defendants have been

deemed to take the necessary steps.  Instead, over our objections, the assessment was left to

settling parties' counsel who relied on representations by the Defendants.  **Not surprisingly – at

least to the Holmes Group – as detailed below, a subsequent data breach has now occurred

at Bank of America putting thousands of people at risk AGAIN for identity theft.**  It is no

wonder why Defendants sought to sweep in a lifetime's worth of potential data breaches into this

settlement agreement that should have covered solely the victims of the Rebollo breach, as they

are all too aware of the constant threat to their inadequate security and the realization that once

again they could allow a data breach to happen.

As discussed above, this action arises from a failure of security measures at Defendant

Countrywide that allowed Defendant Rebollo to improperly access and steal Countrywide

customers' sensitive Personal Confidential Information contained in the computer databases of

Countrywide Home Loan's subprime mortgage division, Full Spectrum Lending.  This failure

allowed Rebollo to download such information stored on Countrywide's computer system to

portable, external devices or "removable media" known as "flash" drives or "thumb" drives, and

then to remove these drives with the data from the offices of Countrywide for improper

dissemination to others in exchange for cash.  *See generally* Affidavit of FBI Special Agent

Richard P. Ryan forming the Criminal Complaint in *U.S. v. Rebollo*, 08-1826M (filed July 31,

2008) ("Ryan Aff.").

The evidence indicates that in the scope of his employment, and apparently with manager approval based on the nature of his employment, Countrywide provided Rebollo with access to various Countrywide Home Loan databases, which contained the Personal Confidential Information of Countrywide customers, including, among other things, their social security numbers. *Id.* at ¶7.c; Dep. Tr. of Craig Froelich (rough draft, April 16, 2009) at 54:23-55:5. Rebollo was not authorized by management to download such information onto flash drives. Froelich Dep. Tr. at 65:13-15; *cf.* Ryan Aff. at ¶7.f.  Most of the Countrywide Home Loan computers were secured by means of computer software that blocked the use of flash drives to download such sensitive information.  Ryan Aff. at ¶9.l.  At Countrywide, Rebollo used two computers – a primary computer and a secondary computer.  Although the blocking software was installed on both computers, it functioned properly only on the primary computer. Apparently, the security system indicated that the software's protection on the second computer was functioning correctly, but in actuality it was not.  That is, the second computer provided a false indication that it was properly protected from the use of flash drives such as those used by Rebollo.  Froelich Dep. Tr. at 19:21-21:24.  Approximately 2,000 (out of 60,000) computers were providing similar false indications of proper protection like Rebollo's second computer.  *Id.* at 21:2-7.

Over a period of approximately two years, Rebollo accessed Countrywide Home Loan databases and ran reports from the databases at his workspace, then downloaded onto flash drives the reports containing Countrywide Home Loan data that included customers' Personal Confidential Information.  Ryan Aff. at  ¶9.d.-e., g, h.  He typically did this during work hours and for about an hour on Sundays.  *Id.* at ¶7.d-e, ¶9.e.  He would use the first computer (with the

properly functioning blocking software) to access and download the information and move it to a shared site within the system network.  He then would sign on to his second computer (without the properly functioning blocking software), move the information to that second computer, and transfer the information from the second computer onto a flash drive.  Dep. Tr. of Christopher Higgins (April 21, 2009) at 101:9-102:21. Thus, as noted above, although it apparently was against company policy for most employees – including Rebollo who did not have manager approval – to use flash drives or external data storage devices with the Countrywide computers, and such policy apparently was intended "to prevent the leak" of Countrywide customer data (Ryan Aff. at  ¶7.f), including the Personal Confidential Information at issue in this case, it appears that the Countrywide Defendants failed to take reasonable precautions to prevent, detect and stop (after it had begun) the systematic use of such flash drives by Rebollo to for that precise purpose over the approximately two-year span.

During this span, Defendant Bank of America purchased Countrywide.  The "legal day one" of operations as an integrated entity was July 1, 2008.  Higgins Dep. Tr. at 13:4-20.  At that time, Rebollo was under investigation by the FBI with the assistance of Countrywide.  Not long after July 1, Rebollo was arrested by federal authorities.  As part of the integration of Countrywide's operations with those of Bank of America, and as a result of the Rebollo incident, Bank of America undertook a number of upgrades to the computer security systems. Specifically, as a result of the Rebollo incident and the failings of Countrywide, Bank of America instituted "12 new controls" comprising five categories:  (1) access to information; (2) movement of data; (3) data location of data stored inside the company; (4) application level security; and (5) component testing of suppliers that work on behalf of the business units.

8

Higgins Dep. Tr. at 13:21-26:22.  The two witnesses – one information technology security officer from each of Countrywide (Froelich) and Bank of America (Higgins) – who provided deposition testimony as part of the confirmatory discovery process testified about the computer systems, flaws in the systems, system upgrades, and so-called system "fixes."  They appear to believe that the technical problems that permitted Rebollo to access, download and steal customers' Personal Confidential Information were rectified and that the systems in place provides adequate security.

Without an independent review and certification by an outside expert, however, the Plaintiff and Defendant proponents of the settlement are asking this Court to take the Defendant officer witnesses' assurances on faith.  Assurances are not sufficient, especially when the witnesses upon whom the settlement proponents are relying are themselves officers of some of those same proponents.  To protect the Class, the veracity of the witnesses' testimony should be tested by an independent expert.  Indeed, as discussed more fully below, just this year the FBI uncovered another case of stolen Bank of America customer confidential and financial information (again involving an inside employee and an FBI sting operation).  This comes within one year after Rebollo was arrested, and demonstrates precisely why the Court should require a review of the security systems and certification of their adequacy by an independent expert.  This should be made a condition in the Settlement Agreement.

Moreover, while the two information technology security witnesses testified at length about the computer systems and fixes to the system, they spoke minimally about employee related – and nothing of physical – security measures and fixes.  There has been relatively little description of the managerial and reporting checks and safeguards that were put in place, and

virtually nothing to suggest that, in practice, they are being properly executed.  The proponents of the settlement have provided almost nothing by which to assess whether data authority levels are properly granted and kept in check, whether computer usage reports are being generated and reviewed by management and acted upon as necessary, whether suspicious activity is being properly monitored and acted upon, whether supervisors at all levels are properly monitoring their direct (and indirect) reports for adherence to company policy, and so forth.  And there was no discovery of physical security measures to assist in ensuring detection of and appropriate reaction to suspected improper activity and misuse of the computer systems and sensitive customer data.  Indeed, there simply is no way to determine from the discovery whether all appropriate internal controls exist and are functioning to ensure as best as possible that an on-going theft of data, like the kind at issue here, will not happen again.  If anything, post-Rebollo events suggest that Countrywide/Bank of America's customers remain susceptible to such conduct.

As crafted, the settlement is entirely silent on the remediation of Bank of America's security programs, allowing Bank of America to simply police itself while placing this Court in the unenviable position of having created a framework that will allow for the very same events to occur yet again.  Bank of America argues that the "Countrywide problems," those that allowed for the data breach, have been fixed.  They claim that a Bank of America system is now in place that is "state of the art", however, the old adages of "talk is cheap" and "the proof is in the pudding" ring true in this instance and must be  considered by the Court in deciding just how fair, reasonable and adequate this proposed settlement really is.

In August of 2009, eight months after the Settling Parties filed a Motion for Preliminary Approval of the proposed class action settlement, Bank of America had to issue replacement credit cards and notify certain Massachusetts customers that their account numbers had been compromised.  Apparently, a data breach occurred at one of Bank of America's third-party merchant databases.  Regardless of whatever spin Bank of America may have attempted to disseminate into the news media and into the general public at that time, the fact remains that Bank of America was responsible and remains responsible for having hired this outside vendor and having signed off on whatever security devices that merchant had in place.  Assumedly, those security devices would have had to have met if not exceeded Bank of America's own standards.  That being the case, the proof is certainly in the pudding, a breach occurred and personal data was compromised subsequent to the settlement agreement in this case.

**The above is not an isolated incident for Bank of America.**  In 2005, Bank of America lost personal confidential data **not fewer than three times**:

1.  In February of 2005, approximately 1,200,000 records were exposed due to a lost data tape;

2.  In June of 2005, approximately 18,000 records were exposed due to a stolen laptop; and

3.  In September of 2005, an undisclosed number of records were exposed due to a second stolen laptop.

If Bank of America had implemented stronger systems, stronger training, and other stronger security measures (*i.e.*, no laptops allowed in and out of their building facilities) in response to the string of 2005 incidents, the August of 2009 breach would not have occurred.  Moreover, additional security breaches were documented in December of 2006 and April of 2007 (unauthorized access to personal data by a former contractor and yet another stolen laptop),

11

respectively.  Bank of America's systems have year after year proven vulnerable and data has been lost and its customers harmed.  Clearly, that is why Bank of America seeks to sweep into this settlement the entirety of their exposure for data breaches occurring prior to July 2009, thereby extinguishing any future claims that may arise for **those breaches** both known and unknown.

Moreover, and most troubling, on June 1, 2010 a former Bank of America employee by the name of Brian Matty Hagan pled guilty to bank fraud in federal court in Tampa, Fl.  Why? On March 10, 2010, Hagan had met with an undercover FBI agent in a local, Tampa area restaurant in an attempt to sell personal, confidential data of Bank of America customers.  He had stolen this data from Bank of America, during the course of his employment, evading the very system Bank of America now wants this Court to endorse.

Hagan was sufficiently brazen and had sufficient time and latitude in breaching Bank of America's system that he actually took the time and made the effort to refine his searches, pinpointing Bank of America customers with more than $100,000 in account balances.  Where an employee has not only the ability to breach the systems, but the time and ability to target what he perceives to be personal confidential data that can be sold at a higher value, clearly, the Bank of America system that it now touts, is inadequate.  Accordingly, the Court should not find that the proposed settlement is fair, reasonable or adequate, due to its lack of adequate protections respecting customer's personal confidential information, as proven shortly after the settlement was reached by Mr. Hagan's conduct.

12

**C.** **Proposed Nationwide Settlement Class Should <u>Not</u> Be Certified Because it is Overbroad**

The proposed settlement class is defined as, "[a]ll persons in the United States who: (1) received a letter from Countrywide anytime from August 2, 2008 to and including November 2, 2008, notifying them that their personal information was involved in an alleged theft committed by a Countrywide employee; or 2) who obtained a mortgage from Countrywide or whose mortgage was serviced by Countrywide prior to July 1, 2008."  Preliminary Approval Order at 3. This Class consists of 17 million people.  *See* Notice Plan at page 37 of 121.  This Class far exceeds the litigation Class of 2.4 million people originally sought to be represented by every plaintiff in this MDL.  It also exceeds by more than seven-fold the group identified by Countrywide as having been affected by the Rebollo data breach.  Because the class prerequisites Rule 23(a) and Rule 23(b)(3) must be satisfied and cannot as to the proposed Settlement Class, the proposed Class should be denied.

None of the Complaints filed in this MDL alleged such a sweeping Class.  None of the Complaints allege injury to such a broad category of persons.  On its face, the Settlement Class sought to be certified is overbroad.  It makes no attempt to narrowly define the Class consistent with the litigation, which limited the Class properly to only those persons whose confidential information was stolen by Rebollo.  Such a Class of persons is entirely knowable, if not already known by Countrywide as a result of its cooperation with the FBI investigation.  The names and addresses of this confined group of people are within Countrywide's possession for purposes of direct-mail notice.

The Settlement Agreement concedes that "Rebollo worked in Countrywide's subprime mortgage division, and ultimately downloaded and made available the Private Information of

13

what is believed to be *approximately 2.4 million individuals* to third parties."  Settlement Agreement at 2 (emphasis added).  Plaintiffs' Motion for Preliminary Approval also acknowledged that "financial and personal information was compromised for *approximately 2.4 million individuals* throughout the United States …"  Motion at 7 (emphasis added). These statements are confirmed by the Affidavit of F.B.I. Agent Richard Ryan and Criminal Complaint against Defendants Rebollo and Siddiqi – upon which MDL plaintiffs relied in filing their respective Complaints in this Court.  Agent Ryan states that "Rebollo estimated that he downloaded approximately 20,000 Countrywide Home Loan customer profiles every week for approximately two years." Agent Ryan Affidavit at ¶ 9(g).  Therefore, by the FBI's reasonable estimates, only 2,080,000 customers were affected by Rebollo's conduct – *i.e.*, 104 weeks (2 years) times 20,000 customer profiles per week.

Countrywide has represented that it sent notification letters to 2.4 million people whom it concluded were affected by the Rebollo data breach.  That is 320,000 more individuals than  the FBI's reasonable estimate. While it is known that certain spouses, co-signers and guarantors of individuals who had their data stolen did not receive letters, assuming such persons also had their data stolen, this group of individuals is still nowhere near the 14-plus million people the Settlement Class seeks to sweep in.  At most, the inclusion of these additional "co-parties" would double the size of affected people to between 4,160,000 (based upon FBI's estimates) and 4,800,000 (based upon Countrywide's estimates).  Either way, the final number is millions less than the proposed Settlement Class.

The Holmes Group suggests that a properly limited Class in this case would include only those individuals whose confidential information was in fact stolen by Rebollo.  To extend the

proposed settlement benefits and corresponding release to any individual who simply provided confidential information to Countrywide without regard to the data breach at issue would serve to improperly involve millions of people in a case in which they do not belong.  It is respectfully submitted that the class action device does not permit such an expansion of litigation.

In prior decisions, this Court rejected similar attempts to certify expansive classes which included persons not presently injured by the conduct at issue in the lawsuit.  For instance, late last year, this Court found the named plaintiffs' claims atypical of a proposed Class of inmates of the McCracken County Detention Center where the named plaintiffs, former inmates of the jail, alleged that the policies and procedures of the jail violated their constitutional rights.  *See Taber v. McCracken County, et, al.,* 5:06-cv-00144 (W.D. Ky.) at Docket No. 66.  In denying class certification, the Court noted that, "[i]n pursuing their own claims for damages for injuries they have suffered, the named plaintiffs would not advance the interests of the entire class of inmates who, after September 6, 2005, first developed symptoms consistent with MRSA after confinement in the jail for a period of more than ten days."  *Id.* at 10.  The Court also noted that "[f]atal to the injunctive class is that the named representatives, former inmates of the jail, are not members of a class composed of present and future inmates of the jail."  *Id.* at 13.

In another case, this Court denied certification of a sprawling class of purchasers of concrete.  The Court held, in response to defense arguments that the class was overbroad and did not meet the requisites of Rule 23, and despite class plaintiffs' efforts to limit the class to residents of Kentucky, that the case was not proper for partial class adjudication largely due to the fact that "[t]hese claims of Class members are extremely disparate, ranging from members with no discernable damages to a few class members with extremely large damages."  *See Adams*

15

*et. al. v. The Federal Materials Co., Inc., et, al.,* 5:05-cv-00090 (W.D. Ky.) [Docket No. 143] at 20.

As in the *McCracken County* and *Federal Materials* cases, there is no basis for expanding the litigation Class definition in this case to include millions of unaffected individuals. This is especially true where there is no reason to believe that persons other than those directly affected by the Rebollo data breach have had their confidential information exposed.  Such an expansion unnecessarily interjects "extremely disparate" issues into on otherwise cohesive litigation class.

Settling Parties ex post facto justification for the expansive class – that the settlement resolves general claims of inadequate security and therefore should shield Countrywide from any liability regardless of when the data breach occurred or how many data breaches have occurred – is nonsensical.  In the absence of an evidentiary proffer by either Settling Plaintiffs or Countrywide,[6] this Court should limit the Settlement Class to the scope of the litigation Class in this case.  Put simply, it is impossible for this Court, or anyone else, to assess the reasonableness of the proposed settlement without first fully understanding the scope of the conduct alleged.  If this Court were to grant final approval to the proposed settlement it would be akin to granting Countrywide and Bank of America immunity from any and all data breaches that may become known in the future, provided that the victim obtained their mortgage from Countrywide or had their mortgage serviced by Countrywide prior to July 1, 2009.  Respectfully, the Court is urged to consider the following examples:

---

[6]     Of course, if the settling parties had cause to believe there have been data breaches apart from the Rebollo incident, the Holmes Group would have expected such evidence to have been provided as part of the confirmatory discovery disclosure ordered by this Court. No such evidence has been provided, despite timely requests for the same.  *See* Exhibit "B".

16

1.      **Other Prior Data Breaches Could be Later Discovered that Would Greatly Expand the Scope of the Harm to the Class Purportedly Covered by the Proposed Settlement**

Since Mr. Rebollo was able to carry out his criminal conduct over a two year period before being discovered, it is reasonable to assume, for purposes of assessing the adequacy of the proposed settlement, that one or more Countrywide employees may have been engaged in the same criminal conduct but have not as of yet been discovered.  In that instance, without knowing how many other data breaches have occurred or how many other customers have in fact had their Personal Confidential Information stolen and sold, it is impossible to assess the value conferred on the Class vis-à-vis the settlement.  Indeed, the FBI could discover tomorrow that in fact every customer – potential and actual – of Countrywide that has entrusted the company with their Personal Confidential Information has definitively had their information illegally accessed, stolen and sold prior to the Rebollo incident by another criminal and are therefore at just as much risk of identity theft as the victims of the Rebollo .

The proposed settlement agreement draws distinctions in the benefits available to the Class based on whether or not Class members have received a "notification letter."  The justification for such disparate treatment is that those class members who received such a letter have been confirmed to have had their Personal Confidential Information stolen and sold by Mr. Rebollo and therefore are at greater risk of identity theft.  *See* Preliminary Approval Order at 16 ("The differential treatment of those who received letters and those who did not is not undue. The Court believes that enough proof has been presented to assert that those who received letters initially have a higher probability of being at risk of identity theft due to the Rebollo incident.") However, if in fact, other data breaches came to light that occurred during the relevant time

period, those "future victims"[10] would be worse off that than the victims of the Rebollo incident. Indeed, the only benefit of the settlement they would be afforded to is essentially a cap on their damages due to identity theft of $50,000 – assuming of course, that fund is not depleted when it comes time for them to claim their damages.

> **2.      A Victim of Identity Theft Due to the Theft of their Private Information from Countrywide May Not Experience Losses from Identity Theft Until After July 31, 2012**

As stated in the Preliminary Approval Order:

> All settlement class members are entitled to reimbursement from Countrywide of up to $50,000 per instance of identity theft, provided the loss is actual and unreimbursed, and more likely than not a result of the alleged theft of their private information through Countrywide.  This alleged theft is not limited to the Rebollo incident.  To recover, class members must first exhaust available identity theft insurance options and the Experian Guarantee [class members who were not victims of the Rebollo incident but were nonetheless folded into the settlement class are not offered such identity theft insurance options under the settlement agreement].  The availability of reimbursement covers losses from January 1, 2006 to July 31, 2012.

Preliminary Approval Order at 14-15.

As the settling parties have made no effort to determine who is in possession of the stolen personal confidential information from the Rebollo incident – as urged by the Holmes Group - and furthermore since any other unknown data breaches have been swept into the settlement making it impossible at this time to know how many other people have definitively had their information stolen and sold, it is likely that class members' information is still in the possession of criminals.  In that sense, it is highly likely that Class Members may fall victim to identity theft due to theft of their information from Countrywide in the coming years.  However, the settlement agreement, whilst extinguishing their claims against Countrywide, puts an arbitrary deadline on the date by which class members must have fallen victim to identity theft before they are able to

---

[10] "Future" is used in the sense that their identities are not currently known.

claim the one benefit of the settlement afforded them – the $50,000 reimbursement due to identity theft.  To be clear, even for those class members whose information is *known* to have been stolen and sold by Mr. Rebollo, if they suffer losses due to the incident at any time after July 31, 2012, they will not be able to make a claim for reimbursement against the fund – again, assuming it is not depleted by July 31, 2012.

As discussed in the examples above, the potential for future claims is not adequately accounted for in the proposed settlement.  In the Preliminary Approval Order, this Court states:

> The Court does not shy away from the fact that, at present, not all class members have suffered the same injury.  But unlike an asbestos mass tort action [*Amchem*] where unknown plaintiffs may develop symptoms decades later, this action involves an objectively identifiable class.  Class members who are fearful of the possibility of future identity theft will have been given notice of the settlement and have the opportunity to opt out.  *See Denney v. Deutsche Bank AG,* 443 F.3d 253, 269 (2ndCir. 2006); *see also McLaughlin on Class Actions: Law and Practice* §4.02 ("There is no *per se* prohibition against certifying a single class including both presently injured and future claimants.")

Preliminary Approval Order at 8.

Though it is admitted that under the proposed class settlement, the class members are objectively identifiable, albeit over-inclusive, it is denied that that basis alone serves to reconcile the inherent error in allowing unknown future claims to be extinguished or in the alternative forcing class members to make uninformed decisions regarding their right to opt-out.  In *Denney v. Deutsche Bank AG*, the case cited by this Court to refute the Holmes' Group's concerns regarding *Amchem* protections, the Court held that the Denney class does not suffer from the conflicts that plagued the Amchem Court because "unlike in *Amchem,* the full extent of injuries suffered by the future-risk class members [in that case] will be known soon enough; they will be in a position to evaluate their full damages by the time they appear before the Special Master for apportionment of the settlement fund. So no one here is interested in a long-term fund; the class

representatives have every incentive to vigorously pursue the common interest of all class

members."   443 F.3d 253, 269 (2nd Cir., 2006).   In this case, no class member is in a position to

evaluate their full damages at any time, let alone prior to making a decision as to whether to opt

out.   Indeed, because the whereabouts of the personal confidential information known to have

been illegally sold is unknown, and the potential amount of other data breaches is unknown, not

a single class member can even purport to be well informed enough to be able to evaluate their

full damages.   As discussed above, it is very possible that any single class member could be

exposed to identity theft and suffer from injuries due to identity theft any number of times

between now and July 31, 2012,[11], and therefore has no way of assessing the true value of the

settlement.   Likewise, it is very possible that a class member has already had his/her information

compromised by Countrywide, stolen and sold but that the criminal(s) in possession of the same

will not use the information to harm the class member until well after the arbitrary deadline.

### D.   The Lack of Discovery by the Settling Plaintiffs Should Make this Court Skeptical in Approving the Proposed Settlement.

"Federal courts are inherently skeptical of pre-certification settlements, precisely because

such settlements tend to be reached quickly before the plaintiffs' counsel has had the benefit of

the discovery necessary to make an informed evaluation of the case and, accordingly, to strike a

fair and adequate settlement." *Acosta v. Trans Union*, LLC, 243 F.R.D. 377, 397 (C.D.Cal.

2007).

Without discovery, it is difficult, if not impossible, to know the size of the Class.

Countrywide chose to notify 2.4 million people whom it determined were victims of the

underlying data breach.   Every plaintiff in this MDL proceeding – including all Settling Plaintiffs

---

[11] The arbitrary deadline within which Class members may make claims for reimbursement due to loss from identity theft – assuming that the fund is not depleted.

– filed Complaints alleging only that a data breach was caused by a Countrywide employee named Rene Rebollo "in a scheme to steal and sell Sensitive Information from as many as 2 million Countrywide customers and mortgage applicants." *See e.g., Moses v. Countrywide Financial Corp., et. al*, 2:09-cv-05416 (D.C. Cal. Aug. 18,2 008) at ¶ 36.[10]  In the absence of any discovery, there is no reasonable basis for concluding that the data breach affected many more than the 2.4 million people identified by Countrywide as a result of the FBI investigation, except for some additional spouses, co-signors, co-applicants and guarantors who did not receive letters from Countrywide.[11]  There is certainly no basis for concluding that the Class of affected people is 17 million strong.

Respectfully, this Court cannot assess the value of the proposed settlement to the proposed Settlement Class without the benefit of at least some confirmatory discovery and without knowing the circumstances surrounding the underlying data breach, especially considering that Settling Plaintiffs wish to expand the litigation Class from 2.4 million-plus to 17 million.  As outlined in *Acosta*,

> for a court to approve a proposed settlement, the parties must have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement. In considering a proposed settlement, a court therefore bears an obligation to evaluate the scope and effectiveness of the investigation plaintiffs' counsel conducted prior to reaching an agreement ... 'An early settlement [such as the instant proposed settlement] will find the court and class counsel less informed than if substantial discovery had occurred. As a result, the court will find it more difficult to access the strengths and weaknesses of the

---

[10]     The *Moses* case was the first case filed by the Barnow Group.

[11]     In the case of the Holmes, a notification letter was addressed and sent by Countrywide to Mr. Matthew Holmes, but his wife, Danielle, did not receive a letter, even though they were co-applicants on the loan form Countrywide.  Several other plaintiffs in the Holmes Group did not receive notification letters from Countrywide, although their spouses received letters.  Without discovery, we cannot know all the individuals who were affected by the Rebollo data breach.

parties' claims and defenses, determine the appropriate membership of the class,
and consider how class members will benefit from settlement.'

243 F.R.D. at 397 (*citing Polar Int'l Brokerage Corp.*, 187 F.R.D. 108, 113 (S.D.N.Y. 1999)

(*quoting Manual for Complex Litigation* 2d § 30.45 (3d Ed. 1995)).

 Respectfully, without meaningful discovery, it is impossible to assess the true exposure to

the Class, both those whose information has been definitively stolen and sold illegally due to Mr.

Rebollo's conduct, and those Class Members whose information was susceptible to such a data

breach due to Countrywide's inadequate security – but for whom it is still unknown whether or

not their information was in fact leaked.

### E. THE PROPOSED SETTLEMENT CLASS FAILS TO PROVIDE ADEQUATE REPRESENTATION FOR AND NOTICE TO FUTURE CLAIMANTS.

 The overbroad Settlement Class seeks to foreclose the rights of persons who have not

suffered any cognizable injury from the data breach, but who may have their identities stolen in

the future as a result of the breach.  This scenario sets forth a classic "future claims" problem

addressed in the Supreme Court's seminal decision in *Amchem Products, Inc. v. Windsor*, 521

U.S. 591 (1997).

 In *Amchem*, the United States Supreme Court held that the discretion a district court has

in certifying a class for settlement purposes does not permit a district court to ease the demands

of Rule 23 of the Federal Rules of Civil Procedure.  To the contrary, the Court held that a district

court must apply "undiluted, even heightened attention" to the requirements of Rule 23 in the

settlement context." *Amchem*, 521 U.S. at 621.  *See also Walker v. Liggett Group, Inc.*, 175

F.R.D. 226, 230 (S.D.W.V. 1997) ("*Amchem* decimated the notion of some circuits that Rule 23

requisites were relaxed in the settlement context").  Specific to this Court's inquiry at the

preliminary approval stage, the Supreme Court admonished that "Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the precertification stage, quite independently of the required determination at postcertification fairness review under subdivision (e) that any settlement is fair in an overriding sense."  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 858 (1999).  *See also Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) ("In the context of a case in which the parties reach a settlement agreement before class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement"); *D'Amato v. Deutsche Bank*, 236 F. 3d 78, 85 (2d Cir. 2001) (noting that where a settlement has been negotiated prior to class certification, "it is subject to a higher degree of scrutiny in assessing its fairness").

In the *Amchem* settlement litigation, which purported to settle the claims of all persons exposed to asbestos regardless of whether they had existing or future manifestations of injury, the  Court of Appeals for the Fifth Circuit found that the obstacles to providing adequate notice to future victims were "insurmountable." *See Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 633 (5th Cir. 1996).  And, while the Supreme Court was not required to rule definitively on the notice issue in its *Amchem* decision, Justice Ginsberg recognized "the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could *ever* be given to legions so unselfconscious and amorphous." *Amchem Products, Inc.  v.  Windsor*, 521 U.S. 591, 628 (1997)(emphasis added).  *See also In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425, 1435 (2d Cir. 1993) (acknowledging that providing an opt-out right to a person "unaware of an injury would probably do no good").

The proposed settlement class here seeks to release the claims of millions of persons across the nation who provided personal information to Countrywide at any time before July 1, 2008. *See* Settlement Memo. at 7. While the settlement purports to provide a remedy for persons whose identity will be stolen in the future as a result of the theft of their personal information, these people have yet to experience any injury from identity theft. Nevertheless, their inclusion in the Settlement Class requires them to assess *now* whether to accept the settlement and release their future claims against Countrywide, or opt out. The proposed Settlement Class is thus infirm, as it does not (and cannot) meet the requirement of adequate notice under Rule 23(e)(1)(B). As the Supreme Court made clear in both *Amchem* and *Ortiz*, a class that includes persons with only future injuries along with presently-injured plaintiffs is driven by inherently conflicting interests. Persons with present injuries necessarily seek to maximize payment of settlement benefits now, while those who may suffer injury later seek to minimize the present payment of benefits to preserve settlement funds for future claimants. These conflicting interests make it impossible for presently-injured class representatives and their counsel to provide adequate representation to the members of a "future-injured" class. *See Amchem*, 521 U.S. at 625-28; *Ortiz*, 527 U.S. at 853.

There is no indication that the Barnow Group even considered, much less resolved, conflicts among the various groups to be included in the proposed Settlement Class. Indeed, it appears that potential claimants with the most substantial interests in this litigation (those who have actually suffered identity theft) were not separately represented at all. Therefore, the proposed Settlement Class – which includes future claimants – should not be certified, regardless of whether the Court believes the substantive terms of the settlement are sufficient for

24

preliminary approval.

There remains three (3) reasons for refusing to finally approve the certification of such a sprawling Settlement Class at this juncture, as it concerns the future claimants in the Settlement Class proposed here: (1) there is an unresolved conflict of interest between present and future claimants, (2) no meaningful right of opt out has been provided, and (3) any Judgment and Release obtained concerning such future claims would be constitutionally infirm and subject to collateral attack under *Amchem*.

     1.    <u>The Unresolved Conflict of Interest Between Present and Future Claimants Bars Certification of the Settlement Class for Purposes of Preliminary Approval and Dissemination of Class Notice.</u>

It is a fundamental tenet of due process that a party may not be bound by a judgment in a representative suit if he or she was not adequately represented in the proceedings leading to that judgment." The Supreme Court has consistently so held.  *See, e.g.*, *Richards v. Jefferson County*, 517 U.S. 793, 794 (1996); *Phillips Petroleum Company v. Shutts*, 472 U.S. 797, 812 (1985); *Hansberry v. Lee*, 311 U.S. 32, 41-42 (1940)(noticing that adequacy of representation is the "touchstone" for the due process treatment of absent class members).  The stringent analysis of the "adequacy" requirement of Rule 23(a)(4) compelled by *Amchem* and *Ortiz* is not relaxed in the settlement context, or as part of the Court's consideration of class certification at the preliminary approval phase.  Adequate representation is a fiduciary obligation that demands the protection of class members' interests through the class representative's vigorous advocacy.[12]

---

[12]    "A class representative, by assuming a representative role on behalf of the absent class members, accepts a fiduciary obligation toward the class that may not be abandoned at will or by agreement with the defendant if prejudice to the absent class members would inhere ...."  *Blanchard v. Edgemark Financial Corp.*, 175 F.R.D. 293, 298 (N.D. Ill. 1997).  *See also, Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528 (1949).  Indeed, the class representative must continue to satisfy those fiduciary obligations even after the resolution of the litigation.  *Doe v. Heckler*, 580 F. Supp 1224, 1229 (D. Md. 1984) ("[T]he

25

Adequacy is also a constitutional requirement.  "[A]dequate representation is the foundation of all representative actions ...." *In re G.M. Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1121 (7th Cir. 1979)(*citing Hansberry*); *see also, Walker*, 175 F.R.D. at 231 ("[t]he bedrock consideration for the court in any certification decision is 'whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives'").  The federal courts have long recognized that adequate representation is mandated by due process.  *Susman v. Lincoln American Corp.*, 561 F.2d 86, 89-90 (7th Cir. 1977) ("due process requires that absent class members be adequately represented in order to be bound by a court's judgment").  *See also, Nat. Assoc. of Regional Medical Programs. v. Mathews*, 551 F.2d 340, 346 (D.C. Cir. 1977) ("adequacy of class representation has a constitutional dimension").

As the Supreme Court made clear in both *Amchem* and *Ortiz*, a class that includes both presently injured plaintiffs and those who will manifest harm only in the future is riven by inherently conflicting interests.  Those conflicts mean that it was not possible that the proposed Settlement Class representatives and the Barnow Group provided "adequate representation" to the members of the futures class.  *Amchem*, 521 U.S. at 625-28; *Ortiz*, 527 U.S. at 853.

This conflict is starkly exemplified in this case.

When the Barnow Group agreed to a settlement, offering funds of $1.5 million and $5 million respectively to be distributed entirely among the members of the Class, the sole basis for a finding of adequate representation vanished.  None of the proffered Settlement Class representatives have alleged that they are presently injured claimants.  Nevertheless, they all will

---

fiduciary responsibility undertaken by the class representatives and their counsel to assure that the rights of unnamed class members are adequately represented ... does not end on the day a judgment is handed down").

share in and exhaust the settlement proceeds.  Quite obviously, there is not adequate representation (indeed, there is no representation) of the interests of later-injured Class members – *i.e.* the persons who suffer identity theft after this Court approves the settlement.  The named representatives cannot adequately represent the absent Class members "at all times," as required by the Supreme Court.  *Hansberry v. Lee*, 311 U.S. at 43; *Shutts*, 472 U.S. at 812.

It is a well-settled rule, as echoed by Justice Rehnquist for the Supreme Court in *Shutts*, that "a court adjudicating a dispute may not be able to predetermine the *res judicata* effect of its own judgment." 472 U.S. at .  This rule is equally well-established in the context of class actions.

> Where a person is not a party to a class action, the judgment therein has conclusive effect against him only if his interests were adequately represented.... [A] person as to whom a class action is ineffective is not required to seek relief during the continuance of the action.

Restatement of Judgments § 116 comment b, at 563-64 (1942).

As discussed herein, in the absence of minimum contacts with the forum, a court cannot constitutionally compel an absent class member to appear and raise objections to the adequacy of representation.  Nor does Rule 23 compel him to do so.  Indeed, "an absent class-action plaintiff is not required to do anything." *Shutts*, 472 U.S. at 510.  *See generally*, Patrick Woolley, The Availability Of Collateral Attack For Inadequate Representation In Class Suits, 79 Tex. L. Rev. 383 (2000).

---

[13]     The Advisory Committee's Note accompanying the 1966 amendment to Rule 23 confirms that:

> [The Rule] does not disturb the recognized principle that the court conducting the [class] action cannot predetermine the res judicata effect of the judgment; this can be tested only in a subsequent action.

In the case of members of the "future class," since neither the Court nor the proponents of the settlement know who they are, as they have not themselves been identified as persons who suffered injury as a result of the Countrywide data breach, it is axiomatic that they cannot be compelled to do anything respecting this Court.  It goes without saying that this Court lacks the constitutional authority to release their unmanifested claims for identity theft.

2.   <u>Future Victims Cannot Be Provided With A Meaningful Opportunity At Settlement To Opt Out</u>.

A third essential requirement of due process is satisfied by "affording absent class members, whose claims for money damages would be entitled to a jury trial an opportunity to remove himself from the class." *Shutts*, 472 U.S. at 811; Cf.  *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 392 (9th Cir. 1992), *cert. dism. as improvidently granted*, 511 U.S. 117 (1994) (where Brown had no opportunity to opt out of class action, "there would be a violation of minimal due process if Brown's damage claims were held barred by *res judicata*.").  In the Court's Preliminary Approval Order, the Court emphasizes that "this is not a mandatory class settlement, [and that] Settlement class members are given the option to object to and/or opt-out of the settlement."   However, the notion that class members should be forced to predict their own vulnerability to identity theft in the future – which may not be covered under the settlement – and therefore make an uninformed decision as to whether to be bound by the settlement or opt-out is nonsensical.

The right to opt-out of the class action serves both the command of the Seventh Amendment and "our 'deep- rooted historic tradition that everyone should have his own day in court,'" *Ortiz*, 527 U.S. at 846 (quoting *Martin v. Wilks*, 490 U.S. 755, 762 (1989)).  Tort victims in particular have a "vital interest" in having some measure of control over litigation that may

28

affect their lives.  *Yandle v. PPG Indus. Inc.*, 65 F.R.D. 566, 572 (E.D. Tex. 1974); *Causey v. Pan Am World Airways, Inc.*, 66 F.R.D. 392, 299 (E.D. Va. 1975); *Hobbs v. Northeast Airlines*, 50 F.R.D. 76, 79 (E.D. Pa. 1970); Robert G. Bone, Rethinking the "Day in Court" Ideal and Nonparty Preclusion, 67 N.Y.U. L. Rev 193, 286-87 (1992).  *See also* Roger H. Trangsrud, Mass Trials in Mass Tort Cases: A Dissent, 1989 U. Ill. L. Rev. 69, 74 ("the right to control personally the suit whereby a badly injured person seeks redress from the alleged tortfeasor has long been valued both here and in England.").

The very structure of the proposed class action settlement here – that purports to include unknown future victims – makes it impossible for the present opt-out procedure to protect due process.  In Professor Coffee's view, "a future claims class action trivializes the right to opt out." John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1446 (1995).  As noted above, the obstacles to notifying and informing future victims of their opt-out rights can be insurmountable, unless properly addressed.  More importantly, one who has not manifested any present injury, even if notified, lacks the basic information needed to make an intelligent decision whether to remain in the class or to pursue a tort action that has not accrued, and might not ever accrue.  *See* Brian Wolfman and Alan B. Morrison, Representing The Unrepresented In Class Actions Seeking Monetary Relief, 71 N.Y.U. L. Rev. 439, 451-55 (1996).  Early on in the famous *Agent Orange* litigation, the Court of Appeals for the Second Circuit candidly stated that providing an opt-out right to a person "unaware of an injury would probably do no good." *In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425, 1435 (2d Cir. 1993), *cert. denied*, 510 U.S. 1140 (1994).

The late Professor Newberg, a leading scholar in the field of class actions, pointedly agrees:

> For class members who cannot currently identify
> themselves for purposes of protecting their interests
> with respect to a class action purportedly
> commenced on their behalf, an opt-out right within
> a court-designated period of time ... is of no
> beneficial use.

1 Herbert B. Newberg, Class Actions § 1.23 at 1-55 (1992).

This situation is little more than a new variation on an old injustice: rigid statutes of limitations or statutes of "repose" under which a person's cause of action in tort can become time-barred even before any harm may occur or became manifest.  The harsh rule was famously lampooned by Judge Frank in *Dincher v. Marlin Firearms Co.*, 198 F.2d 821, 823 (2d Cir. 1952) ("Except in topsy-turvy land, you can't die before you are conceived, or be divorced before ever you marry, or harvest a crop never planted ...").  Nearly every jurisdiction has rejected this harsh result in favor of a "discovery rule," under which the limitations period does not begin to run until the person knows or should have known of his or her injury.  *See*, *e.g.*, *Urie v. Thompson*, 337 U.S. 163 (1949). Nor is it fair to strip the future victims of identity theft of the right to legal redress and a jury trial for failing to opt out of a class action long before they could have known of their injury.

3.    Judgment Concerning and Release of Future Claims Would Be
       Constitutionally Infirm.

The proposed settlement is constitutionally infirm insofar as the presently harmed named plaintiffs seek to bargain away not only their own rights to seek damages in a jury trial, but also the rights of unknown and unaware Class members who may not manifest any harm from

Countrywide's conduct until sometime in the future.[14]  As to the members of that "futures class," the right to trial by jury is not "preserved" as commanded by the Seventh Amendment.[15]  *See Ortiz*, 527 U.S. at 846 (a settlement is constitutionally infirm  if it "compromises [future claimants'] Seventh Amendment rights without their consent.")  The historical background of the Seventh Amendment demonstrates the importance of jury trial as a fundamental right.  Its denial renders the proposed settlement unconstitutional, and therefore unable to be approved preliminarily.

Judgments that are obtained in violation of due process are clearly subject to collateral attack.  In the context of class actions, due process requires three (3) essential proofs:

(1)     that absent members be given meaningful notice;

(2)     that named representatives adequately represent the interests of absent members at all times; and

(3)     that class members be afforded the opportunity to opt out of the class.

Because the Settlement Class seeks to include future claimants, the class action proceedings in this case can not satisfy any of these three due process requisites.  To be clear, it is the inclusion of the claims of a large number of unknown persons who may manifest injury sometime in the future which causes the failure.  As a result, the potential fix lies in the exclusion of these claims from the settlement and release, or, alternatively, a Court-ordered re-negotiation

---

[14]     This situation is caused largely by the fact that the Settling Plaintiffs have simply traded away the rights of Class members to have declaratory or injunctive relief against Countrywide.  Such relief was actively being sought by the Holmes Group at the time the settlement was announced.

[15]     "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of common law." U.S. Const., Amend vii.

of the terms of the settlement to see if a proper fix can be worked out.  Otherwise, the existing

Settlement Class cannot satisfy the requirements of due process set forth herein.

Perhaps the biggest problem with the Settling Plaintiffs' inclusion of future claimants in

the Settlement Class is the fear of collateral attack on the Judgment and Release down the road.

Americans are entitled to seek legal redress in court and to present their case before a jury to

hold companies accountable for injuries caused to them.  Those rights are guaranteed by the

Constitution.  Early in our nation's history, Chief Justice Marshall declared:

> [T]he very essence of civil liberty certainly consists in the right of
> every individual to claim the protection of the laws, whenever he
> receives an injury.  One of the first duties of government is to
> afford that protection.

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803).

In this case, however, the Barnow Group and Countrywide propose to bargain away the

constitutional rights of persons who may suffer identity theft in the future.  They seek this

Court's approval to trade away the constitutional rights not only of those who suffered actual

losses up until the date of this Court's final approval – who will be given a choice to opt out –

but also the rights of all those who would suffer losses in the future.  In exchange, they propose a

settlement that does not offer any compensation for their traded rights.  Because the settlement

violates fundamental constitutional rights, this Court must reject the settlement, as proposed.

While the proponents of the settlement have argued that the law favors settlements and

that therefore, presumably, without the authority to bind all class members Countrywide will not

enter into such a global settlement, that is no reason to curtail the constitutional rights of the

"future class."  Administrative efficiency, though laudable, does not trump the Seventh

Amendment.  The Supreme Court emphasized this point in holding that Congress may not

32

transfer legal claims from Article III courts to non-jury bankruptcy tribunals:

> It may be that providing jury trials in some fraudulent conveyance actions... would impede the swift resolution of bankruptcy proceedings and increase the expense of Chapter 11 reorganizations.  But 'these considerations are insufficient to overcome the clear command of the Seventh Amendment.'

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 63 (1989), *quoting Curtis v. Loether*, 415 U.S.

189, 198 (1974).  As then-Justice Rehnquist once observed:

> [N]o amount of argument that the device provides for more efficiency or more accuracy or is fairer will save it if the degree of invasion of the jury's province is greater than allowed in 1791.  To rule otherwise would effectively permit judicial repeal of the Seventh Amendment...
> [T]he civil jury was surely a burden to the English governors who, in its stead, substituted the vice-admiralty court.  But, as with other provisions of the Bill of Rights, the onerous nature of the protection is no license for contracting the right secured by the Amendment.

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 346 (1979) (Rehnquist, C.J., dissenting).

As set forth above, in determining whether the proposed settlement meets the due process requirement of adequacy of representation under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the Court must apply the principles enunciated by the Supreme Court in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  According to these cases, the Rules Enabling Act plainly precludes a court from applying Rule 23 in a manner that violates the jury rights of future victims.  As described above, the right to trial by jury is deeply rooted in our historical tradition.  The Rules Enabling Act provides that the rules of civil procedure shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury as at common law and as declared by the

Seventh Amendment to the Constitution.  28 U.S.C. § 2072 (1958 ed.) (emphasis added).[16]

The Supreme Court has observed that a "[c]ourt is justified in saying that there has been a failure of due process only in those cases where it cannot be said that the procedure adopted fairly insures the protection of the interests of absent parties who are to be bound by [the judgment]."  *Hansberry v. Lee*, 311 U.S. 32, 42 (1940).  This is exactly such a case.

In sum, a class action settlement that purports to extinguish the jury rights of unknown class members who will manifest injury in the future but without reasonable notice or the opportunity to opt out, as here, cannot provide those class members with the essential procedural guarantees of due process.  They cannot be bound by the judgment.

### F.  The Negative Reaction of Absent Class Members

The reaction of absent class members is a factor for this Court to consider in apprising whether the proposed settlement is fair, reasonable and adequate.  Indeed, it is the absent class members who would potentially be bound by the settlement and for whom this Court owes the utmost fiduciary duty.   Approximately fifty-two (52) absent class members have already notified the Court of either their objections to the proposed settlement or their intention to opt-out of the settlement.  Because the Court *sua sponte* sealed the various opt-out and objection letters, and are they are not available for the Holmes' Group to review, it is left solely to the Court to assess the reasonableness of those objections.  However, the few objections that were made public provide a fair assessment of the many inadequacies of the proposed settlement and should therefore inform the Court's assessment.

---

[16]     The Rules Enabling Act was amended in 1988, and the specific reference to the jury right was omitted. The clause apparently was deemed superfluous; Congress could not and did not authorize rules of procedure that violate the Seventh Amendment. "[T]he Constitution needs no statute to remind us that neither a rule nor a statute can upset a constitutional requirement." David D. Siegel, Commentary on 1988 and 1990 Amendments, reprinted in 28 U.S.C.A. § 2072 (1991).

For example, absent class members Terri and Daniel Limon accurately pointed out to the Court in their letter objection the inadequacies of the settlement for failing to deal with the potential for future harm.  They state, in relevant part:

> We appreciate the fact that Countrywide has extended a two (2) year credit monitoring program to monitor the activity on our accounts; however, this is grossly inadequate and *we know that much damage can occur later on.*  We have not incurred any identification theft expenses at this time, but *are fully aware that our information may have been transferred to other individuals and can still be circulating…* We do not wish to participate in the proposed settlement unless there are assurances and written confirmation that we will be protected should anything arise as a result of Mr. Rebollo's deliberate actions anytime in the future.  We are simply asking that Countrywide continue to supply us with credit report monitoring [ ] indefinitely and should any expense(s) arise as a result of [Rebollo] deliberate action(s),[12] Countrywide would be required to reimburse and compensate us for such expenses.

Limon Letter, at Dkt. No. 117.

Likewise, Alex and Maria Lourdes Ayson, also indicated their displeasure with the two (2) years of credit monitoring offered as part of the settlement and voiced their sentiment that ten (10) years would be more reaonable.  The Ayson's state "just because our information has not been used yet, it does not mean that 5 years down the road, someone or somebody won't decide to use then."  *See* Ayson Letter at Dkt. No. 124.

Finally, absent class member Carol Ferguson voiced her objections to the settlement as follows:

> To [sic] years of credit monitoring will not guarantee the full protection of my identity as this information can be used at any time up until the time of my death which can cause slander of my name, extensive damage to my livelihood as well as my family's, and cost thousands to repair.  There should be free credit monitoring for all three bureaus for life.

Ferguson Letter at Dkt. No. 121.

---

[12] The Limon letter, poignant and accurate as it is, fails to address their exposure to identity theft from other data breaches aside from Rebollo's that have been folded into the settlement.

The above referenced letters from absent class members should inform this Court's assessment of the fairness, reasonableness and adequacy of the proposed settlement.

**III.    CONCLUSION**

For the foregoing reasons, the Holmes Group, by and through their undersigned counsel, hereby object to the final approval of the proposed class action settlement and respectfully request that this Court not grant final approval of the proposed settlement and thereby restore the parties to their respective positions in the Litigation.

Respectfully Submitted,

Dated: June 24, 2010                          /s/_____
Donald E. Haviland, Jr., Esquire
Michael J. Lorusso, Esquire
HAVILAND HUGHES, LLC
111 South Independence Mall East,
Suite 1000
Philadelphia, PA 19106
(215) 609-4661 telephone

ATTORNEYS FOR THE HOLMES GROUP

## CERTIFICATE OF SEVICE

I hereby certify that on this date, June 24, 2010 I caused a true and correct copy of the The Holmes Group's Objection to the Final Approval of Proposed Class Action Settlement to be served on all counsel of record via ECF filing.

_/s_____
Donald E. Haviland, Jr., Esquire
Haviland Hughes, LLC
111 South Independence Mall East,
Suite 1000
Philadelphia, PA 19106
(215) 609-4661 telephone