**FILED**
JEFFREY A. APPERSON, CLERK

JUN 2 8 2010

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION

| | |
|---|---|
| IN RE: COUNTRYWIDE FINANCIAL CORP. CUSTOMER DATA SECURITY BREACH LITIGATION | Case No. 3:08-MD-01998-TBR MDL No. 1998 Honorable Thomas B. Russell |

**THE WEBER-SILVERBACH PLAINTIFFS' MEMORANDUM OF LAW
IN OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT**


# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................1

I.  OVERVIEW ......................................................................................2

II.  STANDARD OF REVIEW ..................................................................4

III.  THE PROPOSED SETTLEMENT OFFERS NO SENSE OF SECURITY .............6

    A.  The Proposed Settlement Agreement Terms Fail to Offer Meaningful Individual Relief ..............................................................................7

        1.  Experian "Coverage" Duration and Express Exclusion of Banks Renders Relief Illusory ...........................................................8

        2.  Two years' credit monitoring is inadequate............................8

        3.  Countrywide $50,000 policy unfairly burdens class members. .........9

    B.  The Proposed Relief Is Fatally Defective. ....................................9

        1.  The Proposed Settlement Agreement Includes No Specifications for the Experian Credit Monitoring Protection Beyond the Agreement Text. .............10

        2.  The proposed settlement's definition of "Private Information" is fatally defective because it denies class membership and recovery to deserving individuals. ............................................................................10

        3.  Limiting relief solely to recipients of the Countrywide letter renders the proposed settlement agreement defective. ...........................13

        4.  The definitions of "Identity Theft" render the proposed settlement agreement defective. ...........................................................15

        5.  The proposed relief fails to address identity theft harms. ...............15

IV.  RELEVANT PROCEDURAL HISTORY ..........................................16

    A.  On December 16, 2008, the Weber/Silverbach Plaintiffs Obtained a Court Order Opening Discovery in the California State Action and Propounded Countrywide With Complete Class and Merits Discovery............18

    B.  The California Court Endorsed the Weber-Silverbach Merits. ..........22

    C.  Countrywide Entered a Hasty Settlement to Avoid Certain Certification in California. ..........................................................................27

    D.  The California Court Confirmed the Value of the Case with the Bench as Factfinder..........................................................................28

V.  CONCLUSION ...............................................................................29

# TABLE OF AUTHORITIES

## Cases

*Caudle v. Towers, Perrin , Forster & Crosby, Inc.* ........................................................ 26

*Cent. Delta Water Agency v. United States* (2002) 306 F.3d 938, 947 .......................... 26

*Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123* (8th Cir. 1975) ......................... 4

*Hodge v. Superior Court* (2006) 145 Cal.App.4th 278 ................................................. 24

*Kahle v. Litton Loan Servicing LP* ............................................................................... 26

*Malcolm v. Davis* 706 F.2d 426, 433 (2d Cir. 1983) ..................................................... 5

*Pisciotta v. Old Nat'l Bancorp.* F.3d 629, 634 (7th Cir.2007). ...................................... 25

*Reynolds v. Beneficial Nat. Bank* 288 F.3d 277 , 279-280 (7th Cir. 2002) ..................... 4

## Statutes

Federal Rule of Civil Procedure 23(e) ........................................................................... 5

## THE WEBER-SILVERBACH PLAINTIFFS' MEMORANDUM OF LAW IN OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

Plaintiffs Daniel Weber, Spencer Silverbach, Vicki Silverbach, and Shabeer Thomas ("Weber-Silverbach Plaintiffs"),[1] through their undersigned attorneys, submit their Objection (the "Objection") to the proposed settlement agreement (Dkt. 7), as subsequently amended, and the revised notice plan. In support of their Objection, the Weber-Silverbach Plaintiffs state as follows.

## I.   OVERVIEW

Defendant, Countrywide Financial Corporation ("Countrywide") is one of the country's largest home mortgage lenders. To induce consumers to enter into loan transactions, Country-wide sought to address consumers' concerns that personal information they provided to Country-wide might fall into the wrong hands or be misused. Countrywide informed clients, *in writing*, that it "strives to safeguard" their information, including by "setting policies and procedures for carefully handling your information"; "limiting employee access to sensitive information"; "protecting against unauthorized access to customer data using data encryption; authentication, and virus detection technology"; "auditing company security practices"; and "conducting background checks on all employees and providing privacy training." In addition, home loan clients received Countrywide's assurance, *in writing*, that it maintained "physical, electronic, and procedural safeguards that comply with federal standards to store and secure information about you from unauthorized access, alteration, and destruction," adding, "Our control policies, for example, authorize access to client information only by individuals who need access to do their work."

---

[1] These individuals may be contacted in care of the undersigned counsel of record. The documents evidencing their membership in the class are collected in Exhibit 1 hereto.

Countrywide failed to fulfill these commitments. It did not provide the promised protections that, like the systems they protect, can only function properly if implemented in a coordinated fashion, encompassing information security technology, human resource management, and compliance oversight. Countrywide's protection systems did not function properly. An employee who had worked for Countrywide for over nine years accessed Countrywide's unprotected client databases, including databases in business units besides his own, downloading the personal information of millions of clients' personal information, and selling it on the black market. For years, he did so on a weekly basis. Starting on August 2, 2008, Countrywide informed Plaintiffs that their personal information had been downloaded by this employee and disseminated through the black market.

The Settling Plaintiffs (as that term is defined in the Court's Order of June 30, 2009 (Dkt. 41) have adopted a Countrywide-style approach to the settlement process and measures designed to inform the Court and protect the class: Here is a case in which confirmatory discovery regarding the Countrywide breach is central to determining what happened, to how many people, and to which people. It is a case in which confirmatory discovery regarding Countrywide's current and planned security remediation efforts is central to the interests of the class and other consumers who would be affected by a similar breach in the future. It is a case in which such confirmatory discovery can be properly evaluated only by individuals with specialized competence in the technologies and security management practices at issue.

Yet the Settling Plaintiffs have been willing to settle for a couple of boxes of largely irrelevant documents and depositions of Countrywide personnel offering the same kind of assurances Countrywide offered before. Further, they are willing to bolster their pre-discovery settlement proposal by buying into the claim that this breach was an isolated circumstance caused by a

rogue actor who found a "software glitch." Finally, they claim to have fulfilled confirmatory discovery obligations. (Dkt. 61.)

However, the Settling Plaintiffs provide no basis for believing they have fulfilled those obligations. Although these discovery matters require special competence, the Settling Plaintiffs have not attested to possessing or having engaged any independent party with such competence. In a data breach case, the Settling Plaintiffs proposed to dispose of the matter without understanding the breach or the prior and continuing security practices of those on whose watch it occurred. Solely from the standpoint of this confirmatory discovery, the settlement process and the proposed settlement are unreasonable, inadequate, and unfair to the class—particularly in light of their effect on who is adjudged to be in the class, be notified, and be affected by Countrywide's conduct going forward.

Finally, to compound matters for those persons included in the class, the individual relief provisions of the settlement, as previously argued by the Weber-Silverbach Plaintiffs, were and are inadequate and illusory.

## II.      STANDARD OF REVIEW

When evaluating a class action settlement proposal, the District Court owes a fiduciary responsibility to the potential class members to ensure that the proposed settlement is fair, adequate, and reasonable. "Under Rule 23(e) the district court acts a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 123 (8th Cir. 1975). This is a heightened standard applicable to the settlement phase of class actions that require careful scrutiny. *Reynolds v. Beneficial Nat. Bank* 288 F.3d 277, 279-280 (7th Cir. 2002).

Rule 23(e) of the Federal Rules of Civil Procedure prescribes the general standards for approval of a class action settlement:

> The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> > (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
> >
> > (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
> >
> > (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

Pre-certification settlements generally are held to a higher degree of scrutiny in assessing their fairness. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). Courts approving such settlements have focused on the "vigor with which the case was prosecuted." *Malcolm v. Davis* 706 F.2d 426, 433 (2d Cir. 1983).

In the matter at hand, the Court has been provided with virtually no evidence that the case was prosecuted with any level of vigor or that the proposed settlement agreement is fair, adequate and reasonable. The settlement discussions took place before any substantive discovery, and involved only a handful of the parties involved. The parties involved in negotiating the proposed settlement were not privy to many of the substantive issues pertaining to the merits of the case and the scope of the damages. When heightened scrutiny is applied to a settlement negotiated at such an early stage of the proceedings, pre-discovery, and followed by confirmatory discovery of little value or assurance to the class, these factors weigh against final approval of the settlement.

## III.   THE PROPOSED SETTLEMENT OFFERS NO SENSE OF SECURITY

There is nothing in the record that reflects the Settling Plaintiffs have sought expert opinion that supports the reasonableness of the inclusion or omission of security-related injunctive relief or the probative value of security-related confirmatory discovery.

Critically, the proposed settlement does not provide class members an accounting of number and identities of persons affected and types of information stolen. (*See* Hendricks Dec., Dkt. 61-3 at ¶ 42, p. 11). Nor does the injunctive relief provide any accounting of the failed technological and managerial security environment that led to the breach or any independent validation of remedial measures already implemented or yet to be taken, so that the proposed settlement fails to provide any meaningful basis for confidence in Countrywide's efforts to address the root cause of the breaches at issue. (*Id.* at ¶ 43, p. 11; ¶¶ 54-55, p. 14).

These omissions correspond to the fatal deficiencies of the confirmatory discovery process in this matter. They call into question the fundamental soundness of the settlement process, given the absence of review, validation, and comment on confirmatory discovery by qualified and independent information security personnel. As explained in the attached Declaration of Michael Murray, Exhibit 2 hereto ("Murray Dec."), Mr. Murray states:

> [I]n the event of a breach such as that described in the documents I have reviewed in this case, the following actions are standard practice to assess the cause, scope, and effect of the breach:
>
> 1)   a forensic assessment performed by a highly-trained and qualified expert to determine the scope and breadth of the current breach;
>
> 2)   an analysis (usually based on standards such as ISO-27001/27002 or equivalent) of the current state of information security risk within the organization performed by a qualified, independent and unbiased third-party;

    3) an action plan for remediation and management of the risks identified;

    4) management and tracking that shows that these risks have in fact been remediated; and

    5) plans for ongoing assessment of potential new risks within the environment.

The execution of these steps is particularly critical in an environment in which employees have broad access to corporate-wide information assets. One major focus of step 2 is to understand the breadth of access and potential risks posed by that access across the enterprise.

These five steps, or actions that are substantively similar, are required in all situations to properly assess and detail the scope and breadth of a breach and prevent future breaches from occurring.

Exh. 2, ¶¶ 6-8 (formatting modified).

### A. The Proposed Settlement Agreement Terms Fail to Offer Meaningful Individual Relief

The proposed settlement provides relief for only a small fraction of the putative class (*see* Hendricks Dec., Dkt. 61-3¶ 53, p. 14), and what relief it provides is sorely inadequate and fatally defective, as discussed in detail below. For the numerous remaining class members, the agreement fails to provide any injunctive relief whatsoever, particularly for those whose privacy has been compromised due to Countrywide's conduct, but who suffer no identity theft losses during the defined relief period.

As noted by Mr. Hendricks:

[M]uch of the supposed relief offered by the proposed settlement is, for all practical purposes, illusory. Worse, because of the illusory nature of the proposed settlement's provisions on "reimbursement" and "guarantee," the proposed settlement has the potential to mislead consumers by leading them to believe they are entitled to benefits which, in reality, they'd be unlikely to enjoy.

(Dkt. 61-3, *Id.* at ¶ 1, p. 1).

### 1.   Experian "Coverage" Duration and Express Exclusion of Banks Renders Relief Illusory

The Experian coverage is inadequate for at least two reasons. First, the $25,000 reimbursement coverage is, inexplicably, limited to two incidents per year.

Second, the Million-Dollar Guarantee excludes "[d]amages or losses of any type for which the credit card company, bank, creditor, etc. is legally liable," or "resulting from fraudulent charges or withdrawal of cash from a debit or credit card or financial/bank/investment account." (*See* Proposed Settlement, Ex. 1)

This is troubling, given that Countrywide is a bank. Even if Countrywide were not to take advantage of the bank exclusion, this language still has the effect of leaving a victim uncompensated if a financial institution or creditor refuses to compensate a consumer for a fraudulent charge.

Finally, the exclusion reveals the illusory character of relief: the Million-Dollar Guarantee covers "stolen" funds, yet because of the likelihood that losses due to stolen funds are precisely the sort of losses addressed by financial institution, there are unlikely to be any stolen funds for the Guarantee to be called on to cover. (*See* Hendricks Dec., Dkt. 61-3 at ¶ 51(b), p. 13).

### 2.   Two years' credit monitoring is inadequate.

The proposed settlement offers a mere two years of credit monitoring. As set forth in the preceding section, credit monitoring itself is insufficient to address the needed and available avenues for identity theft detection. Further, given the fact that the personal information taken is of a type likely to be used in identity theft (particularly Social Security numbers), what is known about the perpetrators, and current trends in identity theft, the restriction of what little monitor-

ing is offered to a two-year time window is simply inadequate. (Hendricks Dec., Dkt. 61-3 at ¶ 1, p. 1; ¶¶ 16-19, p. 6).

### 3.    Countrywide $50,000 policy unfairly burdens class members.

The Countrywide $50,000.00 reimbursement offering is supposedly available to those New York and Puerto Rico residents who cannot legally take advantage of Experian's coverage, but this, too is illusory. Unlike claimants under the Experian coverage, victims seeking compensation from Countrywide must prove to Countrywide that losses suffered were "more likely than not" due to the breach. (See Proposed Settlement Agreement, §IV 2.1(b)(I).) This difference in burden of proof places New York and Puerto Rico class members at a disadvantage in attempting to avail themselves of what subset of relief is ostensibly offered to them under the proposed settlement.

Other infirmities in Countrywide's coverage include:

coverage for losses, presumably out-of-pocket losses, when such losses are not the primary damage arising from identity theft (see Hendricks Dec., Dkt. 61-3 at ¶ 52(a), p. 13)

reimbursement only for an "actual, documented loss" directly attributable to the Countrywide breaches–an extraordinary proof hurdle and significant administrative burden (Id. at ¶ 52(b), p. 14)

all of which are subject to review and approval by Countrywide, itself, with only arbitration as a recourse (Id. at ¶ 52(d), p. 14)

and no coverage whatsoever if another potential source of coverage has already denied the claim, whether or not the denial was justifiable.

### B.    The Proposed Relief Is Fatally Defective.

The Weber-Silverbach Plaintiffs have previously submitted the Declaration of Evan Hendricks and refer to it again in support of this Objection on the grounds of the inadequacy of the relief offered. (Dkt. 61-3).

1. **The Proposed Settlement Agreement Includes No Specifications for the Experian Credit Monitoring Protection Beyond the Agreement Text.**

The proposed settlement agreement includes several components designated as being fulfilled through third-party products. In the case of the Experian $25,000 Identify Theft Reimbursement Coverage and the Experian $1 Million Triple Advantage Premium Guarantee, specifications for those products are attached to the proposed settlement agreement.

For the Credit Monitoring Protection package to be provided by Experian, however, the settlement proponents provided no documentation setting forth the particular terms of the product.

Further, despite the fact that Experian has been offering these or similar products in the marketplace, the proponents of the settlement agreement provided no data from Experian to illustrate the success of the monitoring it has provided and evidence of customer satisfaction with its products and claims processes.

2. **The proposed settlement's definition of "Private Information" is fatally defective because it denies class membership and recovery to deserving individuals.**

The proposed settlement limits the definition of "Private Information" to personal information contained in "mortgage applications" and "mortgage-related documents." This unjustified limitation has the effect of excluding from the settlement class those individuals whose non-mortgage information was compromised and denying recovery to class members whose non-mortgage information is used to perpetrate identity theft.

The proposed settlement's definition of "Private Information" is presumably intended to encompass the personal data compromised while it was under Countrywide's control. However, the definition limits the scope of Private Information to information in mortgage applications and

mortgage documents. As discussed below, this limitation is inconsistent with available information about Countrywide's general business practices and the Rebollo breach.

> (a)   *Limiting "Private Information" to mortgage documents is inconsistent with Countrywide's business practices.*

By limiting the definition of "Private Information" to mortgage applications and mortgage documents, the settlement proponents exclude a large volume of sensitive, personal information that Countrywide publicly admits that it acquires from third parties. "Mortgage application" and "mortgage documents," not further defined in the proposed settlement, surely refer to customers' actual loan applications and agreements.

However, Countrywide acquires information about customers from numerous third-party sources, including credit reporting agencies; data brokers; census data providers; business associates; property records, including appraisals and purchase contract information; employers; and customers' other financial institutions.

There is no information to support the exclusion of non-mortgage documents from the definition of "Private Information" and, as discussed below, the facts of the case offer good reasons to view the omission of other sensitive information as a serious defect.

> (b)   *Limiting "Private Information" to mortgage documents is inconsistent with available information about the Rebollo breaches.*

Rene Rebollo, the perpetrator of the breaches giving rise to the instant claims, had access to many Countrywide Home Loan databases in the scope of his employment, according to the affidavit of FBI Special Agent Richard P. Ryan. When Rebollo downloaded corporate data for identity theft purposes, he obtained it by accessing various corporate networks and databases, many of which contained sensitive information such as Social Security numbers. (*See* Ryan Aff.

At ¶ 4). He specifically stated that he accessed "AS400" and "Accuate" [sic] databases. (*Id.* at ¶ 6).

While the AS/400 is a general-purpose business computer first introduced by IBM in 1988,[2] Actuate is commercially available, enterprise software utilized by Rebollo's division, Full Spectrum Lending, "to create a centralized reporting portal with a single point of entry for all managers to access key reports"[3] containing "a unified view of customer interactions across all products and service offerings."[4]

In Countrywide's case, "all products and service offerings" consisted of more than mortgages. It included insurance products, such as homeowners, life, auto, disability, home warranty and other insurance products; investment services, such as investment planning, mutual funds, IRAs, Roth IRAs, IRA and 401(k) rollovers, stocks, bonds, and fixed and variable annuities; and banking products, such as savings, certificates of deposit, and money market accounts.[5]

In sum, nothing in the public record or information offered by the settlement proponents supports the proposition that Rebollo limited his theft of data to mortgage applications and mortgage documents for loans acquired by Countrywide from other lenders. The record of the FBI investigation indicates that Rebollo accessed multiple networks housing multiple databases and used software that synthesized customer data from the databases of multiple lines of business lines. Since Countrywide's business includes numerous non-mortgage offerings, the proposed settlement's definition of "Private Information" defectively encompasses only a subset of the information that was subject to compromise.

---

[2] www-03.ibm.com/ibm/history/exhibits/vintage/vintage_4506VV1004.html
[3] www.actuate.com/company/news/press-release/?articleid=7263, Aug. 23, 2004
[4] www.actuate.com/company/news/press-release/?articlid=5436, June 14, 2004
[5] Countrywide Privacy Policy, "How we obtain and use information," http://my.countrywide.com/privacy.aspx.

(c)   *The limitation of the definition of "Private Information" constitutes a major defect in the proposed settlement because the definition affects the scope of class membership and the availability of relief.*

The effect of the proposed definition of "Private Information," in the context of the proposed class definition, is to inappropriately restrict membership in the class. Persons whose information resided in the database for one of Countrywide's non-mortgage products or services, or whose information Countrywide acquired for purposes of marketing to prospective customers, would not fall within the class definition.

In addition, persons who do qualify for inclusion in the class might find themselves barred from relief if they were to suffer identity theft arising from use of their non-mortgage-related information, such as insurance records. (*See*, e.g., Settlement Agreement, Terms, §IV, 2.1(b)(i)(1), stating that Countrywide's offer of an additional $50,000 in coverage is limited to "actual, documented, unreimbursed loss which resulted from identity theft caused by the alleged theft of the Private Information")

To further confuse matters, the definitions of "Settlement Class," "Settlement Class Member," and "Private Information" form a set of circular references: "Private Information" is defined as personal information regarding Settlement Class Members, but "Settlement Class" is defined as including persons who provided Private Information to Countrywide.

### 3.   Limiting relief solely to recipients of the Countrywide letter renders the proposed settlement agreement defective.

In addition to the defects of the proposed settlement's definition of the Settlement Class, the settlement terms further narrow the effective class by limiting certain relief to persons who received the Countrywide breach notification letter. (*See*, e.g., Memorandum in Support of Settlement, §II(1), p. 4, regarding Credit Monitoring Protection; §§II(4), IV(c), regarding expense

reimbursement by Countrywide.) This limitation is predicated on the unsubstantiated assumption that Countrywide successfully identified and sent letters to all potential victims of the Rebollo breaches.

However, although the settlement proponents assert their belief that the personal information of approximately 2.4 million individuals was compromised in the breaches (Memorandum in Support of Settlement, §I, p. 2), Countrywide has provided no internal or independent assessment validating the accuracy of that number. It took Countrywide three full months to identify and notify those individuals, who represent approximately 10 percent of the number of loans produced by Countrywide from fiscal years 2003 to 2007 (*see* Countrywide Financial Corporation, SEC Form 10-K for Fiscal Year ending Dec. 31, 2008, http://idea.sec.gov/Archives/edgar/data/25191/000104746908002104/a2182824z10-k.htm.

Further, even if 2.4 million were an accurate total of the affected loan customers, there is no reliable basis to assume Rebollo strictly limited his theft to customers of Countrywide's home loan products (*see* section D(1)(b), above). Nor does Countrywide purport to have notified individuals who were not the named customers, but whose personal information, as family members, payors, business associates, or personal guarantors, were the subjects of personal information accessed by Rebollo.

Significantly, the settlement proponents have offered no reason to believe a company grown large through acquisitions—having managed and monitored its acquired IT assets as poorly as Countrywide did—would retain the necessary log files and be capable of executing a computer forensics investigation to confidently identify a major theft of data that it previously failed to detect for two years.

Countrywide has offered no data regarding identity claims of which it has been notified. Were Countrywide to provide this information, it might help to support of challenge the company's claims that it has identified and notified affected consumers.

Thus, it would be premature, at best, to limit relief to the victims identified and notified by Countrywide during the three months following the arrest of Rebollo.

### 4. The definitions of "Identity Theft" render the proposed settlement agreement defective.

The Federal Trade Commission defined "identity theft" as follows: "Identity theft occurs when someone uses your personally identifying information, like your name, Social Security number, or credit card number, *without your permission*, to commit fraud or other crimes." www.ftc.gov/bcp/edu/microsites/idtheft/consumers/about-identity-theft.html (emphasis added).

However, the proposed settlement agreement defines "Identity Theft" as "the use of a Settlement class member's name, address, Social Security number (SSN), bank, or credit card account number, or other identifying information *without the Settlement Class Member's knowledge* to commit fraud or other crimes." (*See* Proposed Settlement Agreement, §IV, 1.10, p. 6.)

It is patently unfair to preclude recovery in cases in which the victim learns of the use of personal information, has not authorized it, and is unable to prevent it.

### 5. The proposed relief fails to address identity theft harms.

As noted by Plaintiff's expert, Evan Hendricks, "[I]dentity theft has worsened in the sense that it has evolved beyond credit to other important spheres." (*See* Hendricks Dec., Dkt. 61-3 at ¶ 26, page 8) These include criminal identity fraud (*Id.* at ¶ 27-31, p. 8), medical identity theft (*Id.* at ¶ 32-33, p. 9), and taxes and benefits identity theft (*Id.* at ¶ 34, p. 9).

In Mr. Hendricks' opinion, the facts of this case indicate that the risk of identity theft of all types is far from remote (Id. at ¶¶ 35-39, pp. 9-10). Yet, despite the commercial availability of

meaningful resources to detect and mitigate non-credit-related identity theft harms (*Id.* at ¶ 48(c), p. 12), the proposed settlement's reliance on credit monitoring falls woefully short of needed relief that could be offered to the putative class. In particular, credit monitoring does not include monitoring of public records nor do the other proposed relief components provide meaningful assistance in the significant task of sanitizing public records polluted by identity theft. (Dkt. 61-3, *Id.* at ¶ 1, p. 1; ¶ 23, p. 7; ¶ 48, p. 12).

## IV.    RELEVANT PROCEDURAL HISTORY

It is important to note that the representations from Settling Plaintiffs and Countrywide—whether it be in the Motion for Final Approval or the February 2009 hearing—have been inconsistent with what has transpired in the Weber/Silverbach Nationwide Class Action lawsuits that were pending in the California State Court until just recently. For example, in this MDL, the Settling Parties and the Countrywide Defendants have no qualms with "buying a pig in a poke" and settling now and *maybe* finding out what the value of the case is through later discovery. However, in the Weber/Silverbach cases, Countrywide, the Court, and Plaintiffs in unison agreed that discovery must be conducted so that the parties can appropriately value the case.

Another example is that in this MDL, Countrywide has taken the position—and the Settling Plaintiffs apparently acquiesce—that this case will be dismissed by the Courts if it doesn't settle for lack of cognizable damages, no property loss, or possibly no breach of duty. However, in the Weber/Silverbach action, the California Court considered those types of motions and soundly rejected them saying that "there is a property interest in your privacy information," "you probably have standing," and "there is a property loss . . . *certainly the damages are there.*" *Id.* at Dkt. 61-6 at 7:24-25, 9:5, and 9:10-13. The Court went on to say, "There's a duty. *You will lose that one.*"

In the MDL, Countrywide seems to be arguing that the liability, causation, and resulting damages are potentially individual issues which may not even be appropriate for class certification. Contrary to such arguments, the California Court in Weber/Silverbach rejected the very same arguments and said that nationwide class certification was a "lay-down cinch."

In the MDL, Countrywide argued that it would rather file Motions to Dismiss than to allow several months of discovery to proceed. In the Weber/Silverbach actions, the Court ordered that discovery on class and merit issues proceed immediately *without objections from Countrywide*. As a result, Plaintiffs had served extensive discovery and noticed numerous depositions. Countrywide, on the other hand, had already compiled documents and was about to start production. Countrywide had also identified qualified persons within the company to testify on various issues the Court and the Plaintiffs found highly relevant in litigating the case and in determining its settlement value.

Clearly from the outset, and despite Countrywide's repeated attempts to stay the matter, Weber/Silverbach was proceeding on a fast-track toward class certification and a trial on the merits. Procedurally and substantively, Countrywide was forced to reckon with its wrongdoing California.

The chronology of events confirms that, given this unfavorable procedural posture in California, counsel for Countrywide began negotiations with other counsel in the MDL in an attempt to stop the bleeding. Now, the Weber/Silverbach California State Court action has been removed to this M.D.L. proceeding and is faced with a grossly inadequate and uninformed proposed class action settlement. As discussed herein, the procedural posture of the California State Court action illuminates Countrywide's hasty attempt to manipulate an uninformed class action settlement agreement which will prejudice claimants nationwide.

**A.**  **On December 16, 2008, the Weber/Silverbach Plaintiffs Obtained a Court Order Opening Discovery in the California State Action and Propounded Countrywide With Complete Class and Merits Discovery**

At the Initial Status Conference, December 16, 2008, before Hon. Anthony Mohr in Los Angeles Superior Court, the Plaintiffs argued for an Order opening discovery. The pending matter had been designated a complex action and there was an initial stay on all discovery. Judge Mohr sided with the Plaintiffs and ordered that all class and merits discovery be immediately opened.

The Court was adamant that Countrywide must disclose details of its security policies and the data breach itself so that both sides can assess and discuss possible settlement. "I want to get into the facts and the merits. So I'm opening all discovery up as of now . . . . absolutely everything; no holds barred." (*See* Exh. 2" to the Declaration of Rahul Ravipudi, hereinafter "Ravipudi Dec" at Dkt. 61-3 p. 20:26-21:3.)

The California Court went on to further stress that the Plaintiffs' discovery should not be limited, and that "it should include everything . . . class and merits . . . I mean absolutely everything, no holds barred." *Id.*

**B.**  **It Is Undisputed Among Counsel for Countrywide, the Court, and Plaintiffs, That The Discovery Served By Plaintiffs Was Critical In Determining The Settlement Value Of The Case.**

During the Initial Status Conference, December 15, 2008, Judge Mohr posed a litany of questions regarding the class issues and merits of the case which were critical in determining the settlement value of the case. The Court stated that discovery was necessary so the parties would have the opportunity to determine the possibility of settlement. Specifically, Judge Mohr inquired, "So now the big question that will control is, what kind of procedures were in place with Countrywide?"

(*Id.* at Dkt. 61-6 at 13:13-15.) The Court continued with a laundry list of inquiries into pertinent dis-

covery issues:

> Was it the terminal? What's the problem with the terminal? Was it
> fixed? . . . Were other terminals checked? What was the normal procedure
> at countrywide for checking these terminals, from a day to day during the
> time period in question? How could this guy go two years running, pulling
> data off and not get caught when there's security people? . . . I need to *see*
> copies of the representations . . . I need to *see* the ads . . . I have to know
> exactly what is happening with this man [Rebollo]. I have to know exactly
> when these letters to the customers making the offers went out and how
> many were mailed and why weren't they all mailed at once and whether or
> not they all mailed at once and whether or not they are still being mailed
> and how that program was initiated. All of this is extremely important in
> figuring out whether this case is good or not.

The stated purpose of this discovery was to assist in the determination of the possibility

of settlement. As stated by the Court:

> I think if you get your information up front, I think you are going to be
> able to settle your case. That's why I'm pushing it . . . . [I]t's not an
> exercise in futility. You know, once you delve into this in the next seven
> days and really study it, really research it, I think you are going to be in a
> much better position to figure out whether the case can be settled.

(*Id.* at Dkt. 61-6 at 18:4-11.)

The day after the initial status conference—December 16, 2008—Plaintiffs hand served

Countrywide's counsel with Requests for Admission, Requests for Production, Special Interroga-

tories, and Form Interrogatories. (*See* Ravipudi Dec., Dkt. 61-4, Exhs. at Dkts. 61-7, 61-8, 61-9,

61-10.) These thorough discovery efforts would have addressed all issues for class certification

and all final issues regarding liability. *Id.*

In early January of 2009, Plaintiffs' counsel continued to press Countrywide on the dis-

covery issues. (*See* Meet and Confer letters, Ravipudi Dec., Exhs. at Dkt. 61-4, 61-13, 61-15.)

Numerous meet-and-confer letters were sent confirming that documents would be produced

forthwith and depositions would be set shortly thereafter. *Id.* Countrywide did not object or take

issue with discovery propounded, and simply represented that the discovery would be produced. (*See* Confirming Letter from Countrywide's Counsel Exh. 11.") In fact, Countrywide's counsel stated the discovery would be necessary in state court and in the M.D.L. to evaluate any settlement agreement. Specifically, counsel for Countrywide, Mr. Peter Kennedy, advised that producing the documents was a necessary exercise whether the case settles or not. Mr. Kennedy advised that in order for any successful settlement to take place, the Plaintiffs would need to represent to the court that they "have done their due diligence" before a Court would approve a settlement. (*See* Ravipudi Dec., Dkt. 61-4, Exh. 14.) Shortly thereafter, however, Countrywide changed its position and entered a hasty and ill-supported settlement of convenience with the Settling Plaintiffs.

On January 15, 2009, Plaintiffs' counsel Rahul Ravipudi met and conferred with counsel for Countrywide Peter Kennedy and obtained an agreement regarding the defendants' production of documents and scheduling of various Persons Most Knowledgeable Depositions. *Id.* Mr. Kennedy asked for an extension of time in which to produce formal responses to discovery, while making no mention of any potential settlement in the M.D.L. *Id.* Plaintiffs' counsel granted an extension to February 19, 2009, based on Mr. Kennedy's agreement and representation that the document production would "be complete" by that time. (*See* Confirming Letter from Countrywide's Counsel, Dkt. 61-13.) Given the Court's strong direction that Countrywide must "get their information on the table," Counsel for Countrywide agreed that documents would be produced immediately on a "rolling basis," once the terms of the Protective Order were solidified. Several days later a Protective Order was agreed to and Countrywide confirmed that the documents would be produced immediately. (*See* Protective Order Exh. 12, and Confirming Letter from Countrywide's Counsel, Dkt. 61-13.)